Thomas R. Califano, Esq.
Richard A. Chesley, Esq. (admitted *pro hac vice*)
**DLA PIPER LLP (US)**
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile:  (212) 335-4501
thomas.califano@dlapiper.com
richard.chesley@dlapiper.com

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ORION HEALTHCORP, INC. | : | Case No. 18-71748 (AST) |
| CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. | : | Case No. 18-71749 (AST) |
| NEMS ACQUISITION, LLC | : | Case No. 18-71750 (AST) |
| NORTHEAST MEDICAL SOLUTIONS, LLC | : | Case No. 18-71751 (AST) |
| NEMS WEST VIRGINIA, LLC | : | Case No. 18-71752 (AST) |
| PHYSICIANS PRACTICE PLUS, LLC | : | Case No. 18-71753 (AST) |
| PHYSICIANS PRACTICE PLUS HOLDINGS, LLC | : | Case No. 18-71754 (AST) |
| MEDICAL BILLING SERVICES, INC. | : | Case No. 18-71755 (AST) |
| RAND MEDICAL BILLING, INC. | : | Case No. 18-71756 (AST) |
| RMI PHYSICIAN SERVICES CORPORATION | : | Case No. 18-71757 (AST) |
| WESTERN SKIES PRACTICE MANAGEMENT, INC. | : | Case No. 18-71758 (AST) |
| INTEGRATED PHYSICIAN SOLUTIONS, INC. | : | Case No. 18-71759 (AST) |
| NYNM ACQUISITION, LLC | : | Case No. 18-71760 (AST) |
| NORTHSTAR FHA, LLC | : | Case No. 18-71761 (AST) |
| NORTHSTAR FIRST HEALTH, LLC | : | Case No. 18-71762 (AST) |
| VACHETTE BUSINESS SERVICES, LTD. | : | Case No. 18-71763 (AST) |
| MDRX MEDICAL BILLING, LLC | : | Case No. 18-71764 (AST) |
| VEGA MEDICAL PROFESSIONALS, LLC | : | Case No. 18-71765 (AST) |
| ALLEGIANCE CONSULTING ASSOCIATES, LLC | : | Case No. 18-71766 (AST) |
| ALLEGIANCE BILLING & CONSULTING, LLC | : | Case No. 18-71767 (AST) |
| PHOENIX HEALTH, LLC | : | Case No. 18-71789 (AST) |
| NEW YORK NETWORK MANAGEMENT, L.L.C. | : | Case No. 18-74545 (AST) |
| | : | |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------------------------x
:

| | | |
|---|---|---|
| ORION HEALTHCORP, INC. | : | Adv. Pro. No. _____ |
| CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. | : | |
| NEMS ACQUISITION, LLC | : | |
| NORTHEAST MEDICAL SOLUTIONS, LLC | : | |
| NEMS WEST VIRGINIA, LLC | : | |
| PHYSICIANS PRACTICE PLUS, LLC | : | |
| PHYSICIANS PRACTICE PLUS HOLDINGS, LLC | : | |
| MEDICAL BILLING SERVICES, INC. | : | |
| RAND MEDICAL BILLING, INC. | : | |
| RMI PHYSICIAN SERVICES CORPORATION | : | |
| WESTERN SKIES PRACTICE MANAGEMENT, INC. | : | |
| INTEGRATED PHYSICIAN SOLUTIONS, INC. | : | |
| NYNM ACQUISITION, LLC | : | |
| NORTHSTAR FHA, LLC | : | |
| NORTHSTAR FIRST HEALTH, LLC | : | |
| VACHETTE BUSINESS SERVICES, LTD. | : | |
| MDRX MEDICAL BILLING, LLC | : | |
| VEGA MEDICAL PROFESSIONALS, LLC | : | |
| ALLEGIANCE CONSULTING ASSOCIATES, LLC | : | |
| ALLEGIANCE BILLING & CONSULTING, LLC | : | |
| PHOENIX HEALTH, LLC | : | |
| NEW YORK NETWORK MANAGEMENT, L.L.C., | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| ROBINSON BROG LEINWAND GREENE GENOVESE | : | |
| & GLUCK, P.C., A. MITCHELL GREENE, and ADAM | : | |
| GREENE, | : | |
| | : | |
| Defendants. | x | |

---------------------------------------------------------------------

## COMPLAINT AND OBJECTION TO PROOFS OF CLAIM

Orion HealthCorp, Inc. ("Orion") and its affiliated debtors and debtors in possession (collectively, the "Debtors"), by and through their undersigned counsel, DLA Piper LLP (US), allege for their complaint against Robinson Brog Leinwand Greene Genovese & Gluck, P.C., A. Mitchell Greene, and Adam Greene as follows:

## NATURE OF ACTION

1.    This is an action for legal malpractice, aiding and abetting breach of fiduciary duty, breach of fiduciary duty, and unjust enrichment, against the Debtors' former outside general counsel, Robinson Brog Leinwand Greene Genovese & Gluck, P.C. ("Robinson Brog"), and two of its partners, A. Mitchell Greene ("A.M. Greene") and Adam Greene ("A. Greene," together with A.M. Greene, the "Individual Defendants").  Robinson Brog and the Individual Defendants shall be referred to collectively as the "Defendants."  In addition, through this action the Debtors seek disallowance or subordination of a number of secured and priority proofs of claims asserted by Robinson Brog in the Debtors' chapter 11 cases (the "Bankruptcy Cases").

2.    The Debtors are the victims of a large, complex, and brazen fraudulent scheme that resulted in the theft of over $300 million.  This scheme was perpetrated by the Debtors' former management team, led by the flamboyant Parmjit "Paul" Parmar and his chief lieutenants, Sotirios "Sam" Zaharis and Ravi Chivukula (collectively, "Former Management").  All three individuals are now the subject of far reaching criminal and civil prosecution from the United States Department of Justice and the Securities and Exchange Commission.

3.    The scheme orchestrated by Former Management has caused extensive and long-lasting economic harm to the Debtors and virtually all of their stakeholders, including creditors, institutional lenders, employees and former shareholders.  The scheme designed and implemented by Parmar and others could never have come to fruition without the substantial assistance provided by the Defendants, who not only provided legal representation to the Debtors, but without waiver or consent, provided individual counsel to Parmar, which permitted him to divert tens of millions of dollars from the Debtors directly into his pockets.  The Defendants also allowed their IOLA Escrow Account (as defined herein) to be used to make

3

suspect payments on behalf of Former Management in an effort by Defendants to allow the

IOLA Escrow Account to be used as an instrumentality of the fraudulent scheme.

4.       The Debtors seek damages to compensate them for the losses proximately caused

by the actions and omissions of the Defendants and the disallowance or subordination of the

proofs of claim filed by Robinson Brog.

## THE PARTIES

5.       The Debtors are a consolidated enterprise of several companies aggregated

through a series of acquisitions, which operate in four (4) key business lines:  (a) outsourced

revenue cycle management ("RCM") for physician practices, (b) physician practice management,

(c) group purchasing services for physician practices, and (d) an independent practice association

business, which is organized and directed by physicians in private practice to negotiate contracts

with insurance companies on their behalf while such physicians remain independent and which

also provides other services to such physician practices.

6.       Debtors Medical Billing Services, Inc., Rand Medical Billing, Inc., RMI

Physician Services Corporation, Western Skies Practice Management, Inc., Northeast Medical

Solutions, LLC, NEMS West Virginia, LLC, Physician Practice Plus, LLC, Allegiance

Consulting Associates, LLC, and Allegiance Billing & Consulting, LLC are in the RCM

business.   Debtor Integrated Physician Solutions, Inc. operates the physician practice

management business as well as the group purchasing organization.  New York Network IPA,

Inc. and New York Premier IPA, Inc. operate the independent practice association business.  The

remainder of the Debtors are either (a) holding companies or entities that have either no or

minimal current operations, or (b) entities that are the subject of sham acquisitions.

7.     Prior to the commencement of the Bankruptcy Cases, the Debtors' principal place of business was in New Jersey, and the acts and omissions that led to the fraudulent schemes occurred largely in New Jersey.

8.     Robinson Brog is a law firm and professional corporation organized and existing under the laws of the State of New York with its principal place of business in New York County.

9.     A. Mitchell Greene is a lawyer licensed to practice law in the State of New York and is a partner at Robinson Brog.

10.     Adam Greene is a lawyer licensed to practice law in the State of New York and is a partner at Robinson Brog.

## JURISDICTION AND VENUE

11.     On March 16, 2018, certain of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of New York.

12.     On July 5, 2018, New York Network Management, L.L.C., one of the Debtors, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of New York.

13.     This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334, in that the action arises under, arises in, and/or relates to the Bankruptcy Cases.

14.     This adversary proceeding is a core proceeding to which the Court may enter a final judgment under 28 U.S.C. §§ 157(b)(2)(A) and (B).

15.     In the alternative, this adversary proceeding is a non-core proceeding under 28 U.S.C. § 157(c)(1) that is related to the Bankruptcy Cases.

16.     This Court has personal jurisdiction over Robinson Brog.  First, Robinson Brog has filed proofs of claim in these Bankruptcy Cases, thereby subjecting itself to the equitable jurisdiction of this Court.  Second, Robinson Brog and the Defendants provided legal counsel to the Debtors until shortly before the commencement of these Bankruptcy Cases.  Finally, all Defendants have substantial business interests and transact business within this District.

17.     Venue of this adversary proceeding in this Court is proper pursuant to 28 U.S.C. § 1409(a).

## BACKGROUND

### The Debtors' Corporate History

18.     In 1984, the Debtor entity that is currently named Orion HealthCorp, Inc. ("Orion") was incorporated in Delaware under the name Technical Coatings Incorporated.  On September 10, 1984 its name was changed to Technical Coatings, Inc.  On July 11, 1999, its name was changed to Surgicare, Inc. and, in 1999, it was registered for trading on U.S. securities exchanges.

19.     In 2004, Surgicare Inc.'s name was changed to Orion HealthCorp, Inc. and it subsequently acquired Integrated Physician Solutions, LLC ("IPS") and Medical Billing Services, Inc. ("MBS").  In 2006, Orion acquired Rand Medical Billing, Inc. ("Rand").  In 2007, Orion delisted from NASDAQ.  In 2008, Orion acquired RMI Physicians Services Corp. ("RMI") and Western Skies Practice Management, Inc. ("Western Skies").

20.     In April 2013, Constellation Healthcare, LLC ("CHLLC"), a non-debtor, was formed as an investment vehicle by Parmar and Southport Lane Asset Management, LLC specifically for the purpose of acquiring Orion and its operating subsidiaries and to pursue an

acquisition strategy in the RCM market. On June 17, 2013, all of the issued share capital of Orion was acquired by CHLLC. As of the date of Parmar's acquisition, Orion was the parent of IPS, MBS, Rand, RMI, and Western Skies.

21.     On March, 31, 2014, NEMS Acquisition LLC ("NEMS Acquisition"), whose sole member is Orion, acquired North East Medical Solutions LLC ("NEMSLLC") and NEMS West Virginia, LLC ("NEMSWV" and together with NEMSLLC, "NEMS").

22.     In June 2014, investment entities managed by Parmar acquired all of the ownership interests of CHLLC.

23.     On September 3, 2014, Constellation Healthcare Technologies, Inc. ("CHT"), a Debtor and the direct or indirect parent of all of the remaining Debtors, was formed to become the holding company for Orion and its subsidiaries.

24.     Parmar was the Chief Executive Officer of CHT, Zaharis the Chief Financial Officer, and Chivukula the Controller. Parmar, Zaharis, and Chivukula each served on CHT's board of directors.

25.     Former Management formed CHT for the purposes of a public listing on London Stock Exchange's Alternative Investments Market ("AIM"). According to the AIM Offering Memorandum, CHT was to acquire all of the issued share capital of Orion immediately prior to CHT's admission to trading on AIM. Immediately after its admission to trading on AIM, CHLLC was to become the controlling shareholder of CHT holding approximately 68.1 percent of the voting rights of CHT.

26.     The going public transaction was consummated on December 8, 2014 and CHT was admitted to trading on AIM on the London Stock Exchange (the "Going Public Transaction"). At the time of the Going Public Transaction, CHT was the immediate holding

company of Orion, which was in turn the direct or indirect parent company of eight (8) subsidiaries that formed the enterprise at the time, including IPS, MBC, Rand, RMI, Western Skies, NEMS Acquisition, NEMSLLC, and NEMSWV.

### The Fraudulent Schemes

27.     Former Management did not intend for CHT to remain public for long.  Instead, they orchestrated a widespread scheme to defraud investors and others out of hundreds of millions of dollars in connection with a merger transaction designed to convert CHT back into a private entity.

28.     During the entirety of their fraudulent schemes, Former Management totally abandoned the Debtors' interests and were acting solely for their own pecuniary gain.

29.     In order to conceal their fraudulent schemes it was necessary for Former Management to present a positive picture of CHT's financial health.  To do so, Former Management sought to raise tens of millions of dollars in the public markets, purportedly to fund CHT's acquisitions of various operating businesses.  In reality, a number of those entities either did not exist, but for Robinson Brog's help in creating the sham businesses, or had only a fraction of the operating income attributed to them.

30.     Former Management orchestrated these equity raises not to benefit the Debtors, but rather funneled the proceeds of these secondary offerings through bank accounts they controlled and used the money for a variety of purposes that had nothing to do with acquiring the purported targets.

31.     In fact, the money was instead used to make it appear as if the operating subsidiary had substantial customer revenue when, in fact, the funds were simply transfers of the money that had been raised in the secondary offering.

32.     Former Management went to great lengths to make it appear that these funds were revenue by, among things, (a) falsifying and fabricating bank records of subsidiary entities in order to generate a phony picture of CHT's revenue streams, (b) generating fake income streams and phony customers of CHT and its subsidiaries, and (c) making material misrepresentations and omissions to the private investment firm and others.

33.     These actions by Former Management caused a private investment firm and others to value CHT at more than $300 million for purposes of financing the transaction to take the company private (the "Go-Private Transaction").

34.     On January 30, 2017, CHT consummated the Go-Private Transaction by obtaining financing from C.C. Capital, LLC ("C.C. Capital") totaling $82.5 million of cash (as equity) and $130.0 million in financing from certain institutional lenders (plus a $15.0 million commitment). The transaction valued CHT at $309.4 million, or $3.36 per share, a 45% premium to CHT's stock price.

35.     As a result, Parmar and the entities he controlled were paid at least $55.2 million in cash in exchange for their shares of CHT.

36.     It did not take long for CHT's new owners to uncover the Former Defendants' fraudulent schemes, as it very quickly became evident that the Debtors' revenues were hopelessly overstated and the projections were simply fictional.

37.     Accordingly, on September 14, 2017, Parmar resigned as CEO of CHT and its subsidiaries.

38.     On September 28, 2017, FTI Consulting LLC's Forensic and Litigation Consulting Group was retained to conduct a forensic investigation of Former Management following questions raised related to CHT's financial condition.

39.     At a September 29, 2017 meeting of the Board of Trustees, Parmar resigned as a CHT director and/or manager of CHT and its subsidiaries.

40.     At the same meeting, Zaharis and Chivukula were placed on administrative leave pending further investigation.

41.     On March 16, 2018, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of New York.

42.     On May 16, 2018, the United States charged Parmar, Zaharis, and Chivukula with one count of conspiracy to commit securities fraud and one count of securities fraud (the "Criminal Complaint").  The Criminal Complaint alleged that "[b]eginning in or about May 2015 through in or about September 2017, in the District of New Jersey and elsewhere, defendants . . . knowingly and intentionally conspired and agreed with each other and others to commit an offense against the United States, namely securities fraud . . . ."

43.     On May 16, 2018, the United States filed a separate civil forfeiture, alleging a series of acts or omissions that occurred in New Jersey (the "Civil Forfeiture Complaint").  The Civil Forfeiture Complaint sought forfeiture of four (4) properties that Parmar owns or controls, including a house on Colt's Neck, New Jersey and three (3) apartments in New York City.

44.     On May 16, 2018, the U.S. Securities and Exchange Commission also filed a civil complaint against Parmar, Zaharis, and Chivukula (the "SEC Civil Complaint").  Among the relevant allegations, the SEC Civil Complaint alleged that the "Defendants reside in the District of New Jersey and/or resided there during the relevant period.  In addition, many of the acts, practices, events, transactions, communications, courses of business, and other matters alleged herein occurred in the District of New Jersey.  Among other things, Defendants made fraudulent

and misleading statements to Investor-1 by telephone and email while in this District and met with a representative of Investor-1 in the District of New Jersey in connection with Investor-1's performance of due diligence for the go-private transaction."

## Robinson Brog Acted as the Debtors' Outside General Counsel

45.    Beginning in or around May 2012 through approximately October 2017, Defendant Robinson Brog acted as the Debtors' outside general counsel.  During this same period of time, Robinson Brog also represented Parmar individually in myriad litigation and corporate matters.

46.    While Robinson Brog notified Parmar that it was representing him and the corporate entities, at no time, was an effective waiver of conflicts sought, nor obtained.

47.    Defendants A.M. Greene and A. Greene provided substantial legal representation on behalf of the Debtors in both transactional and litigation matters.

48.    The transactional matters for which Robinson Brog represented one or more of the Debtors include, but are not limited to, the following: (a) Orion's acquisition of Phoenix Health, LLC (September 2015); (b) Orion's acquisition of MDRX Medical Billing, LLC (February 2016); (c) VEGA Medical Professionals, LLC's ("VEGA") acquisition of Allegiance Consulting Associates, LLC (September 1, 2016); (d) VEGA's acquisition of Allegiance Billing & Consulting, LLC (September 1, 2016); (e) NYNM Acquisitions LLC's ("NYNM") acquisition of New York Network Management, L.L.C. (March 10, 2017); (f) Physicians Practice Plus LLC's acquisition of New York Network Management, L.L.C. (March 10, 2017); (g) Northstar FHA LLC's acquisition of Northstar First Health LLC (September 2, 2015); and (h) MDRC Medical Billing LLC's acquisition of APEX Healthcare Systems (March 31, 2016).

49.    The litigation matters for which Robinson Brog either performed work or represented one or more of the Debtors include, but are not limited to, the following: (a) *Orion HealthCorp, Inc. and RMI Physicians Services Corp. v. John G. McBride, et al.*, No. 2014-01758 (Dist. Ct. Harris Cnty. Tex.); (b) *Kolb Radiology, PC v. Orion HealthCorp, Inc.*, No. 1:16-cv-07824 (S.D.N.Y.); (c) *Sing-Naryan and Yamraj v. Orion HealthCorp, Inc.*, No. 709520/17 (Sup. Ct. N.Y.); (d) *Parkersburg Radiology Services, Inc. v. Orion HealthCorp, Inc.*, No. 17-C-291 (Cir. Ct. Wood Cnty. W. Va.); (e) *GeBBS Healthcare Solutions, Inc. v. Orion HealthCorp, Inc.*, No. 1:16-cv-02206 (S.D.N.Y.); (f) *Parmjit Singh Parmar et al. v. Destra Targeted Income Unit Investment Trust, et al.*, No. 650709/2017 (Sup. Ct. N.Y.); (g) *Cockerell Dermatopathology, P.A. v. Medical Billing Services, Inc. d/b/a Orion MBS, et al.*, No. DC-16¬02365) (Dist. Ct. Dallas Cnty. Tex.); (h) *Steel Valley Emergency Physicians, LLC v. North East Medical Solutions, LLC, et al.*, No. GD-16-01479 (Ct. Comm. Pleas, Allegheny Cnty. Pa.); (i) *GSS Infotech v. Orion HealthCorp, Inc.*, No. 2014-45701/2016/45701 (Dist. Ct. Harris Cnty. Tex.); (j) *Equivalent Data, LLC v. Orion HealthCorp, Inc.*, No. 2015-43519 (Dist. Ct. Harris Cnty. Tex.); and (k) *Cohen, et al. v. Porteck Corporation, et al.*, No. 617280/2017 (Sup. Ct. N.Y.).

50.    Based upon information and belief, Robinson Brog received well in excess of $4.0 million in fees from the Debtors for work performed on behalf of the Debtors and Parmar individually.

### Robinson Brog Concurrently Represented
### Former Management and Parmar-Controlled Entities

51.    While acting as the Debtors' outside counsel, Robinson Brog represented Parmar, Zaharis and Chivukula in at least sixteen (16) litigation matters.  The litigation matters Robinson Brog either performed work for or represented Former Management in include, but are not limited to, the following: (a) *Destra Targeted Income Unit Investigation Trust, et al. v. Parmjit*

*Singh Parmar, et al.*, No. 130006-VCL (Del. Ch.); (b) *Parmjit Singh Parmar, et al., v. Destra Targeted Income Unit Investment Trust et al.*, No. 650709-2017 (Sup. Ct. N.Y.); (c) *David Bergstein v. Parmjit Singh Parmar*, No. 13-cv-06167 (C.D. Cal.); (d) *David Bergstein and Pineboard Holdings, Inc., v. Parmjit Singh Parmar, et al.*, No. BC-508916 (Cal. Super. Ct.); (e) *Grange Consulting Group and Paul Parmar v. David Bergstein, et al.*, No. 13-cv-06768 (D.N.J.); (f) *Pineboard Holdings, Inc. v. Paul Parmar*, No. 13-cv-03046 (D.N.J.); (g) *Cessna Finance Corp. v. VYWB, LLC and Parmjit S. Parmar*, No. 13-cv-01311 (D. Kan.); (h) *In re Susan H. Tregub*, No. 12-bk-18333 (Bankr. C.D. Cal.); (i) *In re Aramid Entertainment Fund Limited, et al.*, No. 14-11802-shl (Bankr. S.D.N.Y.); (j) *Saiber LLC v. Paul Parmjit Parmar*, No. MRS-L-117-13 (N.J. Super. Ct.); (k) *Aramid Entertainment B.V. v. Bontempo Holdings, LLC*, No. BC437131 (Cal. Super. Ct.); (l) *Wimbledon Financing Master Fund, Ltd. v. Weston Capital Management, LLC, et al.*, No. 653468-2015 (N.Y. Sup. Ct.); (m) *Wimbledon Financing Master Fund, Ltd. v. Sage Group Consulting Inc., et al.*, No. 654559-2017 (N.Y. Sup. Ct.); (n) *Michael Keister v. Parmjit Singh Parmar, et al.*, No. 07-33032-CA-40 (Fla. Cir. Ct.); (o) *Weston Capital Partners Master Fund II, Ltd. v. Arius Libra, Inc.*, No. 653309-2012 (N.Y. Sup. Ct.); and (p) Parmar's global jet litigation.

52.     While acting as Debtors' general counsel, Robinson Brog also represented Parmar in multiple general and transactional matters, including a number of fee disputes, trusts for Parmar's family, tax planning, negotiation of an exit agreement, and most critically, a number of real estate investments.

53.     Based upon information and belief, all legal fees for Robinson Brog's representation of Parmar were paid from proceeds of the Debtors.

54.     One of the most significant matters handled by Robinson Brog on behalf of Parmar was the creation of Ranga Bhoomi, LLC ("Ranga Bhoomi"), which ironically translates from Hindi to "theatre." Ranga Bhoomi was in fact pure theatre, as it was the primary entity through which Parmar diverted company monies for his personal property acquisitions.

55.     On January 25, 2016, Salil Sharma, Parmar's brother-in-law and a Robinson Brog client, signed the certificate of formation for Ranga Bhoomi and filed it with the Office of the Secretary of State for the State of Delaware. Salil Sharma's address is listed on the Internal Revenue Service's employer identification number ("EIN") notice. A. Greene coordinated the incorporation of the Delaware entity and the request for the EIN.

56.     As detailed below, in 2017 alone, Robinson Brog wired over $21.0 million from an escrow account maintained by Robinson Brog to Ranga Bhoomi's bank account. Over $5.0 million was wired to Ranga Bhoomi after Parmar had been forced to resign from the Debtors.

**Robinson Brog Assisted Former Management in the
Sham Acquisitions of Northstar, Phoenix, and MDRX**

57.     In or about May 2015, while CHT was publically listed, Former Management orchestrated three (3) sham acquisitions—Northstar First Health LLC ("Northstar"), Phoenix Health LLC ("Phoenix"), and MDRX Medical Billing LLC ("MDRX")—to inflate CHT's revenues, EBITDA[1], and overall value. This scheme was orchestrated with the "grand prize" of a go-private transaction pursuant to which the Former Management would extract tens of millions of dollars from the Debtors.

58.     Each of the three (3) transactions followed a similar pattern: CHT raised money for the purported acquisition through a secondary stock offering on the AIM; the target or acquired company was formed only shortly before the announced acquisition with the assistance

---

[1] "EBITDA" refers to a company's earnings before interest, taxes, depreciation, and amortization and is a measure commonly used to evaluate a company's financial performance.

of Robinson Brog; and the funds raised for the acquisition were transferred through an escrow account maintained by Robinson Brog, and often times used for non-corporate purposes, including to line the pockets of Parmar and Former Management.

59.    Robinson Brog was centrally involved in each of these sham transactions, including (a) forming the sham entities; (b) assisting in the preparation of the sham acquisition documents; and (c) receiving, holding, and distributing the fruits of these transactions.

### *The Sham Northstar Transaction*

60.    In May 2015, CHT raised approximately $15.8 million through a secondary offering on the AIM.

61.    CHT issued a press release on September 16, 2015, announcing its acquisition of Northstar for $18.0 million.  The press release describes Northstar as having 233 employees, 77 clients, and 2014 year-end revenue of $7.9 million.

62.    According to the certificate of formation signed by A. Greene, Northstar was formed on June 12, 2015—less than four (4) months before it was purchased by CHT.  Northstar had no assets or operations at the time of its formation.

63.    In order to complete the Northstar acquisition, on August 25, 2015, Northstar FHA LLC ("Northstar FHA"), was formed, again by A. Greene.  The following day, on August 26, 2015, Former Management, with the assistance of Robinson Brog completed an "Operating Agreement of Northstar FHA, LLC."

64.    Former Management, with the assistance of A. Greene, created a sham "Unit Purchase Agreement" dated September 16, 2015 between and among Northstar, Northstar FHA, and "Bobby Kumar," the purported owner of all of Northstar's outstanding equity.  The agreement provided that Northstar FHA would purchase Northstar for $11.5 million in cash by

January 21, 2016 and certain additional consideration.  The agreement was signed by Parmar on behalf of Northstar FHA and "Bobby Kumar" on behalf of Northstar.

65.    To create at least some operating business, on September 2, 2015—two weeks prior to the press release announcing the Northstar acquisition—Northstar acquired an actual medical-billing business, Vachette Business Services, LTD ("Vachette"), for $2,785,000. Robinson Brog served as counsel to Northstar (the purchaser), the same entity that its client was to acquire within a matter of weeks.

66.    CHT acquired Northstar for a total consideration of $17.39 million in September 2015, almost $15 million more than the amount Northstar paid that same month for Vachette, which was the only legitimate business in the Northstar group of companies as of that date. Vachette was subsequently sold prior to the commencement of the Bankruptcy Cases for substantially less than it was acquired for barely two years before.

### The Sham Phoenix Transaction

67.    On September 18, 2015, two (2) days after the announced Northstar transaction, CHT announced its acquisition of Phoenix, another purported medical-billing business, in a cash and stock transaction for maximum consideration of $14.0 million.  The press release stated that the acquisition was funded in part from the secondary equity offering conducted earlier in the year and from cash generated from operations.

68.    The press release went on to claim that for the 2014 fiscal year, Phoenix had 138 employees and generated revenue of $9.8 million, EBITDA of $2.2 million, with net assets of $1.1 million as of December 13, 2014.

69.     However, according to its certificate of formation signed by A. Greene, Phoenix was formed on September 11, 2015, just one week prior to CHT's announcement of the acquisition.

70.     Phoenix was a sham with no offices or operations.  More than one month after the purported Phoenix acquisition, an October 28, 2015 email from Chivukula indicated the need to open a bank account for Phoenix, which cannot be accomplished without an EIN.

71.     On October 28, 2015, after Robinson Brog assisted in setting up Phoenix, Chivukula emailed A. Greene (copying Zaharis) and asked, "Can you please send the incorporated documents for Phoenix.  We need to create a bank account and need these documents to get it going."  A. Greene replied and attached certain documents, and in response, Chivukula stated, "Do you also have the EIN letter for Phoenix?"  A. Greene responded that he did not.

72.     Phoenix did not obtain an EIN from the IRS until November 27, 2015, two months after the acquisition date, which belies the purported operations and history of Phoenix.

*The Sham MDRX Transaction*

73.     In January 2016, CHT raised approximately $37.0 million in a secondary offering, which was earmarked for the acquisition of MDRX.

74.     On February 10, 2016, CHT issued a press release announcing its successful acquisition of MDRX for $28.0 million in cash paid on completion of the transaction and an additional $2.0 million due to be paid over the following two years.  The press release noted that MDRX, based in Akron, Ohio, has "a nationwide presence and brings approximately 3,500 physicians onto the Constellation platform."

75.    A sham "Asset Purchase Agreement" between and among MDRX; Apex Healthcare Systems ("Apex"), another fictitious entity created by Former Management; and "Jackson Wright," Apex's fictitious sole equity holder was entered into on March 31, 2016. The agreement provides that MDRX will purchase Apex for $31.8 million in cash and certain additional consideration. The agreement is signed by Parmar on behalf of MDRX and "Jackson Wright" on behalf of Apex. Apparently in a rush to conceal their scheme, the date of the agreement between MDRX and CHT is December 7, 2015, more than three (3) months before the alleged Apex purchase by MDRX. This was the same date that A. Greene signed MDRX's certificate of formation and filed it with the Secretary of State for the State of Delaware.

76.    Like Northstar and Phoenix, MDRX was a fabrication that Former Management created from whole cloth, based on a genuine Akron, Ohio-based medical-billing business that Parmar had analyzed as part of a potential 2015 transaction.

77.    Once again, the newly formed sham entity did not have an EIN. The IRS issued an EIN on March 11, 2016, a month after CHT's press release announcing its acquisition of MDRX for $28 million. The EIN notice was issued to MDRX at the address of Robinson Brog in New York.

### The Go-Private Transaction

78.    In April 2016, Parmar and representatives of C.C. Capital first met to discuss a potential transaction in which C.C. Capital would acquire CHT.

79.    From April 2016 to January 30, 2017, when the Go-Private Transaction was consummated, Former Management made numerous materially false and misleading statements in connection with the Go-Private Transaction.

80.     Former Management went to great lengths to generate fake income streams and phony customers of CHT and its subsidiaries, including Northstar, Phoenix, and MDRX, to present a positive picture CHT's financial health.

81.     For example, Former Management provided C.C. Capital with a list of forty-four (44) purported MDRX customers and seventy-one (71) purported Phoenix customers during the due diligence process.  MDRX and Phoenix, which were fictitious entities, had no customers.

82.     To support the fictitious revenue for the non-existent customers, Former Management went to great lengths to create the appearance of collected cash.  First, cash raised from the secondary offerings was transferred to an operating account and recharacterized as customer receipts. Second, bank statements were altered or completely falsified to include fictitious entries to create the illusion of customer deposits.

83.     Former Management's scheme resulted in grossly inflated revenue, income, and EBITDA figures for the time period that C.C. Capital evaluated whether to enter into the Go-Private Transaction.

84.     On January 30, 2017, CHT consummated the Go-Private Transaction with C.C. Capital.  The transaction valued CHT at $309.4 million, or $3.36 per share, a 45% premium to CHT's stock price.

85.     A PowerPoint presentation shared with the CHT Board of Directors in August 2017—seven (7) months after the Go-Private Transaction—compared the consolidated profit and loss results for Q2 2017 with Q2 2016.  The Q2 2016 financials were consistent with the most current interim results of operations that were shared with C.C. Capital prior to the January 30, 2017 close of the acquisition transaction by CHT Holdco LLC.  An analysis of the financial presentation indicates reported net revenue for the six months ended June 30, 2016 of

approximately $57.0 million; income from operations was approximately $14.5 million, and, the resulting EBITDA totaled approximately $21.1 million.

86.    In connection with the six-month results for the period ending June 30, 2016 (i.e. Q2 2016) reported to the AIM and subsequently shared with C.C. Capital, the financial activity related to fictitious entities and fictitious customers gave rise to overstated revenue and EBITDA totaling $57.0 million and $21.1 million, respectively—approximate overstatements of 54% and 97% of the total revenue and EBITDA reported, respectively.

### Former Management Used Robinson Brog's IOLA Escrow Account As the Piggy Bank for the Sham Transactions

87.    Dating back to at least 2013, Robinson Brog maintained an "interest on lawyer" escrow account with Wells Fargo Bank, N.A. (the "IOLA Escrow Account").  Under New York law, interest on lawyer accounts (IOLA) are only to be used for "qualified funds"; payments from clients for legal services that are too small or expected to be held for too short a period to generate substantial interest.  To the contrary, the IOLA Escrow Account, for which sub-accounts for Parmar and the Debtor entities were established as far back as 2013, and which distributed out almost $160.0 million into 2018, served as the "piggy bank" through which Parmar, Zaharis and Chivukula were able to perpetrate their fraudulent schemes.

88.    Beginning as early as June 2013, Robinson Brog created no less than twelve (12) separate subaccounts within the IOLA Escrow Account for Debtor entities.  In addition, the IOLA Escrow Account had a least one (1) subaccount for Parmar and another for Ranga Bhoomi, through which funds received from sham transactions were funneled toward real estate purchases on behalf of Parmar.  Transfers from the IOLA Escrow Account continued even after Parmar was forced to resign in September 2017.

89.     Between 2013 and 2018, over $161.0 million was deposited into the IOLA Escrow Account, and approximately $159.5 million was distributed from the IOLA Escrow Account.  Of these amounts, approximately $4.3 million was distributed directly to Robinson Brog, including $2.5 million transferred on March 15, 2017, from the proceeds of the Go-Private Transaction.

90.     Far from being a trust account that held "qualified funds" as required by New York law, the IOLA Escrow Account was a multi-purpose account that was used to fund myriad purchases, including massage services, Office Depot expenses and multi-million dollar real estate acquisitions.  The IOLA Escrow Account was used to receive investor funds relating to sham transactions, transfer funds to both Debtor and non-Debtor entities and receive transfers from similar entities.

91.     In addition, non-Debtor funds from the IOLA Escrow Account were used to pay operating expenses, debt service, and other transactions for the benefit of the Debtors.  In fact, based upon information and belief, the amounts contained in the IOLA Escrow Account were used by the Debtors as their general ledger cash amounts for the operating businesses.

92.     Robinson Brog provided information relating to balances in the IOLA Escrow Account to the Debtors' representatives, and specifically Former Management, upon request.

93.     In addition, Robinson Brog served as the escrow agent in connection with the receipt and distribution of over $46.0 million relating to the Go-Private Transaction, and used the IOLA Escrow Account to both hold these funds, and distribute them in furtherance of the scheme of Former Management.

94.     By way of example, on February 3, 2017, Robinson Brog received eight separate wire transfers from Capita Asset Services, as paying agent, aggregating $46.0 million in

proceeds from the Go-Private Transaction.  Six days later, two wire transfers were initiated from the IOLA Escrow Account in the amounts of $8,765,997 and $7,234,997 to Ranga Bhoomi, the non-Debtor entity controlled by Parmar, and formed by Robinson Brog in January 2016.  The first of these wires was in an amount identical to one of the wires received from Capita Asset Services.

95.    As described in detail below, Parmar subsequently used certain of the funds generated from the Go-Private Transaction to purchase several properties, including 50 Riverside Boulevard, Apt. 21B, New York, New York and 40 Broad Street, Unit 20FG, New York, New York.  According to the Civil Forfeiture Complaint, the funding for the purchases of this real estate came directly from the fraudulently obtained Go-Private Transaction proceeds, which were held in escrow by Robinson Brog, and distributed by Robinson Brog from the IOLA Escrow Account.

96.    In addition, at multiple times the IOLA Escrow Account was used to hold and distribute proceeds from the sham transactions described above.  For example, the IOLA Escrow Account was used to hold the proceeds from a fraudulent stock offering, $5,058,408 of which was transferred by Robinson Brog to Parmar on February 19, 2016 for the purchase of a condominium at 2 River Terrace, Apt. 12J, New York, New York.  A. Greene had appointed himself as the agent for the limited liability company that was formed to purchase the River Terrace Property.

97.    The IOLA Escrow Account was similarly used to transfer proceeds from another fraudulent stock offering to acquire the Deutsche Bank mortgage in connection with Parmar's personal residence.

98.     The IOLA Escrow Account was also used to funnel proceeds to other parties that assisted Parmar and others in their fraudulent scheme.  Specifically, at various times, Robinson Brog released approximately $1.5 million to Sage Group Consulting ("Sage"), an entity formed by Salil Sharma, Parmar's brother-in-law.   Sage was instrumental in Parmar's fraudulent schemes, including the creation of fake due diligence reports, website and the forgery of signatures.

99.     Incredibly, on October 2, 2017, five (5) days after Parmar resigned, Robinson Brog wired $5.4 million from the Escrow Account to Ranga Bhoomi, the Parmar-controlled entity that had been established to funnel proceeds directly to Parmar.

### Robinson Brog Facilitated Parmar's Diversion of Company Funds to Acquire and/or Retain Substantial Real Estate Holdings

100.     Parmar used funds generated from the fraudulent stock offerings and the fraudulently induced Go-Private Transaction to purchase several real properties, including the residences located at River Terrace, Unit 12J, New York, New York ("2 River Terrace Condo"), 50 Riverside Boulevard, Apt. 21B, New York, New York ("50 Riverside Condo"), and 40 Broad Street, Unit 20FG, New York, New York ("40 Broad Street Condo").

101.     In order to accomplish these purchases, Parmar needed money and a lawyer.  The funding for the real estate transactions came directly from the fraudulent stock offerings and the Go-Private Transaction proceeds and passed through Robinson Brog's IOLA Escrow Account. In addition to wiring the funds, Robinson Brog and A. Greene represented Parmar in the real estate negotiations.  The transactions would not have been possible without the representation and assistance of Robinson Brog.

### *Purchase of 2 River Terrace Condo*

102.    In an email dated December 14, 2015, with the subject line "2 River terrace #12JK," a real estate broker asked A. Greene to verify information so that a deal sheet could be written up for the purchase of the 2 River Terrace Condo.  In the email, the buyer was listed as Parmar with an all cash purchase price of $5,450,000.  The real estate broker asked to confirm the buyer's name and if the property was being bought by a limited liability company.

103.    A. Greene forwarded this email to Parmar, told him the broker confirmed, and asked Parmar to provide the name of the limited liability company.  Later on December 14, 2015, A. Greene emailed the real estate broker and said the buyer would be 2 River Terrace Apartment 12J LLC and copied Parmar on the email.

104.    On December 29, 2015, a real estate broker emailed A. Greene, copied Zaharis, and asked what names should be listed as occupants of 2 River Terrace.

105.    Zaharis forwarded the real estate broker's email to Parmar and wrote "Adam [Greene] suggests not putting you down at this stage—do we put down Salil?"  Parmar responded to this email and told Zaharis to "[p]ut Salil and Kiran Sharma," Parmar's sister and brother-in-law.

106.    On February 19, 2016, 2 River Terrace Apartment 12J LLC 2 purchased River Terrace Condo for $5,450,000.

107.    Also on February 19, 2016, $5,058,408 was wired to the IOLA Escrow Account for the purchase of 2 River Terrace.  The funds came from a bank account in CHT's name ("CHT M&T Bank Account").  The CHT M&T Bank Account was previously unknown to Debtors' current management and, upon information and belief, was used by Parmar to facilitate fraud.

108.    According to the Civil Forfeiture Complaint, the purchase of 2 River Terrace was funded by monies raised by CHT from fraudulent stock offerings that was diverted by Parmar into the IOLA Escrow Account.

109.    Representing Parmar, Robinson Brog facilitated the purchase of 2 River Terrace. The buyer's address listed on the deed for 2 River Terrace Condo deed is Robinson Brog's address, and utility bills are addressed to A. Greene.  A. Greene also appointed himself as the agent for 2 River Terrace Apartment 12J LLC.  Likely not a coincidence, the 2 River Terrace Condo was sold by Elliot Greene, A. Greene's uncle.

### *Purchase of 50 Riverside Condo*

110.    Parmar's purchase of 50 Riverside Condo was accomplished by the diversion of CHT funds through the Parmar-controlled entity Ranga Bhoomi—an entity set up by Robinson Brog.

111.    On February 6, 2017, Parmar emailed a broker from a New York City real estate firm regarding condo units at 50 Riverside Boulevard and made an offer to purchase a unit for $14.8 million cash: "you can consider this a as a firm offer which will be immediately back by cash posted to escrow for the sole purpose of this acquisition till we finish all relevant paperwork."

112.    On February 8, 2017, the broker informed Parmar that his cash offer of $14,800,000 for Unit 21B at 50 Riverside Boulevard had been accepted by the seller.

113.    On February 9, 2017, Zaharis emailed A. Greene, copying Parmar, regarding arrangements for the transfer for $16,000,000 "from 2 of the Deal closing escrow accounts" to a Ranga Bhoomi bank account.

114.    Zaharis requested that the money be moved in two wire transfers, the first in the amount of $8,765,977.44, which he attributed to Axis Medical Services, LLC, and the second in the amount of $7,234,002.556, which he attributed to Vega Advanced Care LLC: "After the wires are sent, you should have a zero balance for Axis Medical Services LLC and a $1,459404.40 balance for Vega Advanced Care LLC in the escrow account."

115.    On February 10, 2017, Robinson Brog made two wire transfers from the IOLA Escrow Account to the Ranga Bhoomi bank account.  One for $8,765,977.44 and the other for $7,234,002.56.

116.    On April 7, 2017, 21B One River Park LLC purchased the 50 Riverside Condo for $15,074,100.

### *Purchase of 40 Broad Street Condo*

117.    Parmar also used the proceeds of the fraudulent schemes to fund the purchase of the 40 Broad Street Condo for his father.

118.    On or about July 13, 2017, Zaharis directed Robinson Brog to wire $1,623,600 from the IOLA Escrow Account to Kriss & Feuerstein LLP for the purchase of the 40 Broad Street Condo.

119.    On July 13, 2017, $1,623,600 was wired from the IOLA Escrow Account, and specifically the "Constellation Health/CHT Clsing" sub-account to Kriss & Feuerstein LLP.  As outlined above, this escrow account is the same account into which the proceeds for the fraudulently induced Go-Private Transaction were placed.  Accordingly, the funding for the purchase of the 40 Broad Street Condo came directly from the fraudulently obtained Go-Private Transaction proceeds.

120.    The sale of the 40 Broad Street Condo was finalized in August 2017.  New York City property records show that Dioskourio Kastor Polydeuces, LLC ("DKP") purchased this property for $1,640,000 on August 8, 2017.  The address for DKP on the filings is listed as 3400 Highway 35 Suite 9a, Hazlet, New Jersey, which is the same address as Sage.  As described above, Sage is a related-party consulting firm operated by Parmar's brother-in-law, Salil Sharma. Sage is also a client of Robinson Brog.

121.    Incorporation documents for DKP are signed by Parmar's father, Harmohan Parmar.

### 18 and 19 Colts Gaits Lane, Colts Neck, New Jersey

122.    Robinson Brog was also involved in the non-arms-length-sale of a $23,700,000 mortgage on Parmar's property located at 18 and 19 Colts Gait Lane, Colts Neck, New Jersey (the "Colts Neck Property").

123.    On or about March 15, 2000, Parmar purchased vacant land at Colts Gait Lane, Colts Neck, New Jersey (later referred to as 19 Colts Gait Lane) for $1,150,000.  There was no mortgage recorded for this purchase.  Then, on or about December 2, 2003, Parmar purchased more vacant land at 18 Colts Gait Lane, Colts Neck, New Jersey for $1,745,000.  There was no mortgage recorded for this purchase either.

124.    Parmar later developed the land and took out the following mortgages: (1) Morgan Stanley Dean Witter Credit Corporation for $10.0 million in December 2004; (2) Citibank Federal Savings for $4.0 million in May 2006; and (3) Citibank Federal Savings Bank for $12.0 million in November 2006, which was issued as a home equity line of credit.

125.    On or about January 25, 2008, Deutsche Bank issued a mortgage to Parmar secured by the property in the amount of $23,700,000.

126.    Just two years later, on or about May 6, 2010, Deutsche Bank filed a Notice of Lis Pendens for the foreclosure of the $23,700,000 mortgage.

127.    In late 2015 and into early 2016, Deutsche Bank entered into loan work out negotiations in an effort to arrange a payoff on the $23,700,000 mortgage.

128.    On December 6, 2015, Zaharis emailed Parmar a document titled, "DB Short Sale Offer," attaching a letter addressed to Parmar allegedly written by John Petrozza ("Petrozza") expressing interest in buying this property.   Upon information and belief, Petrozza is a close associate of Parmar and, per Constellation Health, LLC's second amended operating agreement, dated August 6, 2015, is a member of the entity's board of directors.   In the letter, Petrozza offered Parmar $6.75 million for the property.

129.    On December 14, 2015, August DelVecchio ("DelVecchio"), an attorney with Emmet, Marvin & Martin LLP working on behalf of Deutsche Bank, emailed Parmar and Joshua Frank, a Deutsche Bank vice president in the bank's special loan review division, and attached a short sale letter outlining Petorzza's interest in purchasing the property for $6,250,000.   The letter noted that one condition of sale is that the sale is an arm's length transaction, which the letter defined as "a transaction where (i) the Buyer is not a member of your family, business associate or other favored party and (ii) no hidden terms or special understandings exist between you, the Buyer, appraiser, or sale agent/broker."

130.    Parmar forwarded DelVecchio's email and letter to A. Greene.   A. Greene responded, copying A.M. Greene: "Perfect we will get all of this done, look forward to it.  Could be a very merry xmas.  What we will do is close with an llc 100% owned by Abruzzi [Petrozza's company] and then assign the interest once the bank is out to an entity owned by the trust."

131.    A. Greene's email confirmed that he and Robinson Brog were working on behalf of Parmar to conceal the fact that the short sale would not be an arm's length transaction, as required by Deutsche Bank.

132.    Ultimately, Parmar and A. Greene orchestrated a better deal.  Deutsche Bank came to an agreement in which they would sell the $23,700,000 mortgage to Aquila Alpha LLC ("Aquila Alpha") for a total purchase price of $3,800,000.  Aquila Alpha was an entity that was formed and controlled by Parmar and Zaharis and used by Parmar to acquire real property.

133.    On March 2, 2016, Deutsche Bank and Aquila Alpha executed a Note Sale Agreement pursuant to which Aquila Alpha purchased Deutsche Bank's $23,700,000 mortgage on the Colts Neck Property for $3,800,000.  Upon information and belief, the $3,800,000 used to purchase the Deutsche Bank mortgage was derived from proceeds of the fraudulent stock offerings that were orchestrated by Former Management.

134.    Given the numerous liens and judgments against Parmar, totaling tens of millions of dollars, the scheme in which Aquila Alpha acquired the Deutsche Bank mortgage then subsequently foreclosed on the property is an attempt by Parmar, with the help of Robinson Brog, to insulate his property from being seized by creditors seeking to recover assets.

### Robinson Brog's Proofs of Claims

135.    Robinson Brog has filed eight (8) separate secured and priority proofs of claim in the Bankruptcy Cases (collectively, the "Proofs of Claim"):

a.    Claim No. 10018 against Orion HealthCorp., Inc. in the amount of $427,136.80 ("Claim No. 10018");

b.    Claim No. 10019 against Constellation Healthcare Technologies, Inc. in the amount of $440,050.80 ("Claim No. 10019");

c.     Claim No. 10020 against Northeast Medical Solutions, LLC in the amount of $5,157.52 ("Claim No. 10020");

d.     Claim No. 10021 against Orion HealthCorp., Inc. in the amount of $427,136.80 ("Claim No. 10021");

e.     Claim No. 10022 against Constellation Healthcare Technologies, Inc. in the amount of $440,050.80 ("Claim No. 10022");

f.     Claim No. 10023 against NEMS West Virginia, LLC in the amount of $2,107.50 ("Claim No. 10023");

g.     Claim No. 10024 against Physicians Practice Plus, LLC in the amount of $19,174.40 ("Claim No. 10024"); and

h.     Claim No. 10025 against Medical Billing Services in the amount of $6,060.00 ("Claim No. 10025").

## COUNT I - LEGAL MALPRACTICE
### (All Defendants)

136.    The Debtors repeat and incorporate by reference the allegations set forth in paragraphs 1 through 135, as if fully set forth herein.

137.    The Debtors had an attorney-client relationship with Robinson Brog.

138.    As the Debtors' outside general counsel, Robinson Brog had a duty to use such skill, prudence, and diligence as members of the legal profession commonly possess and exercise in providing legal services to the Debtors.

139.    Robinson Brog failed to exercise the skill, prudence, and diligence commonly possessed by members of the legal profession and thus breached its duty owed to Debtors by (a) preparing and filing certificates of incorporation for three (3) sham entities, (b) assisting in the preparation of the sham acquisition documents, (c) using the IOLA Escrow Account as a conduit

for the conversion of the Debtors' funds to Former Management; (d) serving as the escrow agent in connection with the receipt and misappropriation of over $46.0 million relating to the Go-Private Transaction, and (e) helping Former Management funnel Go-Private Transaction proceeds toward real estate purchases.

140.    As a direct and proximate result of Robinson Brog's legal malpractice, the Debtors have suffered damages in an amount to be determined at trial, but no less than Fifty Million Dollars ($50,000,000.00).

## COUNT II - AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (All Defendants)

141.    The Debtors repeat and incorporate by reference the allegations set forth in paragraphs 1 through 140, as if fully set forth herein.

142.    As management of CHT, Parmar, Zaharis and Chivukula owed fiduciary duties of loyalty and due care to the Debtors.  These duties obligated Former Management to refrain from engaging in self-dealing, to refrain from acting in a manner contrary to the interests of the Debtors, to make truthful and complete disclosures to the Debtors, and to refrain from obtaining an improper advantage at the Debtors' expense.

143.    Robinson Brog had actual knowledge of Former Management's fiduciary duties to the Debtors.

144.    Robinson Brog nevertheless provided substantial assistance to Former Management in breaching their fiduciary duties to the Debtors by (a) preparing and filing certificates of incorporation for three (3) sham entities, (b) assisting in the preparation of the sham acquisition documents, (c) using the IOLA Escrow Account as a conduit for the conversion of the Debtors fund to the Former Management; (d) serving as the escrow agent in connection with the receipt and misappropriation of over $46.0 million relating to the fraudulent stock

offerings and Go-Private Transaction, (e) helping Former Management funnel Go-Private Transaction proceeds toward real estate purchases, and (f) failing to act when it knew that Former Management was breaching their fiduciary duties owed to the Debtors.

145.    Without the assistance of Robinson Brog, Former Management would not have been able to engage in the conduct that breached their fiduciary duties.

146.    As a direct and proximate result of Robinson Brog's substantial assistance, the Debtors have suffered damages in an amount to be determined at trial, but no less than Fifty Million Dollars ($50,000,000.00).

## COUNT III - BREACH OF FIDUCIARY DUTY
### (All Defendants)

147.    The Debtors repeat and incorporate by reference the allegations set forth in paragraphs 1 through 146, as if fully set forth herein.

148.    The Debtors had an attorney-client relationship with Robinson Brog.

149.    As the Debtors' counsel, Robinson Brog owed the Debtors fiduciary duties.

150.    Robinson Brog failed to exercise proper care in its representation of the Debtors, because it simultaneously represented Former Management.

151.    These simultaneous representations gave rise to numerous conflicts of interest, resulting in divided loyalties.

152.    At all times relevant herein, the Debtors, including its Board of Directors, were unaware of the fraud being perpetrated by Former Management.  Robinson Brog never discussed the risks of simultaneous representations with the Debtors, never advised the Debtors about the existence of these conflicts of interest, nor did it ever seek or obtain their informed consent.

153.    At all times relevant herein, the Debtors were unaware of the fraud being perpetrated by Former Management.  As the Debtors' outside counsel, had Robinson Brog

alerted the Debtors of Former Management's fraudulent scheme, the Debtors could and would have taken action to: (a) remove Parmar, Zaharis and Chivukula from the management of CHT, (b) stop the fraud, and (c) take other remedial action.

154.    As a direct and proximate result of Robinson Brog's breach of its fiduciary duty, the Debtors have suffered damages in an amount to be determined at trial, but no less than Fifty Million Dollars ($50,000,000.00).

### COUNT IV - UNJUST ENRICHMENT
**(All Defendants)**

155.    The Debtors repeat and incorporate by reference the allegations set forth in paragraphs 1 through 154, as if fully set forth herein.

156.    Based upon information and belief, Robinson Brog received over $4.0 million in fees for work done on behalf of Former Management to accomplish their fraudulent scheme—a scheme that resulted in the Debtors' demise.

157.    Based upon information and belief, all legal fees for Robinson Brog's representation of Former Management were paid from proceeds of the Debtors.

158.    As a result of Former Management's scheme, Robinson Brog has been unjustly enriched.  Equity and good conscience require restitution in an amount at least equal to all fees paid to Robinson Brog by, or on behalf of, the Debtors.

### COUNT V – OBJECTION TO PROOFS OF CLAIM
**(Robinson Brog)**

159.    The Proofs of Claim should be disallowed because: (a) they are not entitled to priority treatment under sections 503 and 507 of the Bankruptcy Code; (b) they are not entitled to secured treatment under section 506 of the Bankruptcy Code; (c) certain Proofs of Claim are duplicative; and (d) certain Proofs of Claim lack any supporting documentation.

160.    Section 502(b) of the Bankruptcy Code provides in pertinent part that:

> [t]he court, after notice and a hearing, shall determine the amount of [a] claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that . . . such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured.

11 U.S.C. § 502(b)(1).

161.    Robinson Brog seeks treatment of the Proofs of Claim as administrative claims under section 507(a)(2) of the Bankruptcy Code, which allows second priority for "administrative expenses allowed under section 503(b) of this title." A party requesting approval of an administrative expense claim under section 503(b) bears the burden of proving the request is for an actual and necessary expense of preserving the estate. *In re O'Brien Env. Eng.* 181 F.3d 527 (3d Cir. 1999).

162.    Robinson Brog has not, and cannot demonstrate that the services provided are an actual and necessary expense of preserving the estates. First, the Proofs of Claim are for services provided prior to the commencement of the Bankruptcy Cases, which, as a matter of law obviates any entitlement to administrative expense treatment. Second, Robinson Brog, which assisted in the demise of the Debtors, cannot establish that any service it has provided has assisted in preserving the estates. Attorneys who hold an interest adverse to the estates and who are forbidden from representing the debtor may not be compensated for services. *In re Milwaukee Engraving Co.* 219 F.3d 635 (7th Cir. 2000).

163.    Additionally, Robinson Brog failed to maintain their records by matter or client thereby causing the Debtors to incur significant expense in reviewing its production of documents.

164.    Similarly, Robinson Brog does not possess a perfected security interest in the Debtors' property, and thus cannot establish a secured claim under section 506 of the Bankruptcy Code.

165.    Further, Claim No. 10018 is duplicative of Claim No. 10021, and Claim No. 10019 is duplicative 10022.  Accordingly, the duplicative Proofs of Claim must be disallowed.

166.    In addition, Bankruptcy Rule 3001(f) provides in order to constitute prima facie evidence of the "validity and amount of the claim" the claim must be executed and filed in accordance with the Bankruptcy Rules.  Fed. R. Bankr. P. 3001(f).  Further, Bankruptcy Rule 3001(c)(1) requires that a claim based on a writing must be filed with a copy of the writing.  Fed R. Bankr. P. 3001(c)(1).  Accordingly, as Robinson Brog has failed to provide documentation to support Claim Nos. 10018 and 10019, these Proofs of Claim must be disallowed.

## COUNT VI – EQUITABLE SUBORDINATION
### (Robinson Brog)

167.    The Debtors repeat and incorporate by reference the allegations set forth in paragraphs 1 through 166, as if fully set forth herein.

168.    In the event that the Proofs of Claim are not disallowed, the Proofs of Claim must be subordinated pursuant to section 510(c) of the Bankruptcy Code.  Under section 510(c), a claim must be subordinated if (a) the creditor engaged in inequitable conduct, (b) the misconduct resulted in harm to the Debtors' creditors and (c) the remedy of subordination is not inconsistent with the Bankruptcy Code.  Fiduciaries of the Debtors, such as Robinson Brog, are subjected to heightened scrutiny, and they have the burden to prove the fairness to the Debtors' creditors and their estates.  *Bayer Corp. v. MascoTech, Inc.,* 269 F.3d 726 (6th Cir. 2001).

169.    Based upon the facts set forth in this Adversary Complaint, Robinson Brog engaged in wholly inequitable conduct, which substantially harmed the Debtors' estates.  The remedy of subordination is not inconsistent with any provision of the Bankruptcy Code.

170.    Accordingly, to the extent not otherwise disallowed, the Proofs of Claim must be subordinated pursuant to section 510(c) of the Bankruptcy Code.

## PRAYER FOR RELIEF

WHEREFORE, the Debtors respectfully request that the Court award judgment against Robinson Brog Leinwand Greene Genovese & Gluck, P.C., A. Mitchell Greene, and Adam Greene as follows:

A.    On Count I for legal malpractice against all Defendants, Fifty Million Dollars ($50,000,000.00);

B.    On Count II for aiding and abetting breach of fiduciary duty against all Defendants, Fifty Million Dollars ($50,000,000.00);

C.    On Count III for breach of fiduciary duty against all Defendants, Fifty Million Dollars ($50,000,000.00);

D.    On Count IV for unjust enrichment against all Defendants, all fees and expenses paid to Robinson Brog in an amount to be determined;

E.    On Count V, sustaining the Debtors' objection to Robinson Brog's Proofs of Claim;

F.    On Count VI for equitable subordination, a declaration that all claims of Robinson Brog are subordinated to claims of all creditors; and

G.        Awarding pre-judgement and post-judgment interest, attorneys' fees, costs, and

such other relief as this Court deems just and proper.

Dated:        July 27, 2018                            Respectfully submitted,
                   New York, New York

                                                                **DLA PIPER LLP (US)**

                                                                 */s/ Thomas R. Califano*
                                                                Thomas R. Califano (6144)
                                                                DLA Piper LLP (US)
                                                                1251 Avenue of the Americas
                                                                New York, New York 10020-1104
                                                                Telephone: (212) 335-4500
                                                                Facsimile:  (212) 335-4501
                                                                E-mail:  thomas.califano@dlapiper.com

                                                                *Counsel to the Debtors and*
                                                                *Debtors in Possession*