UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re:                                                        :        Chapter 11
                                                              :
Orion HealthCorp, Inc.                                        :        Case No. 18-71748 (AST)
Constellation Healthcare Technologies, Inc.                   :        Case No. 18-71749 (AST)
NEMS Acquisition, LLC                                         :        Case No. 18-71750 (AST)
Northeast Medical Solutions, LLC                              :        Case No. 18-71751 (AST)
NEMS West Virginia, LLC                                       :        Case No. 18-71752 (AST)
Physicians Practice Plus, LLC                                 :        Case No. 18-71753 (AST)
Physicians Practice Plus Holdings, LLC                        :        Case No. 18-71754 (AST)
Medical Billing Services, Inc.                                :        Case No. 18-71755 (AST)
Rand Medical Billing, Inc.                                    :        Case No. 18-71756 (AST)
RMI Physician Services Corporation                            :        Case No. 18-71757 (AST)
Western Skies Practice Management, Inc.                       :        Case No. 18-71758 (AST)
Integrated Physician Solutions, Inc.                          :        Case No. 18-71759 (AST)
NYNM Acquisition, LLC                                         :        Case No. 18-71760 (AST)
Northstar FHA, LLC                                            :        Case No. 18-71761 (AST)
Northstar First Health, LLC                                   :        Case No. 18-71762 (AST)
Vachette Business Services, LTD.                              :        Case No. 18-71763 (AST)
MDRX Medical Billing, LLC                                     :        Case No. 18-71764 (AST)
Vega Medical Professionals, LLC                               :        Case No. 18-71765 (AST)
Allegiance Consulting Associates, LLC                         :        Case No. 18-71766 (AST)
Allegiance Billing & Consulting, LLC                          :        Case No. 18-71767 (AST)
Phoenix Health, LLC                                           :        Case No. 18-71789 (AST)
New York Network Management, LLC                              :        Case No. 18-74545 (AST)
                                                              :
                              Debtors.                         :        (Jointly Administered)
-------------------------------------------------------------x

ORION HEALTHCORP, INC., et al.,

                              Plaintiffs,

                   v.                                                   Adv. Pro. No. 18-08104 (AST)

ROBINSON BROG LEINWAND GREENE GENOVESE
& GLUCK, P.C., A. MITCHELL GREENE, AND ADAM
GREENE,

                              Defendants.
-------------------------------------------------------------x

## DECLARATION OF MARIAN C. RICE IN SUPPORT OF MOTION TO DISMISS COMPLAINT AND OBJECTION TO PROOFS OF CLAIM

MARIAN C. RICE, an attorney, declares the following to be true and correct under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.    I am a member of L'Abbate, Balkan, Colavita & Contini, L.L.P., co-counsel for Defendants Robinson Brog Leinwand Greene Genovese & Gluck, P.C., A. Mitchell Greene, and Adam Greene (collectively, "Robinson Brog"), in the above-referenced adversary proceeding.

2.    I submit this Declaration and the accompanying Memorandum of Law, dated September 20, 2018, in support of Robinson Brog's motion (the "Motion"), pursuant to section 105(a) of the Bankruptcy Code and Rules 8(a), 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, made applicable here by Rules 7008, 7009, and 7012 of the Federal Rules of Bankruptcy Procedure, for an order dismissing with prejudice the Complaint and Object to Proofs of Claim [Dkt. 1] (the "Complaint") filed by plaintiffs (collectively, the "Debtors") in the above-captioned adversary proceeding.

3.    I submit true and correct copies of the following exhibits in further support of the Motion:

Exhibit A -    Opinion Letter, dated January 30, 2017, from Winston & Strawn, LLP, "as special counsel to Constellation Healthcare Technologies, Inc." to Bank of America and annexed corporate formation documents

Exhibit B -    Operating Agreement of Physicians Practice Plus LLC entered into as of the 19th day of February, 2015

Exhibit C -    Amended and Restated Operating Agreement of Northstar First Health, LLC entered into as of the 16th day of September, 2015

Exhibit D -   Operating Agreement of Phoenix Health, LLC entered into as of the 16th day of September, 2015

Exhibit E -   Operating Agreement of Vega Medical Professionals, LLC entered into as of the 31st day of August, 2016

Exhibit F -   Operating Agreement of MDRX Medical Billing, LLC entered into as of the 7th day of December, 2015

Exhibit G -   Operating Agreement of NYNM Acquisition, LLC entered into as of the ___ day of March, 2017

Exhibit H -   Project Chariot - Flow of Funds showing payments to professionals hired by C.C. Capital to perform due diligence in connection with the Go-Private Transaction

Exhibit I -   Subscription Agreement, dated November 24, 2016, Schedule 7.3(C)

Exhibit J -   Agreement and Plan of Merger dated November 26, 2017

Exhibit K -   Release of Claims executed by CHT Holdco, LLC, dated as of November 24, 2016

Exhibit L -   Email from Christina Trotta Roupas of Winston & Strawn, LLP dated November 24, 2016 and attached C.C. Capital "Signing Checklist" to be executed at the signing

4.    This Court granted Robinson Brog priority administrative expense claims for both its pre-petition fees and post-petition production costs and expenses. *See* May 25, 2018 Order [Dkt. 256, Case No. 18-71748 (AST)] (the "Adequate Protection Order"). In accordance with the Adequate Protection Order, Robinson Brog filed eight separate proofs of claim (the "Proofs of Claim") in the aggregate amount of approximately $440,000. Compl. ¶ 135. On June 30, 2018, one day after filing its Proofs of Claims, Robinson Brog notified Epiq, the Debtors' claims agent, that claims 10018 and 10019 were duplicates of the operative claims 10021 and 10022 as a result of technical difficulties experienced in uploading backup documentation in relation to its claims.

3

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 20, 2018.

_____
Marian C. Rice

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Alex Spiro, Esq.
Lindsay Weber, Esq.

L'ABBATE, BALKAN, COLVITA &
CONTINI LLP
1001 Franklin Avenue
Garden City, New York 11530
Marian C. Rice, Esq.

*Co-Counsel to Robinson Brog Leinwand Greene*
*Genovese & Gluck, P.C., A. Mitchell Greene, and Adam Greene*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

| In re: | : | Chapter 11 |
|---|---|---|
| | : | |
| ORION HEALTHCORP, INC. | : | Case No. 18-71748 (AST) |
| CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. | : | Case No. 18-71749 (AST) |
| NEMS ACQUISITION, LLC | : | Case No. 18-71750 (AST) |
| NORTHEAST MEDICAL SOLUTIONS, LLC | : | Case No. 18-71751 (AST) |
| NEMS WEST VIRGINIA, LLC | : | Case No. 18-71752 (AST) |
| PHYSICIANS PRACTICE PLUS, LLC | : | Case No. 18-71753 (AST) |
| PHYSICIANS PRACTICE PLUS HOLDINGS, LLC | : | Case No. 18-71754 (AST) |
| MEDICAL BILLING SERVICES, INC. | : | Case No. 18-71755 (AST) |
| RAND MEDICAL BILLING, INC. | : | Case No. 18-71756 (AST) |
| RMI PHYSICIAN SERVICES CORPORATION | : | Case No. 18-71757 (AST) |
| WESTERN SKIES PRACTICE MANAGEMENT, INC. | : | Case No. 18-71758 (AST) |
| INTEGRATED PHYSICIAN SOLUTIONS, INC. | : | Case No. 18-71759 (AST) |
| NYNM ACQUISITION, LLC | : | Case No. 18-71760 (AST) |
| NORTHSTAR FHA, LLC | : | Case No. 18-71761 (AST) |
| NORTHSTAR FIRST HEALTH, LLC | : | Case No. 18-71762 (AST) |
| VACHETTE BUSINESS SERVICES, LTD. | : | Case No. 18-71763 (AST) |
| MDRX MEDICAL BILLING, LLC | : | Case No. 18-71764 (AST) |
| VEGA MEDICAL PROFESSIONALS, LLC | : | Case No. 18-71765 (AST) |
| ALLEGIANCE CONSULTING ASSOCIATES, LLC | : | Case No. 18-71766 (AST) |
| ALLEGIANCE BILLING & CONSULTING, LLC | : | Case No. 18-71767 (AST) |
| PHOENIX HEALTH, LLC | : | Case No. 18-71789 (AST) |
| NEW YORK NETWORK MANAGEMENT, LLC | : | Case No. 18-74545 (AST) |
| | : | |
| Debtors. | : | (Jointly Administered) |

-----------------------------------------------------------------x

```
------------------------------------------------------------------x
```
ORION HEALTHCORP, INC., et al.,

                            Plaintiffs,                Adv. Pro. No. 18-08104 (AST)

      v.

ROBINSON BROG LEINWAND GREENE GENOVESE
& GLUCK, P.C., A. MITCHELL GREENE, AND ADAM
GREENE,

                            Defendants.
```
------------------------------------------------------------------x
```

## EXHIBIT INDEX

| Exhibit | Description |
|---|---|
| Exhibit A - | Opinion Letter, dated January 30, 2017, from Winston & Strawn, LLP, "as special counsel to Constellation Healthcare Technologies, Inc." to Bank of America and annexed corporate formation documents |
| Exhibit B - | Operating Agreement of Physicians Practice Plus LLC entered into as of the 19th day of February, 2015 |
| Exhibit C - | Amended and Restated Operating Agreement of Northstar First Health, LLC entered into as of the 16th of September, 2015 |
| Exhibit D - | Operating Agreement of Phoenix Health, LLC entered into as of the 16th day of September, 2015 |
| Exhibit E - | Operating Agreement of Vega Medical Professionals, LLC entered into as of the 31st day of August, 2016 |
| Exhibit F - | Operating Agreement of MDRX Medical Billing, LLC entered into as of the 7th day of December, 2015 |
| Exhibit G - | Operating Agreement of NYNM Acquisition, LLC entered into as of the __ day of March, 2017 |
| Exhibit H - | Project Chariot - Flow of Funds showing payments to professionals hired by C. C. Capital to perform due diligence in connection with the Go-Private Transaction |
| Exhibit I - | Subscription Agreement, dated November 24, 2016, Schedule 7.3(C) |
| Exhibit J - | Agreement and Plan of Merger dated November 26, 2017 |

| **Exhibit** | **Description** |
|---|---|
| Exhibit K - | Release of Claims executed by CHT Holdco, LLC, dated as of November 24, 2016 |
| Exhibit L - | Email from Christina Trotta Roupas of Winston & Strawn, LLP dated November 24, 2016 and attached C.C. Capital "Signing Checklist" to be executed at the signing |

# Exhibit A



One Riverfront Plaza, Suite 730
Newark, NJ 07102
T +1 973 848 7676
F +1 973 848 7650

North America   Europe   Asia

January 30, 2017

Bank of America, N.A., as Administrative Agent
    and the Lenders party to the Credit Agreement
    referred to below as of the date hereof

Ladies and Gentlemen:

    We have acted as special counsel to Constellation Healthcare Technologies, Inc., a Delaware corporation ("Holdings"), CHT MergerSub, Inc., a Delaware corporation ("MergerSub"), Orion HealthCorp, Inc., a Delaware corporation ("Borrower"), Medical Billing Services, Inc., a Texas corporation ("Medical Billing"), NEMS Acquisition LLC, a Delaware limited liability company ("NEMS Acquisition"), Northstar FHA, LLC, a Delaware limited liability company ("Northstar"), Phoenix Health, LLC, a Delaware limited liability company ("Phoenix"), MDRX Medical Billing, LLC, a Delaware limited liability company ("MDRX"), Vega Medical Professionals, LLC, a Delaware limited liability company ("Vega"), Rand Medical Billing, Inc., a California corporation ("Rand"), RMI Physician Services Corporation, a Texas corporation ("RMI"), Integrated Physician Solutions, Inc., a Delaware corporation ("Integrated Physician"), Physicians Practice Plus LLC, a Delaware limited liability company ("Physicians Practice"), Physicians Practice Plus Holdings LLC, a Delaware limited liability company ("Physicians Holdings"), NorthStar First Health, LLC, a Delaware limited liability company ("NorthStar First"), Western Skies Practice Management, Inc., a Colorado corporation ("Western Skies"), Northeast Medical Solutions, LLC, a Pennsylvania limited liability company ("Northeast Medical"), NEMS West Virginia, LLC, a Pennsylvania limited liability Company ("NEMS"), Vachette Business Services, Ltd., an Ohio limited liability company ("Vachette"), Allegiance Billing & Consulting, LLC, a New York limited liability company ("Allegiance Billing") and Allegiance Consulting Associates, LLC, a New York limited liability company ("Allegiance Consulting", together with Medical Billing, NEMS Acquisition, Northstar, Phoenix, MDRX, Vega, Rand, RMI, Integrated Physician, Physicians Practice, Physicians Holdings, NorthStar First, Western Skies, Northeast Medical, NEMS, Vachette and Allegiance Billing, the "Subsidiaries") in connection with that certain Credit Agreement, dated as of January 30, 2017 (the "Credit Agreement") among Holdings, MergerSub, Borrower, the Subsidiaries, the several banks and other financial institutions parties thereto (the "Lenders"), and Bank of America, N.A., as administrative agent for the Lenders (in such capacity, the "Administrative Agent"). Capitalized terms used herein, but not otherwise defined herein, shall have the respective meanings ascribed to such terms in the Credit Agreement. This opinion letter is delivered to you at our clients' request pursuant to Section 4.01(c) of the Credit Agreement.

    As used herein, the terms "Opinion Party" and "Opinion Parties" shall refer to, individually or collectively, as applicable, each of Holdings, MergerSub, Borrower and the Subsidiaries.

    As used herein, the terms "DE Opinion Party" and "DE Opinion Parties" shall refer to, individually or collectively, as applicable, each of Holdings, MergerSub, Borrower, NEMS Acquisition, Northstar, Phoenix, MDRX, Vega, Integrated Physician, Physician Practice, Physician Holdings and NorthStar First.

    As used herein, the terms "NY Opinion Party" and "NY Opinion Parties" shall refer to, individually or collectively, as applicable, each of Allegiance Billing and Allegiance Consulting.

As used herein, the terms "<u>TX Opinion Party</u>" and "<u>TX Opinion Parties</u>" shall refer to, individually or collectively, as applicable, each of Medical Billing and RMI.

As used herein, the term "<u>CA Opinion Party</u>" shall refer to Rand.

As used herein, the terms "<u>Covered Party</u>" and "<u>Covered Parties</u>" shall refer to, individually or collectively, as applicable, each DE Opinion Party, each NY Opinion Party, each TX Opinion Party and the CA Opinion Party.

In rendering the opinions set forth herein, we have examined:

(i)    the certificate of incorporation, certificate of formation or articles of organization, as applicable, in each case as certified by the Secretary of State of the applicable jurisdiction as of a recent date, and bylaws or operating agreement, as applicable, as amended through the date hereof, of each Covered Party, in each case as certified by an officer or manager of the applicable Covered Party as of the date hereof;

(ii)    resolutions of the respective governing body of each Covered Party, in each case as certified by an officer or manager of the applicable Covered Party as of the date hereof;

(iii)    the certificates of fact regarding each of the TX Opinion Parties and the good standing certificates of each of the DE Opinion Parties, NY Opinion Parties and the CA Opinion Party attached hereto as <u>Schedule I</u> (collectively, the "<u>Status Certificates</u>");

(iv)    the Credit Agreement;

(v)    the Notes issued on the date hereof;

(vi)    the Security Agreement;

(vii)    the Pledge Agreement;

(viii)    the Notice of Grant of Security Interest in Trademarks, dated as of the date hereof, by and between Borrower and the Administrative Agent;

(ix)    the Notice of Grant of Security Interest in Copyrights, dated as of the date hereof, by and between Northeast Medical and the Administrative Agent;

(x)    the Notice of Grant of Security Interest in Copyrights, dated as of the date hereof, by and between RMI and the Administrative Agent;

(xi)    the Borrower Assignment, Assumption and Release;

(xii)    unfiled copies of the financing statements attached hereto as <u>Schedule II</u> (the "<u>DE Financing Statements</u>") under the Delaware Code (as hereinafter defined), naming each of the DE Opinion Parties as debtor and the Administrative Agent as secured party, which DE Financing Statements we understand will be filed for the DE Opinion Parties in the Office of the Secretary of State of Delaware (the "<u>DE Filing Office</u>");

(xiii)    unfiled copies of the financing statements attached hereto as <u>Schedule III</u> (the "<u>NY Financing Statements</u>") under the New York Code (as hereinafter defined), naming each of the NY

Opinion Parties as debtor and the Administrative Agent as secured party, which NY Financing Statements we understand will be filed for the NY Opinion Parties in the Office of the Secretary of State of New York (the "NY Filing Office");

(xiv)    unfiled copies of the financing statements attached hereto as Schedule IV (the "TX Financing Statements") under the Texas Code (as hereinafter defined), naming each of the TX Opinion Parties as debtor and the Administrative Agent as secured party, which TX Financing Statements we understand will be filed for the TX Opinion Parties in the Office of the Secretary of State of Texas (the "TX Filing Office");

(xv)    unfiled copy of the financing statement attached hereto as Schedule V (the "CA Financing Statement", and collectively with the DE Financing Statements, NY Financing Statements and TX Financing Statements, the "Financing Statements") under the California Code (as hereinafter defined), naming the CA Opinion Party as debtor and the Administrative Agent as secured party, which CA Financing Statement we understand will be filed for the CA Opinion Party in the Office of the Secretary of State of California (the "CA Filing Office");

(xvi)    tax clearance letters from the Comptroller of the State of Texas attached hereto as Schedule VI, each dated as of January 18, 2017, regarding the status of each entity's Texas franchise tax account to determine such status with respect to each of the TX Opinion Parties (such records, as of such date, the "Online Tax and Status Records"); and

(xvii)    such other agreements, instruments and documents, and such questions of law, as we have deemed necessary or appropriate to enable us to render the opinions expressed below.

Additionally, we have examined originals or copies, certified to our satisfaction, of such certificates of public officials and officers and of representatives of the Opinion Parties and we have made such inquiries of officers and representatives of the Opinion Parties, in each case, as we have deemed relevant or necessary to establish the basis for the opinions set forth herein. The items identified in clause (i) above are collectively hereinafter referred to as the "Organizational Documents" and the items identified in clauses (iv) through (xi) above are collectively hereinafter referred to as the "Transaction Documents".

In rendering the opinions expressed below, we have, with your consent, assumed the legal capacity of all natural persons executing documents, that the signatures of persons signing all documents in connection with which this opinion letter is rendered are genuine, that all documents submitted to us as originals or duplicate originals are authentic and that all documents submitted to us as copies, whether certified or not, conform to authentic original documents. Additionally, we have, with your consent, assumed and relied upon the following:

(a)    the accuracy and completeness of all certificates and other statements, documents, records, financial statements and papers reviewed by us, and the accuracy and completeness of all representations, warranties, schedules and exhibits contained in the Transaction Documents, with respect to the factual matters set forth therein;

(b)    except to the extent expressly set forth in paragraph 1 below with respect to the Covered Parties and paragraph 2 below with respect to the Covered Parties and the Opinion Parties, as applicable, all parties to the documents reviewed by us are duly organized, validly existing and in good standing (to the extent applicable) under the laws of their respective jurisdictions of incorporation or formation and qualified under the laws of all jurisdictions where they are conducting their businesses or otherwise

Bank of America, N.A., as Administrative Agent                    January 30, 2017
and the Lenders party to the Credit Agreement                                Page 4

required to be so qualified, and have full power and authority to execute, deliver and perform under such documents and all such documents have been duly authorized, executed and delivered by such parties;

(c)    each Transaction Document constitutes the valid and binding obligation of each party thereto (other than the Opinion Parties) enforceable against such party in accordance with its terms;

(d)    neither the Administrative Agent nor any of its representatives has any knowledge (actual or constructive) of any adverse claim, lien, security interest, claim, encumbrance, interest or other condition of title affecting any of the "Collateral" (as defined in the Security Agreement) or the "Pledged Collateral" (as defined in the Pledge Agreement), except for Liens described in Schedule 7.01 to the Credit Agreement;

(e)    all items of Collateral for which possession must be taken by a secured party in order to perfect its security interest under Section 9-312 of the Uniform Commercial Code of New York (the "New York Code") are in the possession or constructive possession of the Administrative Agent and not in the possession of any Opinion Party, any of their respective Subsidiaries or any of their respective, affiliates or agents or any other person acting on behalf of any Opinion Party or any of their respective Subsidiaries;

(f)    each of the Opinion Parties has acquired good and sufficient title to each item of Collateral and Pledged Collateral existing on the date hereof and has, or has the power to transfer, "rights" in and to such item of Collateral or Pledged Collateral within the meaning of Section 9-203 of the New York Code consistent with and sufficient for purposes of the Transaction Documents, and the same will be true of each item of Collateral and Pledged Collateral acquired after the date hereof;

(g)    the name of each secured party listed in each Financing Statement is the name of such secured party as contemplated by Section 9-502(a)(2) of the Delaware Code, the New York Code, the Texas Code, or the California Code, as applicable;

(h)    "value" within the meaning of Section 1-204 of the New York Code has been given;

(i)    the Collateral and the Pledged Collateral actually exist and the descriptions of the Collateral and the Pledged Collateral in the Security Agreement and the Pledge Agreement, respectively, reasonably describe the property intended by the parties thereto to be described therein as Collateral and Pledged Collateral, respectively;

(j)    for purposes of our opinion set forth in paragraph 12 below: (i) each issuer of the Pledged Collateral consisting of uncertificated securities is organized under either the law of the State of Delaware, the law of the State of Texas, the law of the State of California or the law of the State of New York and has not specified the law of another jurisdiction as the law governing matters specified in Section 8-110(a)(2) through (5) of the New York Code; and (ii) each owner identified on Schedule 2(a) to the Pledge Agreement of certain Pledged Collateral consisting of uncertificated securities is, and will remain, the only registered owner of such Pledged Collateral; and

(k)    none of the arrangers, the Administrative Agent, the Lenders or the Transaction Documents are subject to the provisions of Section 5-531 of the New York General Obligations Law.

Whenever our opinion with respect to the existence or absence of facts is indicated to be based on our knowledge or awareness, we are referring to the actual present knowledge of the particular Winston & Strawn LLP attorneys who have represented the Opinion Parties during the course of our limited representation of the Opinion Parties in connection with the Transaction Documents.  Except as expressly

set forth herein, we have not undertaken any independent investigation, examination or inquiry to determine the existence or absence of any facts (and have not caused the review of any court file or indices) and no inference as to our knowledge concerning any facts should be drawn as a result of the limited representation undertaken by us.

In addition, we make the following disclosures and comments concerning our opinions in paragraph 10 below addressing perfection of certain security interests:

(i)    We note that the Organizational Documents of the DE Opinion Parties indicate that each of the DE Opinion Parties is a Delaware corporation or Delaware limited liability company, and thus each of the DE Opinion Parties is a "registered organization" within the meaning of the New York Code, located (for purposes of Section 9-307 and 9-301 of the New York Code) in Delaware. Under Section 9-301 of the New York Code (the law of which is the contractually chosen substantive law governing each of the Security Agreement and the Pledge Agreement), perfection of nonpossessory security interests in the Collateral and the Pledged Collateral granted by any DE Opinion Party would accordingly be governed by Delaware law. To the extent that Delaware law applies to such matters (under the New York Code), with your consent, in rendering the opinions set forth in paragraph 10(a) below, we have relied solely on our review of Article 9 of the Uniform Commercial Code as enacted in Delaware and set forth in the CCH Secured Transactions Guide viewed online as of January 13, 2017 (the "Delaware Code"), without any investigation of legal decisions or other statutory provisions in effect in Delaware that may affect the perfection of security interests under Delaware law.

(ii)    We note that the Organizational Documents of the NY Opinion Parties indicate that each of the NY Opinion Parties is a New York limited liability company, and thus each of the NY Opinion Parties is a "registered organization" within the meaning of the New York Code, located in New York.

(iii)    We note that the Organizational Documents of the TX Opinion Parties indicate that each of the TX Opinion Parties is a Texas corporation, and thus each of the TX Opinion Parties is a "registered organization" within the meaning of the Texas Code, located (for purposes of Section 9-307 and 9-301 of the New York Code) in Texas. Under Section 9-301 of the New York Code (the law of which is the contractually chosen substantive law governing each of the Security Agreement and the Pledge Agreement), perfection of nonpossessory security interests in the Collateral and the Pledged Collateral granted by any TX Opinion Party would accordingly be governed by Texas law. To the extent that Texas law applies to such matters (under the New York Code), with your consent, in rendering the opinions set forth in paragraph 10(c) below, we have relied solely on our review of Article 9 of the Uniform Commercial Code as enacted in Texas (the "Texas Code").

(iv)    We note that the Organizational Documents of the CA Opinion Party indicate that the CA Opinion Party is a California corporation, and thus the CA Opinion Party is a "registered organization" within the meaning of the California Code, located (for purposes of Section 9-307 and 9-301 of the New York Code) in California. Under Section 9-301 of the New York Code (the law of which is the contractually chosen substantive law governing each of the Security Agreement and the Pledge Agreement), perfection of nonpossessory security interests in the Collateral and the Pledged Collateral granted by the CA Opinion Party would accordingly be governed by California law. To the extent that California law applies to such matters (under the New York Code), with your consent, in rendering the opinions set forth in paragraph 10(d) below, we have relied solely on our review of Division 9 of the Uniform Commercial Code as enacted in California (the "California Code").

(v)    We note that under Section 9-301(b) of the New York Code (the law of which is the contractually chosen substantive law governing the Pledge Agreement), perfection of possessory security interests in the Pledged Collateral (to the extent the Pledged Collateral constitutes "certificated securities"

Bank of America, N.A., as Administrative Agent                              January 30, 2017
and the Lenders party to the Credit Agreement                                          Page 6

within the meaning of the New York Code) would be governed by New York law (the State in which we understand the secured party will hold the certificated securities).

Based upon the foregoing and subject to the assumptions, qualifications, limitations and comments stated herein, we are of the opinion that:

1.        Each of the DE Opinion Parties is validly existing and in good standing as a corporation or a limited liability company, as applicable, under the laws of the State of Delaware. Each of the NY Opinion Parties is validly existing as a limited liability company under the laws of the State of New York. Each of the TX Opinion Parties is validly existing and in good standing as a corporation under the laws of the State of Texas. The CA Opinion Party is validly existing and in good standing as a corporation under the laws of the State of California. Each of the Covered Parties has the corporate or limited liability company, as applicable, power and authority to own, pledge, mortgage and operate its properties, to conduct its business as presently conducted, to execute and deliver each of the Transaction Documents to which it is a party and perform its obligations thereunder.

2.        The execution, delivery and performance of each of the Transaction Documents to which any Covered Party is a party have been duly authorized by all necessary corporate or limited liability company, as applicable, action on the part of each such Covered Party, and each of the Transaction Documents has been duly executed and delivered by each Opinion Party that is a party thereto to the extent such due execution and delivery is governed by (i) the laws of the State of New York, (ii) in the case of the DE Opinion Parties only, the Delaware Covered Law, (iii) in the case of the TX Opinion Parties only, the Texas Corporate Law and (iv) in the case of the CA Opinion Party only, the California Corporate Law.

3.        Each of the Transaction Documents constitutes the valid and binding obligation of each Opinion Party that is a party thereto, enforceable against such Opinion Party in accordance with its terms.

4.        Assuming the proceeds of the loans are used solely for the purposes set forth in Section 6.11 of the Credit Agreement, neither the execution and delivery by each of the Opinion Parties of the Transaction Documents to which it is a party, nor the performance by each of the Opinion Parties of its obligations thereunder:

(a)        violates any statutory law, rule or regulation of the State of New York or the United States (including any applicable order or decree of any court or governmental instrumentality known to us) applicable to such Opinion Party which a New York lawyer exercising customary professional diligence would reasonably be expected to recognize as being applicable to transactions of the type contemplated by the Transaction Documents; or

(b)        requires the consent or approval of, or any filing or registration with, any governmental body, agency or authority of the State of New York or the United States, other than (i) the filing of the NY Financing Statements, (ii) those that have been obtained, and (iii) any consents, approvals or filings that may be required in connection with the exercise by the Administrative Agent of remedies under the Transaction Documents.

For purposes of the opinions expressed in this paragraph 4, we have assumed that none of the Opinion Parties will take in the future any discretionary action (including a decision not to act) permitted by the Transaction Documents that would cause the performance of the Transaction Documents to violate any statutory law or regulation of the State of New York or the United States, or require the consent or

Bank of America, N.A., as Administrative Agent                          January 30, 2017
and the Lenders party to the Credit Agreement                                    Page 7

approval of, or any filing or registration with, any governmental body, agency or authority of the State of
New York or the United States.

5.    Assuming the proceeds of the loans are used solely for the purposes set forth in Section
6.11 of the Credit Agreement, neither the execution and delivery by each of the DE Opinion Parties of the
Transaction Documents to which it is a party, nor the performance by each of the DE Opinion Parties of
its obligations thereunder:

    (a)    violates (i) any provision of such DE Opinion Party's Organizational Documents or (ii)
the General Corporation Law of the State of Delaware (the "Delaware Corporate Law")
or the Limited Liability Company Act of the State of Delaware (the "Delaware LLC
Law", and together with the Delaware Corporate Law, the "Delaware Covered Law"), as
applicable; or

    (b)    requires the consent or approval of, or any filing or registration with, any governmental
body, agency or authority of the State of Delaware (solely with respect to the Delaware
Code or Delaware Covered Law), other than (i) the filing of the DE Financing
Statements, (ii) those that have been obtained, and (iii) any consents, approvals or filings
that may be required in connection with the exercise by the Administrative Agent of
remedies under the Transaction Documents.

For purposes of the opinions expressed in this paragraph 5, we have assumed that none of the DE
Opinion Parties will take in the future any discretionary action (including a decision not to act) permitted
by the Transaction Documents that would cause the performance of the Transaction Documents to violate
the Delaware Covered Law or require the consent or approval of, or any filing or registration with, any
governmental body, agency or authority of the State of Delaware (solely with respect to the Delaware
Code and the Delaware Covered Law).

6.    Assuming the proceeds of the loans are used solely for the purposes set forth in Section
6.11 of the Credit Agreement, neither the execution and delivery by each of the NY Opinion Parties of the
Transaction Documents to which it is a party, nor the performance by each of the NY Opinion Parties of
its obligations thereunder violates (i) any provision of such NY Opinion Party's Organizational
Documents or (ii) the New York Limited Liability Company Law (the "New York LLC Law").  For
purposes of the opinions expressed in this paragraph 6, we have assumed that none of the NY Opinion
Parties will take in the future any discretionary action (including a decision not to act) permitted by the
Transaction Documents that would cause the performance of the Transaction Documents to violate the
New York LLC Law.

7.    Assuming the proceeds of the loans are used solely for the purposes set forth in Section
6.11 of the Credit Agreement, neither the execution and delivery by each of the TX Opinion Parties of the
Transaction Documents to which it is a party, nor the performance by each of the TX Opinion Parties of
its obligations thereunder:

    (a)    violates (i) any provision of such TX Opinion Party's Organizational Documents, or (ii)
the Texas Business Corporation Act (the "Texas Corporate Law"); or

    (b)    requires the consent or approval of, or any filing or registration with, any governmental
body, agency or authority of the State of Texas (solely with respect to the Texas Code
and the Texas Corporate Law), other than (i) the filing of the TX Financing Statements,
(ii) those that have been obtained, and (iii) any consents, approvals or filings that may be

required in connection with the exercise by the Administrative Agent of remedies under the Transaction Documents.

For purposes of the opinions expressed in this paragraph 7, we have assumed that none of the TX Opinion Parties will take in the future any discretionary action (including a decision not to act) permitted by the Transaction Documents that would cause the performance of the Transaction Documents to violate the Texas Corporate Law or require the consent or approval of, or any filing or registration with, any governmental body, agency or authority of the State of Texas (solely with respect to the Texas Code and the Texas Corporate Law).

8.      Assuming the proceeds of the loans are used solely for the purposes set forth in Section 6.11 of the Credit Agreement, neither the execution and delivery by the CA Opinion Party of the Transaction Documents to which it is a party, nor the performance by the CA Opinion Party of its obligations thereunder:

(a)      violates (i) any provision of the CA Opinion Party's Organizational Documents, or (ii) the Corporations Code of the State of California (the "California Corporate Law"); or

(b)      requires the consent or approval of, or any filing or registration with, any governmental body, agency or authority of the State of California (solely with respect to the California Code and the California Corporate Law), other than (i) the filing of the CA Financing Statement, (ii) those that have been obtained, and (iii) any consents, approvals or filings that may be required in connection with the exercise by the Administrative Agent of remedies under the Transaction Documents.

For purposes of the opinions expressed in this paragraph 8, we have assumed that the CA Opinion Party will not take in the future any discretionary action (including a decision not to act) permitted by the Transaction Documents that would cause the performance of the Transaction Documents to violate the California Corporate Law or require the consent or approval of, or any filing or registration with, any governmental body, agency or authority of the State of California (solely with respect to the California Code and the California Corporate Law).

9.      The provisions of the Security Agreement and the Pledge Agreement are sufficient to create in the Administrative Agent's favor as security for the payment of the "Secured Obligations" (as defined in the Credit Agreement) a security interest in all right, title and interest of the Opinion Parties in those items and types of Collateral and Pledged Collateral, as described in the Security Agreement or the Pledge Agreement, as applicable, in which a security interest may be created under Article 9 of the New York Code (the "Article 9 Collateral").

10.     The description of the Article 9 Collateral:

(a)      set forth in each DE Financing Statement is sufficient under Section 9-504 of the Delaware Code to perfect a security interest in the items and types of Collateral and Pledged Collateral in which a security interest may be perfected by the filing of a financing statement under the Delaware Code. Assuming that the DE Financing Statements have been properly filed in the DE Filing Office, the Administrative Agent's security interest in the Article 9 Collateral of the DE Opinion Parties has been perfected, to the extent a security interest in that portion of the Article 9 Collateral may be perfected under the Delaware Code by the filing of the DE Financing Statements;

(b)     set forth in each NY Financing Statement is sufficient under Section 9-504 of the New York Code to perfect a security interest in the items and types of Collateral and Pledged Collateral in which a security interest may be perfected by the filing of a financing statement under the New York Code. Assuming that the NY Financing Statements have been properly filed in the NY Filing Office, the Administrative Agent's security interest in the Article 9 Collateral of the NY Opinion Parties has been perfected, to the extent a security interest in that portion of the Article 9 Collateral may be perfected under the New York Code by the filing of the NY Financing Statements;

(c)     set forth in each TX Financing Statement is sufficient under Section 9-504 of the Texas Code to perfect a security interest in the items and types of Collateral and Pledged Collateral in which a security interest may be perfected by the filing of a financing statement under the Texas Code. Assuming that the TX Financing Statements have been properly filed in the TX Filing Office, the Administrative Agent's security interest in the Article 9 Collateral of the TX Opinion Parties has been perfected, to the extent a security interest in that portion of the Article 9 Collateral may be perfected under the Texas Code by the filing of the TX Financing Statements; and

(d)     set forth in the CA Financing Statement is sufficient under Section 9504 of the California Code to perfect a security interest in the items and types of Collateral and Pledged Collateral in which a security interest may be perfected by the filing of a financing statement under the California Code. Assuming that the CA Financing Statement has been properly filed in the CA Filing Office, the Administrative Agent's security interest in the Article 9 Collateral of the CA Opinion Parties has been perfected, to the extent a security interest in that portion of the Article 9 Collateral may be perfected under the California Code by the filing of the CA Financing Statement.

11.     Assuming that the Administrative Agent has taken and is retaining possession of each physical stock certificate or membership certificate evidencing shares of stock or membership interests, as applicable, included in the Pledged Collateral (such physical certificates, the "Pledged Certificates") in the State of New York in registered form accompanied by undated transfer powers with respect thereto duly endorsed in blank by an effective endorsement and the Administrative Agent has taken such Pledged Certificates in good faith without notice (actual or constructive) of any adverse claim within the meaning of the New York Code, there has been created under the Pledge Agreement, and there has been granted to the Administrative Agent, a perfected security interest in the Pledged Certificates, free of adverse claims, to the extent a security interest may be perfected by possession thereof under the New York Code.

12.     The Administrative Agent will have a perfected security interest in the portion of Pledged Collateral consisting of uncertificated securities when each issuer thereof has agreed that it will comply with the instructions with respect to such Pledged Collateral originated by the Administrative Agent without further consent by the applicable registered owner of such Pledged Collateral.

13.     No Opinion Party is an "investment company", as such term is defined in the Investment Company Act of 1940, as amended (the "ICA"), registered or required to be registered under the ICA.

14.     Assuming the accuracy of the representations and warranties in Sections 5.13 of the Credit Agreement and assuming that each of the Opinion Parties applies the proceeds of the Loans as provided for and set forth in Section 7.10 of the Credit Agreement, the making of the Loans as provided in the Credit Agreement will comply with the provisions of Regulation U and Regulation X of the Federal Reserve Board. For purposes of this opinion, we have assumed that the Lenders are subject to Regulation U because none of the Lenders is a "creditor" as defined in Regulation T.

Bank of America, N.A., as Administrative Agent                                         January 30, 2017
and the Lenders party to the Credit Agreement                                                Page 10

The opinions expressed herein are subject to the following qualifications, limitations and comments (and where such qualification, limitation or comment makes reference to the New York Code and relates to our opinions set forth above in paragraph 10 as to perfection, such reference shall be deemed a reference to the Delaware Code, Texas Code or California Code as and to the extent relevant):

(a)    the enforceability of the Transaction Documents and the obligations of each of the Opinion Parties thereunder and the availability of certain rights and remedial provisions provided for in the Transaction Documents are subject to: (i) judicial action giving effect to foreign governmental actions or foreign laws, in either case, affecting creditor's rights; (ii) the effect of bankruptcy, fraudulent conveyance or transfer, insolvency, reorganization, receivership, arrangement, liquidation, conservatorship and moratorium laws; (iii) limitations imposed by other laws and judicial decisions relating to or affecting the rights of creditors or secured creditors generally; and (iv) general principles of equity (regardless of whether enforcement is considered in proceedings at law or in equity), upon the availability of injunctive relief or other equitable remedies, including, without limitation, where (1) the breach of covenants or provisions imposes restrictions or burdens upon a party and it cannot be demonstrated that the enforcement of such remedies, restrictions or burdens is reasonably necessary for the protection of another party to the agreement, (2) a party's enforcement of such remedies, covenants or provisions under the circumstances, or the manner of such enforcement, would violate such party's implied covenant of good faith and fair dealing, or would be commercially unreasonable, (3) a court having jurisdiction finds that such remedies, covenants or provisions were, at the time made, or are in application, unconscionable as a matter of law or contrary to public policy or (4) self-help or automatic or summary remedies are exercised without notice or opportunity for hearing or correction or disclaiming liability or responsibility in connection with the exercise of remedies;

(b)    we express no opinion as to the enforceability of cumulative remedies to the extent such cumulative remedies purport to or would have the effect of compensating the party entitled to the benefits thereof in amounts in excess of the actual loss suffered by such party;

(c)    provisions in the Transaction Documents deemed to impose the payment of interest on interest may be unenforceable, void or voidable under applicable law, except to the extent permitted by Section 5-527 of the New York General Obligations Law;

(d)    we express no opinion as to the validity, binding effect or enforceability of any indemnification or contribution provisions of the Transaction Documents to the extent such provisions violate the public policy underlying any law, rule or regulation or purport to provide for the indemnification of a person for its own negligence, willful misconduct or illegal conduct;

(e)    requirements in the Transaction Documents specifying that provisions thereof may only be waived in writing may not be valid, binding or enforceable to the extent that an oral agreement or an implied agreement by trade practice or course of conduct has been created modifying any provision of such documents;

(f)    we express no opinion as to the severability of any provision of any of the Transaction Documents;

(g)    we express no opinion with respect to the validity, binding effect or enforceability of any provision of the Transaction Documents: (i) purporting to establish evidentiary standards or a consent to venue or jurisdiction of any particular court or other governmental authority (either as to personal jurisdiction or subject matter jurisdiction); (ii) waiving service of process or demand or notice and hearing or constitutional rights (including a jury trial) or statute of limitations; or (iii) purporting to eliminate any obligation to marshal assets;

AmericasActive:8451631.5

(h)    we express no opinion with respect to any provisions of the Transaction Documents purporting to appoint the Administrative Agent or any Lender as attorney-in-fact or agent for any Opinion Party;

(i)    we express no opinion with respect to any provision of the Transaction Documents to the extent that such provision permits set-off to be made without notice;

(j)    notwithstanding certain language of the Transaction Documents, the Administrative Agent and the Lenders may be limited to recovering only reasonable expenses with respect to the retaking, holding, preparing for sale or lease, selling, leasing and the like of Collateral and/or Pledged Collateral and reasonable attorneys' fees and legal expenses and only reasonable compensation for funding losses, increased costs or yield protection;

(k)    our opinion with respect to the enforceability of the choice of law provisions of the Transaction Documents in paragraph 3 above under the laws of the State of New York is rendered in reliance on Section 5-1401 of the New York General Obligations Law and is subject to the qualifications that such enforceability: (i) may be limited by public policy considerations of any jurisdiction, other than the State of New York, in which enforcement of such provisions, or of a judgment upon an agreement containing such provisions, is sought; and (ii) does not apply to the extent provided in Section 1-301(c) of the New York Code.  Accordingly, we express no opinion as to the effect of the law of any jurisdiction (other than the State of New York) as to the choice of law in the Transaction Documents (including, without limitation, whether any court outside the State of New York would honor the choice of New York law as the governing law of the Transaction Documents);

(l)    our opinions expressed in paragraph 1 hereof as to the existence and good standing of each Covered Party are given solely on the basis of the Status Certificates, and the Online Tax and Status Records applicable to the TX Opinion Parties, and such opinions speak only as of the dates of such certificates and not as of the date hereof;

(m)    we express no opinion as to the effect of the law of any jurisdiction (other than the State of New York) wherein any party seeking enforcement of any Transaction Document may be located or wherein the enforcement of any Transaction Document may be sought that limits the rates of interest legally chargeable or collectible;

(n)    except as expressly set forth in paragraphs 13 and 14 above, we express no opinion with respect to the applicability or effect of federal or state anti-trust, unfair competition, tax, pension, employee benefit, environmental, commodities, securities or "blue sky" laws or Federal Reserve Board margin regulations on the transactions contemplated by the Transaction Documents;

(o)    we express no opinion as to the effect of any federal law related to copyrights, patents, trademarks, service marks or other intellectual property on the opinions expressed herein;

(p)    we express no opinion with respect to the USA Patriot Act of 2001 or any laws relating to foreign asset control or any rules, regulations or orders relating to any of the foregoing;

(q)    we express no opinion as to whether a failure to exercise or delay in exercising rights or remedies will operate as a waiver of any such right or remedy or with respect to the enforceability of "time is of the essence" or other provisions relating to a delay or failure to exercise any right, remedy or option;

(r)    we express no opinion as to any law that might be violated by any misrepresentation or omission or a fraudulent act;

(s)    we express no opinion as to the effect of the legal or regulatory status or the nature of the business of any party to any Transaction Document except as expressly set forth in paragraphs 1, 13 and 14 above;

(t)    we express no opinion concerning the validity, enforceability, attachment, perfection or filings required in respect of any lien or other security interest purportedly granted under any Transaction Document in: (i) personal property interests of any type excluded from the scope of Articles 8 and 9 of the New York Code; (ii) property subject to a statute, regulation or treaty of the United States that preempts Article 9 of the New York Code; (iii) vehicles, aircraft, boats or any other type of property subject to a certificate of title or similar statute; (iv) insurance policies, condemnation and other similar awards, and unearned premiums; (v) permits, certificates, approvals, authorizations, licenses and other properties, rights or interests subject to the jurisdiction of a governmental authority whose consent is required before such items may be transferred, reissued or made subject to any lien or other security interest, (vi) "general intangibles" (as defined in the New York Code) that terminate or become terminable (pursuant to the terms of an agreement) if a security interest is granted therein; (vii) property subject to negative pledge clauses of which the Administrative Agent is aware; (viii) consumer goods and timber to be cut, and accounts and general intangibles resulting from the sale of any of the foregoing; (ix) goods covered by warehouse receipts; (x) letters of credit and letter-of-credit rights; (xi) any "accounts," "chattel paper," "documents," "instruments" or "general intangibles" (each as defined in the New York Code) with respect to which the account debtor or obligor is the United States of America, any state, county, city, municipality or other governmental body, or any department, agency or instrumentality thereof, unless the same has been assigned to the Administrative Agent pursuant to and in accordance with the Assignment of Claims Act of 1940, as amended, or any applicable similar law or regulation relating to the assignment or pledge thereof; (xii) "commercial tort claims" (as defined in the New York Code) or (xiii) tax refund claims;

(u)    except as expressly set forth in paragraphs 9, 10, 11 and 12 above, we express no opinion as to the creation or perfection of a security interest in any Collateral or Pledged Collateral;

(v)    we have not made nor undertaken to make any investigation of the state of title to the Collateral or Pledged Collateral or the location thereof and we express no opinion with respect to the existence of title to such Collateral or Pledged Collateral, the location thereof or the priority of the liens, security interests or pledges granted or purported to be granted by the Transaction Documents;

(w)    any purported assignment of any agreement or any governmental approval, license or permit may be subject to restrictions upon assignment or transfer that, although not necessarily applicable to assignments intended as security, may be required to be satisfied before the Administrative Agent will be treated as an assignee (other than a collateral assignee) thereof, except to the extent that consents to or approvals of such assignment have been obtained from the appropriate governmental body or third party and except to the extent that restrictions on such assignment are unenforceable under Sections 9-406 through 9-409 of the New York Code;

(x)    we express no opinion as to the creation or perfection of a security interest in any Collateral and/or Pledged Collateral consisting of "proceeds" (as such term is defined in the New York Code) to the extent such perfection is limited as set forth in Section 9-315 of the New York Code and, under certain circumstances described in Sections 9-320 and 9-330 of the New York Code, purchasers of Collateral and/or Pledged Collateral may take the same free of a perfected security interest;

(y) we express no opinion with respect to any goods that are accessions to, or commingled with, other goods to the extent that the security interest is limited by Section 9-335 or 9-336 of the New York Code;

(z) the rights of debtors, guarantors and other secured parties to receive notices under Sections 9-610, 9-611, 9-612, 9-613, 9-614, 9-620, 9-621 and 9-624 of the New York Code may not be waived prior to default and the failure to comply with such notice requirements may bar or limit the recovery of any deficiency remaining after the retention or sale of repossessed collateral and, further, we express no opinion as to the right of the Administrative Agent or any Lender to enforce any of its rights without notice to the Opinion Parties and without judicial hearing or without bond, and we do not express any opinion as to whether the periods of notice set forth in the Transaction Documents are enforceable;

(aa) we express no opinion with respect to the validity, binding effect or enforceability of any purported waiver, release or disclaimer under any of the Transaction Documents relating to: (i) statutory or equitable rights and defenses of any Opinion Party that are not subject to waiver, release or disclaimer; or (ii) rights or claims of, or duties owing to, any Opinion Party (including, without limitation, any waiver, release or disclaimer of any provision of the New York Code) to the extent limited by Sections 1-302, 9-207 and 9-602 of the New York Code or other provisions of applicable law, or to the extent such rights, claims and duties otherwise exist as a matter of law, except to the extent such Opinion Party has effectively so waived, released or disclaimed such rights, claims or duties in accordance with Section 9-602 of the New York Code or other applicable law;

(bb) the duties to exercise reasonable care in the custody and preservation of the Collateral and Pledged Collateral in a secured party's possession and to deal with and to dispose of the Collateral and Pledged Collateral in a commercially reasonable manner as required by the New York Code or other applicable law may not be disclaimed by agreement, modified, waived or released prior to a default;

(cc) any rights of the Administrative Agent to foreclose its liens or enforce its remedies against the Collateral and/or Pledged Collateral must be enforced pursuant to the provisions of the New York Code and other applicable federal, state and local laws;

(dd) except with respect to the Administrative Agent's right to file the Financing Statements, we express no opinion with respect to the validity, binding effect or enforceability of any provision of the Transaction Documents that purports to authorize the Administrative Agent or any Lender to sign or file documents without the signature of any Opinion Party;

(ee) we express no opinion as to the Administrative Agent's ability to use "self-help" remedies to repossess the Collateral and/or Pledged Collateral if a breach of the peace were to occur;

(ff) pursuant to Section 9-108(c) of the New York Code, a description of collateral in a security agreement as "all assets" or "all personal property" or words of similar import is not sufficient for purposes of Section 9-203 of the New York Code and, accordingly, our opinion in paragraph 9 above does not apply to the extent of any such description of collateral in the Security Agreement or the Pledge Agreement;

(gg) we express no opinion as to the validity or enforceability of any provision of the Transaction Documents that purports to reinstate the perfected status or continue the priority of any lien or security interest that may have been released or terminated; and

(hh) our opinions are limited by the effect of statutes and rules of law protecting guarantors, including those (i) which may discharge a guarantor, if the beneficiary of the guaranty alters the

obligation of a principal, fails to inform the guarantor of material information pertinent to the principal or any collateral, elects remedies that may impair the subrogation or reimbursement rights of the guarantor against the principal or the value of any collateral, fails to accord the guarantor the protections afforded a debtor under New York law (including, without limitation, the New York Code), or otherwise takes any action which prejudices the guarantor, without obtaining consent of the guarantor, and (ii) relating to waivers or subordination by a guarantor of its rights against the principal or otherwise.

The opinions expressed herein are based upon and are limited to: (i) the laws of the State of New York; (ii) the Delaware Covered Law; (iii) solely with respect to our opinions set forth in paragraphs 5(b) and 10(a) above, subject to the limitations set forth herein, the Delaware Code; (iv) the Texas Corporate Law, (v), solely with respect to our opinion set forth in paragraphs 7(b) and 10(c) above, subject to the limitations set forth herein, the Texas Code; (vi) the California Corporate Law; (vii) solely with respect to our opinion set forth in paragraphs 8(b) and 10(d) above, subject to the limitations set forth herein, the California Code; and (viii) the laws of the United States, and we express no opinion with respect to the laws of any other state, jurisdiction or political subdivision. The opinions expressed herein that are based on the laws of the State of New York and the United States of America are limited to the laws which a New York lawyer exercising customary professional diligence would reasonably be expected to recognize as being applicable to transactions of the type contemplated by the Transaction Documents.

Our opinions set forth in this letter are based upon the facts in existence and laws in effect on the date hereof and we expressly disclaim any obligation to update our opinions herein, regardless of whether changes in such facts or laws come to our attention after the delivery hereof.

This opinion letter is solely for the benefit of the addressees hereof in connection with the execution and delivery of the Credit Agreement. At your request, we hereby consent to reliance hereon by any successor or future assignee of any interest of an addressee hereof in the loans under the Credit Agreement pursuant to an assignment that is made in accordance with the express provisions of Section 11.06 of the Credit Agreement, on the condition and understanding that: (i) this letter speaks only as of the date hereof; (ii) we have no responsibility or obligation to update this letter, to consider its applicability or correctness to anyone other than its addressees, or to take into account changes in law, facts or any other developments of which we may later become aware; (iii) any such reliance by a future assignee must be actual and reasonable under the circumstances existing at the time of assignment, including any changes in law, facts or any other developments known to or reasonably knowable by the assignee at such time; and (iv) in furtherance and not in limitation of the foregoing, our consent to such reliance shall in no event constitute a reissuance of the opinions expressed herein or otherwise extend any statute of limitation period applicable hereto on the date hereof. No attorney-client relationship exists or has existed by reason of our preparation, execution and delivery of this opinion letter to any addressee hereof or other person or entity except for the Opinion Parties. In permitting reliance hereon by any person or entity other than the Opinion Parties, we are not acting as counsel for such other person or entity and have not assumed and are not assuming any responsibility to advise such other person or entity with respect to the adequacy of this opinion letter for its purposes. Except as permitted pursuant to the second sentence of this paragraph, this opinion letter may not be relied upon in any manner by any other person and may not be disclosed, quoted, filed with a governmental agency or otherwise referred to without our prior written consent except that you may furnish copies of this opinion letter: (i) pursuant to judicial process or government order or requirement of applicable law or regulation; (ii) to your accountants, auditors and counsel; (iii) participants and prospective assignees; and (iv) to bank or other regulatory examiners; provided that none of the foregoing are entitled to rely on this opinion letter.

Very truly yours,

Winston & Strawn LLP

Schedule I

**STATUS CERTIFICATES**

(attached)

AmericasActive:8451631.5

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697



Rolando B. Pablos
Secretary of State

## Office of the Secretary of State

### Certificate of Fact

The undersigned, as Secretary of State of Texas, does hereby certify that the document, Articles Of Incorporation for MEDICAL BILLING SERVICES, INC. (file number 77042200), a Domestic For-Profit Corporation, was filed in this office on October 16, 1985.

It is further certified that the entity status in Texas is in existence.

In testimony whereof, I have hereunto signed my name officially and caused to be impressed hereon the Seal of State at my office in Austin, Texas on January 20, 2017.





Rolando B. Pablos
Secretary of State

*Come visit us on the internet at http://www.sos.state.tx.us/*

Phone: (512) 463-5555          Fax: (512) 463-5709          Dial: 7-1-1 for Relay Services
Prepared by: SOS-WEB          TID: 10264          Document: 709834060007

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697



Rolando B. Pablos
Secretary of State

# Office of the Secretary of State

### Certificate of Fact

The undersigned, as Secretary of State of Texas, does hereby certify that the document, Articles Of Incorporation for RMI PHYSICIAN SERVICES CORPORATION (file number 131275100), a Domestic For-Profit Corporation, was filed in this office on May 23, 1994.

It is further certified that the entity status in Texas is in existence.

In testimony whereof, I have hereunto signed my name officially and caused to be impressed hereon the Seal of State at my office in Austin, Texas on January 20, 2017.





Rolando B. Pablos
Secretary of State

*Come visit us on the internet at http://www.sos.state.tx.us/*

Phone: (512) 463-5555
Prepared by: SOS-WEB

Fax: (512) 463-5709
TID: 10264

Dial: 7-1-1 for Relay Services
Document: 709834060003

# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "CHT MERGERSUB, INC." IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE FIFTH DAY OF JANUARY, A.D. 2017.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL REPORTS HAVE BEEN FILED TO DATE.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "CHT MERGERSUB, INC." WAS INCORPORATED ON THE FOURTEENTH DAY OF NOVEMBER, A.D. 2016.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES HAVE BEEN PAID TO DATE.

Jeffrey W. Bullock, Secretary of State

6119641  8300

SR# 20170070459

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 201822948

Date: 01-05-17

# Delaware

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "CONSTELLATION HEALTHCARE TECHNOLOGIES, INC." IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE FIFTH DAY OF JANUARY, A.D. 2017.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL REPORTS HAVE BEEN FILED TO DATE.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "CONSTELLATION HEALTHCARE TECHNOLOGIES, INC." WAS INCORPORATED ON THE THIRD DAY OF SEPTEMBER, A.D. 2014.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL FRANCHISE TAXES HAVE BEEN ASSESSED TO DATE.

Jeffrey W. Bullock, Secretary of State

5596678  8300

SR# 20170070468

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 201822953

Date: 01-05-17

# Delaware

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "INTEGRATED PHYSICIAN SOLUTIONS, INC." IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE SIXTH DAY OF JANUARY, A.D. 2017.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL REPORTS HAVE BEEN FILED TO DATE.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "INTEGRATED PHYSICIAN SOLUTIONS, INC." WAS INCORPORATED ON THE TWENTY-FOURTH DAY OF SEPTEMBER, A.D. 1996.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES HAVE NOT BEEN ASSESSED TO DATE.

Jeffrey W. Bullock, Secretary of State

2666486  8300

SR# 20170083967

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 201827494

Date: 01-06-17

# Delaware

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "MDRX MEDICAL BILLING, LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE FIFTH DAY OF JANUARY, A.D. 2017.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "MDRX MEDICAL BILLING, LLC" WAS FORMED ON THE SEVENTH DAY OF DECEMBER, A.D. 2015.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE NOT BEEN ASSESSED TO DATE.

Jeffrey W. Bullock, Secretary of State

5901044  8300

SR# 20170070159

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 201822865

Date: 01-05-17

# Delaware

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "NEMS ACQUISITION LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE SIXTH DAY OF JANUARY, A.D. 2017.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "NEMS ACQUISITION LLC" WAS FORMED ON THE FOURTH DAY OF MARCH, A.D. 2014.

Jeffrey W. Bullock, Secretary of State

5491788  8300

SR# 20170083550

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 201827442

Date: 01-06-17

# Delaware

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF

DELAWARE, DO HEREBY CERTIFY "NORTHSTAR FHA, LLC" IS DULY FORMED

UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND

HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS

OF THE SIXTH DAY OF JANUARY, A.D. 2017.

Jeffrey W. Bullock, Secretary of State

5810284  8300

SR# 20170083959

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 201827508

Date: 01-06-17

# Delaware

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "NORTHSTAR FIRST HEALTH, LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE FIFTH DAY OF JANUARY, A.D. 2017.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "NORTHSTAR FIRST HEALTH, LLC" WAS FORMED ON THE TWELFTH DAY OF JUNE, A.D. 2015.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE NOT BEEN ASSESSED TO DATE.

Jeffrey W. Bullock, Secretary of State

5766071  8300
SR# 20170070162
You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 201822867
Date: 01-05-17

# Delaware

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "ORION HEALTHCORP, INC." IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE ELEVENTH DAY OF JANUARY, A.D. 2017.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL REPORTS HAVE BEEN FILED TO DATE.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "ORION HEALTHCORP, INC." WAS INCORPORATED ON THE TWENTIETH DAY OF JULY, A.D. 1984.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES HAVE NOT BEEN ASSESSED TO DATE.

Jeffrey W. Bullock, Secretary of State

2040278  8300

SR# 20170173098

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 201854638

Date: 01-11-17

# Delaware

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "PHOENIX HEALTH, LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE FIFTH DAY OF JANUARY, A.D. 2017.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "PHOENIX HEALTH, LLC" WAS FORMED ON THE FOURTEENTH DAY OF SEPTEMBER, A.D. 2015.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE NOT BEEN ASSESSED TO DATE.

Jeffrey W. Bullock, Secretary of State

5823105  8300

SR# 20170070161

Authentication: 201822866

Date: 01-05-17

You may verify this certificate online at corp.delaware.gov/authver.shtml

# Delaware

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "PHYSICIANS PRACTICE PLUS HOLDINGS LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE SIXTH DAY OF JANUARY, A.D. 2017.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "PHYSICIANS PRACTICE PLUS HOLDINGS LLC" WAS FORMED ON THE NINETEENTH DAY OF FEBRUARY, A.D. 2015.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE NOT BEEN ASSESSED TO DATE.

Jeffrey W. Bullock, Secretary of State

5696416  8300

SR# 20170083968

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 201827495

Date: 01-06-17

# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "PHYSICIANS PRACTICE PLUS LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE SIXTH DAY OF JANUARY, A.D. 2017.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "PHYSICIANS PRACTICE PLUS LLC" WAS FORMED ON THE NINETEENTH DAY OF FEBRUARY, A.D. 2015.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE NOT BEEN ASSESSED TO DATE.

Jeffrey W. Bullock, Secretary of State

5696422  8300

SR# 20170083965

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 201827493

Date: 01-06-17

# Delaware

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "VEGA MEDICAL PROFESSIONALS, LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE FIFTH DAY OF JANUARY, A.D. 2017.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "VEGA MEDICAL PROFESSIONALS, LLC" WAS FORMED ON THE SECOND DAY OF FEBRUARY, A.D. 2016.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE NOT BEEN ASSESSED TO DATE.

Jeffrey W. Bullock, Secretary of State

5953261  8300

SR# 20170070158

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 201822864

Date: 01-05-17

# State of New York
# Department of State } ss:

*I hereby certify, that ALLEGIANCE CONSULTING ASSOCIATES, LLC a NEW YORK Limited Liability Company filed Articles of Organization pursuant to the Limited Liability Company Law on 12/04/2012, and that the Limited Liability Company is existing so far as shown by the records of the Department.*



\*\*\*

*Witness my hand and the official seal of the Department of State at the City of Albany, this 04th day of January two thousand and seventeen.*

Brendan W. Fitzgerald
Executive Deputy Secretary of State

*201701050594 \* 45*

# State of New York
# Department of State } ss:

*I hereby certify, that ARMANTI BILLING & CONSULTING, L.L.C. a NEW YORK Limited Liability Company filed Articles of Organization pursuant to the Limited Liability Company Law on 02/21/2001, and that the Limited Liability Company is existing so far as shown by the records of the Department.*

*A Certificate of Amendment ARMANTI BILLING & CONSULTING, L.L.C., changing its name to ALLEGIANCE BILLING & CONSULTING, LLC, was filed 08/09/2006.*

\*\*\*



*Witness my hand and the official seal of the Department of State at the City of Albany, this 04th day of January two thousand and seventeen.*

Brendan W. Fitzgerald
Executive Deputy Secretary of State

*201701050592 * 45*

# State of California
## Secretary of State

CERTIFICATE OF STATUS

ENTITY NAME:

  RAND MEDICAL BILLING, INC.

FILE NUMBER:     C1269599
FORMATION DATE:   02/20/1985
TYPE:           DOMESTIC CORPORATION
JURISDICTION:     CALIFORNIA
STATUS:         ACTIVE (GOOD STANDING)

I, ALEX PADILLA, Secretary of State of the State of California, hereby certify:

The records of this office indicate the entity is authorized to exercise all of its powers, rights and privileges in the State of California.

No information is available from this office regarding the financial condition, business activities or practices of the entity.



IN WITNESS WHEREOF, I execute this certificate and affix the Great Seal of the State of California this day of January 06, 2017.

**ALEX PADILLA**
**Secretary of State**

KML

Schedule II

**DE FINANCING STATEMENTS**

**(attached)**

AmericasActive:8451631.5

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Helen Nickel                          (704) 331-3713

B. E-MAIL CONTACT AT FILER (optional)
helennickel@mvalaw.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

Moore & Van Allen PLLC
100 North Tryon Street
Suite 4700
Charlotte, NC  28202-4003

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| CHT MERGERSUB, INC. | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3400 Highway 35 South Suite 9A | Hazlet | NJ | 07730 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Bank of America, N.A., as Administrative Agent | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 101 N. Tryon Street, 5th Floor, NC1-001-05-45 | Charlotte | NC | 28255 | US |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of the Debtor, whether now owned or hereafter acquired.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Filed with: DE - SOS (327000.027492)

F#555844
A#772742

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Helen Nickel                          (704) 331-3713

B. E-MAIL CONTACT AT FILER (optional)
helennickel@mvalaw.com

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Moore & Van Allen PLLC
100 North Tryon Street
Suite 4700
Charlotte, NC  28202-4003

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Constellation Healthcare Technologies, Inc. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 3400 Highway 35 South Suite 9A | Hazlet | NJ | 07730 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Bank of America, N.A., as Administrative Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 101 N. Tryon Street, 5th Floor, NC1-001-05-45 | Charlotte | NC | 28255 | US |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of the Debtor, whether now owned or hereafter acquired.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)    ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction    ☐ Manufactured-Home Transaction    ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien    ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor    ☐ Consignee/Consignor    ☐ Seller/Buyer    ☐ Bailee/Bailor    ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Filed with: DE - SOS (327000.027492)

F#555847
A#772745

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Helen Nickel                    (704) 331-3713

B. E-MAIL CONTACT AT FILER (optional)
helennickel@mvalaw.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

Moore & Van Allen PLLC
100 North Tryon Street
Suite 4700
Charlotte, NC  28202-4003

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Integrated Physician Solutions, Inc. | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 100 Jericho Quadrangle Suite 235 | Jericho | NY | 11753 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Bank of America, N.A., as Administrative Agent | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 101 N. Tryon Street, 5th Floor, NC1-001-05-45 | Charlotte | NC | 28255 | US |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of the Debtor, whether now owned or hereafter acquired.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)   ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Filed with: DE - SOS (327000.027492)

F#555850
A#772748

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)     International Association of Commercial Administrators (IACA)

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Helen Nickel                    (704) 331-3713

B. E-MAIL CONTACT AT FILER (optional)
helennickel@mvalaw.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

⌐ Moore & Van Allen PLLC
100 North Tryon Street
Suite 4700
⌐ Charlotte, NC  28202-4003 ⌐

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| MDRX Medical Billing, LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 3400 Highway 35 South Suite 9A | Hazlet | NJ | 07730 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Bank of America, N.A., as Administrative Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 101 N. Tryon Street, 5th Floor, NC1-001-05-45 | Charlotte | NC | 28255 | US |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of the Debtor, whether now owned or hereafter acquired.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)   ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Filed with: DE - SOS (327000.027492)

F#555851
A#772749

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)          International Association of Commercial Administrators (IACA)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Helen Nickel                                    (704) 331-3713

B. E-MAIL CONTACT AT FILER (optional)
helennickel@mvalaw.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

⌐ Moore & Van Allen PLLC                                    ⌐
  100 North Tryon Street
  Suite 4700
⌊ Charlotte, NC  28202-4003                                 ⌋

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| NEMS ACQUISITION LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 100 Jericho Quadrangle Suite 235 | Jericho | NY | 11753 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Bank of America, N.A., as Administrative Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 101 N. Tryon Street, 5th Floor, NC1-001-05-45 | Charlotte | NC | 28255 | US |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of the Debtor, whether now owned or hereafter acquired.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Filed with: DE - SOS (327000.027492)

F#555861
A#772759

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Helen Nickel                    (704) 331-3713

B. E-MAIL CONTACT AT FILER (optional)
helennickel@mvalaw.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

Moore & Van Allen PLLC
100 North Tryon Street
Suite 4700
Charlotte, NC  28202-4003

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| NORTHSTAR FHA, LLC | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 3400 Highway 35 South Suite 9A | Hazlet | | NJ | 07730 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Bank of America, N.A., as Administrative Agent | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 101 N. Tryon Street, 5th Floor, NC1-001-05-45 | Charlotte | | NC | 28255 | US |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of the Debtor, whether now owned or hereafter acquired.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Filed with: DE - SOS (327000.027492)

F#555852
A#772750

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Helen Nickel                    (704) 331-3713

B. E-MAIL CONTACT AT FILER (optional)
helennickel@mvalaw.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

⌐Moore & Van Allen PLLC                          ⌐
  100 North Tryon Street
  Suite 4700
  ⌐Charlotte, NC  28202-4003                      ⌐

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| NorthStar First Health, LLC | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 3400 Highway 35 South Suite 9A | Hazlet | | NJ | 07730 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Bank of America, N.A., as Administrative Agent | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 101 N. Tryon Street, 5th Floor, NC1-001-05-45 | Charlotte | | NC | 28255 | US |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of the Debtor, whether now owned or hereafter acquired.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)   ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:                          6b. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility   ☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Filed with: DE - SOS (327000.027492)

F#555853
A#772751

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)     International Association of Commercial Administrators (IACA)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Helen Nickel                    (704) 331-3713

B. E-MAIL CONTACT AT FILER (optional)
helennickel@mvalaw.com

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Moore & Van Allen PLLC
100 North Tryon Street
Suite 4700
Charlotte, NC  28202-4003

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| ORION HEALTHCORP, INC. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 3400 Highway 35 South Suite 9A | Hazlet | NJ | 07730 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Bank of America, N.A., as Administrative Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 101 N. Tryon Street, 5th Floor, NC1-001-05-45 | Charlotte | NC | 28255 | US |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of the Debtor, whether now owned or hereafter acquired.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Filed with: DE - SOS (327000.027492)

F#555845
A#772743

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)       International Association of Commercial Administrators (IACA)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Helen Nickel                    (704) 331-3713

B. E-MAIL CONTACT AT FILER (optional)
helennickel@mvalaw.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

Moore & Van Allen PLLC
100 North Tryon Street
Suite 4700
Charlotte, NC  28202-4003

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Phoenix Health, LLC | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 3400 Highway 35 South Suite 9A | Hazlet | NJ | 07730 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Bank of America, N.A., as Administrative Agent | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 101 N. Tryon Street, 5th Floor, NC1-001-05-45 | Charlotte | NC | 28255 | US |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of the Debtor, whether now owned or hereafter acquired.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Filed with: DE - SOS (327000.027492)

F#555854
A#772752

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)          International Association of Commercial Administrators (IACA)

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Helen Nickel                    (704) 331-3713

B. E-MAIL CONTACT AT FILER (optional)
helennickel@mvalaw.com

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Moore & Van Allen PLLC
100 North Tryon Street
Suite 4700
Charlotte, NC  28202-4003

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Physicians Practice Plus Holdings LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 100 Jericho Quadrangle Suite 235 | Jericho | NY | 11753 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Bank of America, N.A., as Administrative Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 101 N. Tryon Street, 5th Floor, NC1-001-05-45 | Charlotte | NC | 28255 | US |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of the Debtor, whether now owned or hereafter acquired.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Filed with: DE - SOS (327000.027492)

F#555863
A#772761

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Helen Nickel                                      (704) 331-3713

**B. E-MAIL CONTACT AT FILER (optional)**
helennickel@mvalaw.com

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

Moore & Van Allen PLLC
100 North Tryon Street
Suite 4700
Charlotte, NC  28202-4003

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Physicians Practice Plus LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 100 Jericho Quadrangle Suite 235 | Jericho | NY | 11753 | US |

2. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only <u>one</u> Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Bank of America, N.A., as Administrative Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 101 N. Tryon Street, 5th Floor, NC1-001-05-45 | Charlotte | NC | 28255 | US |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of the Debtor, whether now owned or hereafter acquired.

5. Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)  ☐ being administered by a Decedent's Personal Representative

6a. Check <u>only</u> if applicable and check <u>only</u> one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check <u>only</u> if applicable and check <u>only</u> one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Filed with: DE - SOS (327000.027492)

F#555864
A#772762

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Helen Nickel                    (704) 331-3713

B. E-MAIL CONTACT AT FILER (optional)
helennickel@mvalaw.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Moore & Van Allen PLLC
100 North Tryon Street
Suite 4700
Charlotte, NC 28202-4003

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Vega Medical Professionals, LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 3400 Highway 35 South Suite 9A | Hazlet | NJ | 07730 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Bank of America, N.A., as Administrative Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 101 N. Tryon Street, 5th Floor, NC1-001-05-45 | Charlotte | NC | 28255 | US |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of the Debtor, whether now owned or hereafter acquired.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Filed with: DE - SOS (327000.027492)

F#555856
A#772754

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

**Schedule III**

**NY FINANCING STATEMENTS**

**(attached)**

AmericasActive:8451631.5

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Helen Nickel                    (704) 331-3713

**B. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Moore & Van Allen PLLC

100 North Tryon Street
Suite 4700
Charlotte, NC 28202-4003

helennickel@mvalaw.com

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

**1a. ORGANIZATION'S NAME**
Allegiance Billing & Consulting, LLC

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3400 Highway 35 South Suite 9A | Hazlet | NJ | 07730 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | LLC | New York | ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

(blank)

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

**3a. ORGANIZATION'S NAME**
Bank of America, N.A., as Administrative Agent

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 101 N. Tryon Street, 5th Floor, NC1-001-05-45 | Charlotte | NC | 28255 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

All assets of the Debtor, whether now owned or hereafter acquired.

**5. ALTERNATIVE DESIGNATION [if applicable]:** ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

**8. OPTIONAL FILER REFERENCE DATA**
Filed with: NY - Secretary of State (327000.027492)

F#555848
A#772746

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Helen Nickel                (704) 331-3713

**B. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Moore & Van Allen PLLC

100 North Tryon Street
Suite 4700
Charlotte, NC  28202-4003

helennickel@mvalaw.com

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Allegiance Consulting Associates, LLC | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3400 Highway 35 South Suite 9A | Hazlet | NJ | 07730 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | LLC | New York | ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Bank of America, N.A., as Administrative Agent | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 101 N. Tryon Street, 5th Floor, NC1-001-05-45 | Charlotte | NC | 28255 | USA |

**4.** This FINANCING STATEMENT covers the following collateral:

All assets of the Debtor, whether now owned or hereafter acquired.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.     Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]     [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

**8. OPTIONAL FILER REFERENCE DATA**
Filed with: NY - Secretary of State (327000.027492)

F#555849
A#772747

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

**Schedule IV**

**TX FINANCING STATEMENTS**

(attached)

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Helen Nickel                    (704) 331-3713

B. E-MAIL CONTACT AT FILER (optional)
helennickel@mvalaw.com

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Moore & Van Allen PLLC
100 North Tryon Street
Suite 4700
Charlotte, NC  28202-4003

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| MEDICAL BILLING SERVICES, INC. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 100 Jericho Quadrangle Suite 235 | Jericho | NY | 11753 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Bank of America, N.A., as Administrative Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 101 N. Tryon Street, 5th Floor, NC1-001-05-45 | Charlotte | NC | 28255 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of the Debtor, whether now owned or hereafter acquired.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Filed with: TX - Secretary of State (327000.027492)

F#555859
A#772757

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Helen Nickel                    (704) 331-3713

B. E-MAIL CONTACT AT FILER (optional)
helennickel@mvalaw.com

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Moore & Van Allen PLLC
100 North Tryon Street
Suite 4700
Charlotte, NC  28202-4003

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| RMI PHYSICIAN SERVICES CORPORATION | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 100 Jericho Quadrangle Suite 235 | Jericho | NY | 11753 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Bank of America, N.A., as Administrative Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 101 N. Tryon Street, 5th Floor, NC1-001-05-45 | Charlotte | NC | 28255 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of the Debtor, whether now owned or hereafter acquired.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Filed with: TX - Secretary of State (327000.027492)

F#555866
A#772764

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

**Schedule V**

## CA FINANCING STATEMENT

**(attached)**

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
|---|---|
| Helen Nickel | (704) 331-3713 |

B. E-MAIL CONTACT AT FILER (optional)
helennickel@mvalaw.com

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Moore & Van Allen PLLC
100 North Tryon Street
Suite 4700
Charlotte, NC  28202-4003

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| RAND MEDICAL BILLING, INC. | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 100 Jericho Quadrangle Suite 235 | Jericho | NY | 11753 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Bank of America, N.A., as Administrative Agent | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 101 N. Tryon Street, 5th Floor, NC1-001-05-45 | Charlotte | NC | 28255 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of the Debtor, whether now owned or hereafter acquired.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Filed with: CA - Secretary of State (327000.027492)

F#555865
A#772763

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

**Schedule VI**

**TAX CLEARANCE LETTERS**

**(attached)**

AmericasActive:8451631.5

TEXAS COMPTROLLER *of* PUBLIC ACCOUNTS

P.O.Box 13528 · Austin, TX 78711-3528



January 18, 2017

RMI PHYSICIAN SERVICES CORPORATION
3200 WILCREST DR STE 600 ATTN:KAY RETZLOFF
HOUSTON, TX 77042-6000

### TAX CLEARANCE LETTER FOR REINSTATEMENT*

To: Texas Secretary of State
    Corporations Section

Re: RMI PHYSICIAN SERVICES CORPORATION
    Taxpayer number: 17604372395
    File number: 0131275100

The referenced entity has met all franchise tax requirements and is eligible
for reinstatement through May 15, 2017.

LEE HOPES JR
Enforcement - Houston, SW
Field Operations - Enforcement
(713)783-1665

---

*The reinstatement must be filed with the Texas Secretary of State on or before the expiration date of this
letter. After this date, additional franchise tax filing requirements must be met, and a new request for tax
clearance must be submitted.

You can file for reinstatement online at www.sos.state.tx.us/corp/sosda/index.shtml. Forms and
instructions for reinstatement are available at www.sos.state.tx.us/corp/forms_option.shtml or by
calling (512) 463-5555. This tax clearance letter must be attached to the reinstatement forms.

Form 05-377 (Rev.6-10/4)

TEXAS COMPTROLLER *of* PUBLIC ACCOUNTS

P.O. Box 13528 · Austin, TX 78711-3528



January 18, 2017

MEDICAL BILLING SERVICES, INC.
3200 WILCREST DR STE 600
HOUSTON, TX 77042-6000

## TAX CLEARANCE LETTER FOR REINSTATEMENT*

To: Texas Secretary of State
Corporations Section

Re: MEDICAL BILLING SERVICES, INC.
Taxpayer number: 17601629714
File number: 0077042200

The referenced entity has met all franchise tax requirements and is eligible
for reinstatement through May 15, 2017.

LEE HOPES JR
Enforcement - Houston, SW
Field Operations - Enforcement
(713) 783-1665



---

*The reinstatement must be filed with the Texas Secretary of State on or before the expiration date of this
letter. After this date, additional franchise tax filing requirements must be met, and a new request for tax
clearance must be submitted.*

*You can file for reinstatement online at www.sos.state.tx.us/corp/sosda/index.shtml. Forms and
instructions for reinstatement are available at www.sos.state.tx.us/corp/forms_option.shtml or by
calling (512) 463-5555. This tax clearance letter must be attached to the reinstatement forms.*

Form 05-377 (Rev.6-10/4)

# Exhibit B

**OPERATING AGREEMENT**

**OF**

**PHYSICIANS PRACTICE PLUS LLC**

This Operating Agreement (this "Agreement") of PHYSICIANS PRACTICE PLUS LLC (the "**Company**"), a Delaware limited liability company is entered into as of the 19th day of February, 2015 by and among the Company and the sole Member whose name is set forth on Exhibit A attached to this Agreement and incorporated by reference in this Agreement.

**WHEREAS**, the Company was organized as a limited liability company pursuant to the Delaware Limited Liability Company Act (the "**LLC Law**"), as amended from time to time, under the name PHYSICIANS PRACTICE PLUS LLC and, for that purpose, a Certificate of Formation was  filed with the Delaware Secretary of State on February 19, 2015; and

**WHEREAS**, the Company and the sole Member desire to operate the Company in accordance with the terms and subject to the conditions set forth in this Agreement.

**NOW, THEREFORE**, it is agreed as follows:

**Article I        Formation and Name: Office; Purpose; Term**

**a)        Organization.**  The Company was organized as a limited liability company pursuant to the LLC Law, and a Certificate of Formation was filed with the Delaware Secretary of State on February 19, 2015.

**b)        Name of the Company.**  The name of the Company is PHYSICIANS PRACTICE PLUS LLC. The Company may do business under that name and under any other name or names upon which the Member decides.

**c)        Purpose.**  The Company is organized for any lawful purpose and to do any and all things necessary, convenient, or incidental to that purpose.

**d)        Term.**  The term of the Company began upon the filing of the Certificate of Formation with the Delaware Secretary of State and shall have a perpetual existence, unless its existence is sooner terminated pursuant to Article VII of this Agreement.

**e)        Member.**  The name, present mailing address and membership interest of the sole Member is set forth on Exhibit A.

**Article II        Member; Capital; Capital Account and Interests**

**1)        Initial Capital Contribution.**  The Member contributed to the Company cash or other assets in the amount set forth in <u>Exhibit B</u> for its interest in the Company (the "**Interest**").  The Interests shall be evidenced by a Certificate, issued by the Company to and in the name of the Member (the "**Certificate**").  The Certificate shall be stamped or otherwise imprinted with a legend substantially in the following form:

> THE LIMITED LIABILITY COMPANY UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER STATE OR FEDERAL SECURITIES STATUTE. NO OFFER, SALE, TRANSFER, PLEDGE OR OTHER DISPOSITION THEREOF MAY BE MADE UNLESS THE LIMITED LIABILITY COMPANY UNITS ARE REGISTERED UNDER THE ACT AND ANY OTHER APPLICABLE SECURITIES STATUTE, OR AN EXEMPTION FROM SUCH REGISTRATION REQUIREMENTS IS APPLICABLE TO SUCH TRANSACTION.

> THE TRANSFER OF THE UNITS REPRESENTED BY THIS CERTIFICATE IS LIMITED BY THE TERMS AND CONDITIONS OF THE OPERATING AGREEMENT OF PHYSICIANS PRACTICE PLUS LLC. DATED AS OF February __ 2015, AS AMENDED AND RESTATED FROM TIME TO TIME.

**a)        No Additional Capital Contributions Required.**  The Member shall not be required to contribute any additional capital to the Company.  The Member shall not have any personal liability for any debt, obligation or liability of the Company.

**b)        No Interest on Capital Contributions.**  The Member shall not be paid interest on its capital contribution.

**c)        Return of Capital Contributions.**  Except as otherwise provided in this Agreement, the Member shall not have the right to receive any return of its capital contribution.

**d)        Form of Return of Capital.**  If the Member is entitled to receive a return of its capital contribution, the Company may distribute cash, notes, property, or a combination thereof to the Member in return of the capital contribution.

**e)        Loans.**  The Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms as determined by the Member.

**Article III        Profit, Loss, and Distributions**

Cash flow for the Company may be distributed to the Member at such times and in such amounts as determined by the Manager.  For each Fiscal Year, Net Profits and Net Losses shall be allocated as follows: Net Profits shall be allocated in proportion to a Member's respective interest in the Company. Net Losses shall be allocated in proportion to a Member's interests in the Company. "**Net Profits**" and "**Net Losses**" shall mean the net taxable income or net taxable loss of the Company, respectively, as determined for federal income tax purposes, for each fiscal year of the Company, plus any income that is exempt from federal income tax and minus expenditures that are not deductible in computing federal taxable income and not properly chargeable to capital accounts, in each case to the extent such items are not otherwise taken into account in computing Net Profits or Net Losses.

**Article IV**        **Management: Rights, Powers, and Duties**

      **a)**        **Management.**

          i)        The Company shall be managed by the Member (the "**Manager**").  Until a different Manager is designated by the Member, the Manager shall be Orion Healthcorp Inc.   The Manager shall have the full and exclusive right and power to act for and bind the Company.

          ii)        The Manager may cause the Company to employ and retain such other persons as may be necessary or appropriate for the conduct of the Company's business, on such terms as the Manager shall determine, including persons who may be designated as officers. The officers of the Company shall have the titles, powers, and duties delegated to them by the Manager.  Any number of titles may be held by the same officer.

          iii)        The Manager shall have the power and authority to delegate his right and power to manage and control the business and affairs of the Company to one or more other persons (including one or more committees, managers and agents, employees and/or affiliates of a manager), including delegation by management agreement or other arrangement.

      **b)**        **Liability and Indemnification.**

          i)        Except as otherwise provided by law, the Manager, or any delegate of the Manager, shall not be liable, responsible or accountable in any way for damages or otherwise to the Company for any act or failure to act pursuant to this Agreement or otherwise unless there is a judicial determination that (i) such person acted in bad faith, (ii) the conduct of such person constituted intentional misconduct or a knowing violation of law, (iii) such person gained a financial benefit to which he was not legally entitled or (iv) such person failed to perform his duties, in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances.

          ii)        The Company shall indemnify, defend and hold harmless the Manager, or any delegate of the Manager, from and against any claims, losses, liabilities, damages, fines, penalties, costs and expenses (including, without limitation, reasonable fees and disbursements of counsel and other professionals) arising out of or in connection with any act or failure to act by such person pursuant to this Agreement, or the business and affairs of the Company, to the fullest extent permitted by law; provided,

13

however, that the Manager, or any delegate of the Manager, shall not be entitled to indemnification hereunder if there is a judicial determination that (a) such person's actions or omissions to act were made in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated, or (b) such person personally gained a financial benefit to which he or she was not legally entitled.

**Article V          Transfers of Interest**

The Member may transfer, in whole or in part, his interest in the Company.

**Article VI          Admission of Additional Members**

The Member may admit one or more additional members to the Company.

**Article VII          Dissolution, Liquidation, and Termination of the Company**

The Company shall be dissolved upon the happening of any of the following events:

    i)          upon the consent of the Member;

    ii)          upon the death, retirement, resignation or bankruptcy of the Member or the occurrence of any other event which terminates the continued membership of the Member in the Company; or

    iii)          upon the entry of a decree of judicial dissolution under Section 18-802 of the LLC Law.

**Article VIII          General Provisions**

**a)          Applicable Law.**  All questions concerning the construction, validity, and interpretation of this Agreement and the performance of obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Delaware.

**b)          Article and Section Titles.**  The headings herein are inserted as a matter of convenience only and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

c)    **Separability of Provisions.**   Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

d)    **Amendments**.  Amendments to this Agreement may be adopted by the affirmative vote of those Members holding 100% of the membership interest in the Company.

**IN WITNESS WHEREOF,** the Member has executed, or caused this Agreement to be executed, as of the date set forth hereinabove.

MEMBER:

Orion Healthcorp Inc.

By:  _____

Paul Parmar

Manager

Orion Healthcorp Inc.

By:  _____

Paul Parmar

Manager

15

{00722185.DOCX;2 }

**EXHIBIT A**

**MEMBER**

|                                          |              |
| :--------------------------------------: | :----------: |
| <u>NAME</u>                              | <u>INTEREST</u> |
| Physicians Practice Plus Holdings LLC    | 100%         |
| c/o Adam J. Greene esq.                  |              |
| 875 Third Avenue 9th Floor               |              |
| NY, NY 10028                             |              |

**EXHIBIT B**

**<u>INITIAL CAPITAL CONTRIBUTION</u>**

Ten ($10.00) Dollars.

# **EXHIBIT D**

See attached

## **<u>EXHIBIT E</u>**

We have filed in New York and are in the process of complying with the publishing requirement set forth in the New York Limited Liability Company Law.

# Exhibit C

# AMENDED AND RESTATED
## OPERATING AGREEMENT
### OF
### <u>NORTHSTAR FIRST HEALTH, LLC,</u>

This Amended and Restated Operating Agreement (this "Agreement") of NORTHSTAR FIRST HEALTH, LLC, (the "**Company**"), a Delaware limited liability company is entered into as of the 15 th day of September, 2015 by and among the Company and the sole Member whose name is set forth on <u>Exhibit A</u> attached to this Agreement and incorporated by reference in this Agreement.

**WHEREAS**, the Company was organized as a limited liability company pursuant to the Delaware Limited Liability Company Act (the "**LLC Law**"), as amended from time to time, under the name NORTHSTAR FIRST HEALTH, LLC, and, for that purpose, a Certificate of Formation was filed with the Delaware Secretary of State on June 15, 2015; and

**WHEREAS**, the Company and the sole Member desire to operate the Company in accordance with the terms and subject to the conditions set forth in this Agreement.

**NOW, THEREFORE**, it is agreed as follows:

**Article I        Formation and Name: Office; Purpose; Term**

a)        **Organization.**  The Company was organized as a limited liability company pursuant to the LLC Law, and a Certificate of Formation was filed with the Delaware Secretary of State on June 15, 2015.

b)        **Name of the Company.**  The name of the Company is NORTHSTAR FIRST HEALTH, LLC. The Company may do business under that name and under any other name or names upon which the Member decides.

c)        **Purpose.**  The Company is organized for any lawful purpose and to do any and all things necessary, convenient, or incidental to that purpose.

d)        **Term.**  The term of the Company began upon the filing of the Certificate of Formation with the Delaware Secretary of State and shall have a perpetual existence, unless its existence is sooner terminated pursuant to Article VII of this Agreement.

e)        **Member.**  The name, present mailing address and membership interest of the sole Member is set forth on <u>Exhibit A.</u>

10

**Article II      Member; Capital; Capital Account and Interests**

**1)      Initial Capital Contribution.**  The Member contributed to the Company cash or other assets in the amount set forth in <u>Exhibit B</u> for its interest in the Company (the "**Interest**"). The Interests shall be evidenced by a Certificate, issued by the Company to and in the name of the Member (the "**Certificate**").  The Certificate shall be stamped or otherwise imprinted with a legend substantially in the following form:

> THE LIMITED LIABILITY COMPANY UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER STATE OR FEDERAL SECURITIES STATUTE. NO OFFER, SALE, TRANSFER, PLEDGE OR OTHER DISPOSITION THEREOF MAY BE MADE UNLESS THE LIMITED LIABILITY COMPANY UNITS ARE REGISTERED UNDER THE ACT AND ANY OTHER APPLICABLE SECURITIES STATUTE, OR AN EXEMPTION FROM SUCH REGISTRATION REQUIREMENTS IS APPLICABLE TO SUCH TRANSACTION.
>
> THE TRANSFER OF THE UNITS REPRESENTED BY THIS CERTIFICATE IS LIMITED BY THE TERMS AND CONDITIONS OF THE OPERATING AGREEMENT OF NORTHSTAR FIRST HEALTH, LLC., DATED AS OF SEPTEMBER 16, 2015 AS AMENDED AND RESTATED FROM TIME TO TIME.

**a)      No Additional Capital Contributions Required.**  The Member shall not be required to contribute any additional capital to the Company.  The Member shall not have any personal liability for any debt, obligation or liability of the Company.

**b)      No Interest on Capital Contributions.**  The Member shall not be paid interest on its capital contribution.

**c)      Return of Capital Contributions.**  Except as otherwise provided in this Agreement, the Member shall not have the right to receive any return of its capital contribution.

**d)      Form of Return of Capital.**  If the Member is entitled to receive a return of its capital contribution, the Company may distribute cash, notes, property, or a combination thereof to the Member in return of the capital contribution.

**e)      Loans.**  The Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms as determined by the Member.

11

## Article III    Profit, Loss, and Distributions

Cash flow for the Company may be distributed to the Member at such times and in such amounts as determined by the Manager. For each Fiscal Year, Net Profits and Net Losses shall be allocated as follows: Net Profits shall be allocated in proportion to a Member's respective interest in the Company. Net Losses shall be allocated in proportion to a Member's interests in the Company. "**Net Profits**" and "**Net Losses**" shall mean the net taxable income or net taxable loss of the Company, respectively, as determined for federal income tax purposes, for each fiscal year of the Company, plus any income that is exempt from federal income tax and minus expenditures that are not deductible in computing federal taxable income and not properly chargeable to capital accounts, in each case to the extent such items are not otherwise taken into account in computing Net Profits or Net Losses.

## Article IV    Management: Rights, Powers, and Duties

### a)    Management.

i)    The Company shall be managed by a manager (the "**Manager**"). Until a different Manager is designated by the Member, the Manager shall be Paul Parmar. The Manager shall have the full and exclusive right and power to act for and bind the Company.

ii)    The Manager may cause the Company to employ and retain such other persons as may be necessary or appropriate for the conduct of the Company's business, on such terms as the Manager shall determine, including persons who may be designated as officers. The officers of the Company shall have the titles, powers, and duties delegated to them by the Manager. Any number of titles may be held by the same officer.

iii)    The Manager shall have the power and authority to delegate his right and power to manage and control the business and affairs of the Company to one or more other persons (including one or more committees, managers and agents, employees and/or affiliates of a manager), including delegation by management agreement or other arrangement.

### b)    Liability and Indemnification.

i)    Except as otherwise provided by law, the Manager, or any delegate of the Manager, shall not be liable, responsible or accountable in any way for damages or otherwise to the Company for any act or failure to act pursuant to this Agreement or otherwise unless there is a judicial determination that (i) such person acted in bad faith, (ii) the conduct of such person constituted intentional misconduct or a knowing violation of law, (iii) such person gained a financial benefit to which he was not legally entitled or (iv) such person failed to perform his duties, in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances.

ii)    The Company shall indemnify, defend and hold harmless the Manager, or any delegate of the Manager, from and against any claims, losses, liabilities, damages, fines,

12

penalties, costs and expenses (including, without limitation, reasonable fees and disbursements of counsel and other professionals) arising out of or in connection with any act or failure to act by such person pursuant to this Agreement, or the business and affairs of the Company, to the fullest extent permitted by law; provided, however, that the Manager, or any delegate of the Manager, shall not be entitled to indemnification hereunder if there is a judicial determination that (a) such person's actions or omissions to act were made in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated, or (b) such person personally gained a financial benefit to which he or she was not legally entitled.

## Article V    Transfers of Interest

The Member may transfer, in whole or in part, his interest in the Company.

## Article VI    Admission of Additional Members

The Member may admit one or more additional members to the Company.

## Article VII    Dissolution, Liquidation, and Termination of the Company

The Company shall be dissolved upon the happening of any of the following events:

    i)    upon the consent of the Member;

    ii)    upon the death, retirement, resignation or bankruptcy of the Member or the occurrence of any other event which terminates the continued membership of the Member in the Company; or

    iii)    upon the entry of a decree of judicial dissolution under Section 18-802 of the LLC Law.

## Article VIII    General Provisions

**a)    Applicable Law.**    All questions concerning the construction, validity, and interpretation of this Agreement and the performance of obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Delaware.

**b)    Article and Section Titles.**    The headings herein are inserted as a matter of convenience only and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

c)    **Separability of Provisions.**    Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

d)    **Amendments.**  Amendments to this Agreement may be adopted by the affirmative vote of those Members holding 100% of the membership interest in the Company.

**IN WITNESS WHEREOF,** the Member has executed, or caused this Agreement to be executed, as of the date set forth hereinabove.

MEMBER:

NORTHSTAR FHA, LLC

By:_____
Paul Parmar
Manager

14

# EXHIBIT A

## __MEMBER__

| __NAME__ | __INTEREST__ |
|----------|--------------|
| NORTHSTAR FHA, LLC | 100% |

# EXHIBIT B

## INITIAL CAPITAL CONTRIBUTION

Ten ($10.00) Dollars.

# Exhibit D

# OPERATING AGREEMENT

## OF

## PHOENIX HEALTH, LLC

This Operating Agreement (this "Agreement") of Phoenix Health, LLC, (the "**Company**"), a Delaware limited liability company is entered into as of the 16th day of September, 2015 by and among the Company and the sole Member whose name is set forth on Exhibit A attached to this Agreement and incorporated by reference in this Agreement.

**WHEREAS**, the Company was organized as a limited liability company pursuant to the Delaware Limited Liability Company Act (the "**LLC Law**"), as amended from time to time, under the name PHOENIX HEALTH, LLC, and, for that purpose, a Certificate of Formation was filed with the Delaware Secretary of State on September 14, 2015; and

**WHEREAS**, the Company and the sole Member desire to operate the Company in accordance with the terms and subject to the conditions set forth in this Agreement.

**NOW, THEREFORE**, it is agreed as follows:

**Article I**      **Formation and Name: Office; Purpose; Term**

**a)**      **Organization.**   The Company was organized as a limited liability company pursuant to the LLC Law, and a Certificate of Formation was filed with the Delaware Secretary of State on September 14, 2015.

**b)**      **Name of the Company.**   The name of the Company is PHOENIX HEALTH, LLC. The Company may do business under that name and under any other name or names upon which the Member decides.

**c)**      **Purpose.**   The Company is organized for any lawful purpose and to do any and all things necessary, convenient, or incidental to that purpose.

**d)**      **Term.**   The term of the Company began upon the filing of the Certificate of Formation with the Delaware Secretary of State and shall have a perpetual existence, unless its existence is sooner terminated pursuant to Article VII of this Agreement.

**e)**      **Member.**   The name, present mailing address and membership interest of the sole Member is set forth on Exhibit A.

**Article II        Member; Capital; Capital Account and Interests**

**1)        Initial Capital Contribution.**  The Member contributed to the Company cash or other assets in the amount set forth in Exhibit B for its interest in the Company (the "**Interest**"). The Interests shall be evidenced by a Certificate, issued by the Company to and in the name of the Member (the "**Certificate**").  The Certificate shall be stamped or otherwise imprinted with a legend substantially in the following form:

> THE LIMITED LIABILITY COMPANY UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER STATE OR FEDERAL SECURITIES STATUTE. NO OFFER, SALE, TRANSFER, PLEDGE OR OTHER DISPOSITION THEREOF MAY BE MADE UNLESS THE LIMITED LIABILITY COMPANY UNITS ARE REGISTERED UNDER THE ACT AND ANY OTHER APPLICABLE SECURITIES STATUTE, OR AN EXEMPTION FROM SUCH REGISTRATION REQUIREMENTS IS APPLICABLE TO SUCH TRANSACTION.

> THE TRANSFER OF THE UNITS REPRESENTED BY THIS CERTIFICATE IS LIMITED BY THE TERMS AND CONDITIONS OF THE OPERATING AGREEMENT OF PHOENIX HEALTH, LLC., DATED AS OF SEPTEMBER 14, 2015 AS AMENDED AND RESTATED FROM TIME TO TIME.

**a)        No Additional Capital Contributions Required.**  The Member shall not be required to contribute any additional capital to the Company.  The Member shall not have any personal liability for any debt, obligation or liability of the Company.

**b)        No Interest on Capital Contributions.**  The Member shall not be paid interest on its capital contribution.

**c)        Return of Capital Contributions.**   Except as otherwise provided in this Agreement, the Member shall not have the right to receive any return of its capital contribution.

**d)        Form of Return of Capital.**  If the Member is entitled to receive a return of its capital contribution, the Company may distribute cash, notes, property, or a combination thereof to the Member in return of the capital contribution.

**e)        Loans.**  The Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms as determined by the Member.

2

## Article III    Profit, Loss, and Distributions

Cash flow for the Company may be distributed to the Member at such times and in such amounts as determined by the Manager.  For each Fiscal Year, Net Profits and Net Losses shall be allocated as follows: Net Profits shall be allocated in proportion to a Member's respective interest in the Company. Net Losses shall be allocated in proportion to a Member's interests in the Company. "**Net Profits**" and "**Net Losses**" shall mean the net taxable income or net taxable loss of the Company, respectively, as determined for federal income tax purposes, for each fiscal year of the Company, plus any income that is exempt from federal income tax and minus expenditures that are not deductible in computing federal taxable income and not properly chargeable to capital accounts, in each case to the extent such items are not otherwise taken into account in computing Net Profits or Net Losses.

## Article IV    Management: Rights, Powers, and Duties

### a)    Management.

i)    The Company shall be managed by a manager (the "**Manager**").  Until a different Manager is designated by the Member, the Manager shall be Paul Parmar.  The Manager shall have the full and exclusive right and power to act for and bind the Company.

ii)    The Manager may cause the Company to employ and retain such other persons as may be necessary or appropriate for the conduct of the Company's business, on such terms as the Manager shall determine, including persons who may be designated as officers. The officers of the Company shall have the titles, powers, and duties delegated to them by the Manager.  Any number of titles may be held by the same officer.

iii)    The Manager shall have the power and authority to delegate his right and power to manage and control the business and affairs of the Company to one or more other persons (including one or more committees, managers and agents, employees and/or affiliates of a manager), including delegation by management agreement or other arrangement.

### b)    Liability and Indemnification.

i)    Except as otherwise provided by law, the Manager, or any delegate of the Manager, shall not be liable, responsible or accountable in any way for damages or otherwise to the Company for any act or failure to act pursuant to this Agreement or otherwise unless there is a judicial determination that (i) such person acted in bad faith, (ii) the conduct of such person constituted intentional misconduct or a knowing violation of law, (iii) such person gained a financial benefit to which he was not legally entitled or (iv) such person failed to perform his duties, in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances.

ii)    The Company shall indemnify, defend and hold harmless the Manager, or any delegate of the Manager, from and against any claims, losses, liabilities, damages, fines, penalties, costs and expenses (including, without limitation, reasonable fees and disbursements of counsel and other professionals) arising out of or in connection with any act or failure to act

3

by such person pursuant to this Agreement, or the business and affairs of the Company, to the fullest extent permitted by law; provided, however, that the Manager, or any delegate of the Manager, shall not be entitled to indemnification hereunder if there is a judicial determination that (a) such person's actions or omissions to act were made in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated, or (b) such person personally gained a financial benefit to which he or she was not legally entitled.

## Article V        Transfers of Interest

The Member may transfer, in whole or in part, his interest in the Company.

## Article VI       Admission of Additional Members

The Member may admit one or more additional members to the Company.

## Article VII      Dissolution, Liquidation, and Termination of the Company

The Company shall be dissolved upon the happening of any of the following events:

    i)        upon the consent of the Member;

    ii)       upon the death, retirement, resignation or bankruptcy of the Member or the occurrence of any other event which terminates the continued membership of the Member in the Company; or

    iii)      upon the entry of a decree of judicial dissolution under Section 18-802 of the LLC Law.

## Article VIII   General Provisions

    a)        **Applicable Law.**   All questions concerning the construction, validity, and interpretation of this Agreement and the performance of obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Delaware.

    b)        **Article and Section Titles.**   The headings herein are inserted as a matter of convenience only and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

**c)**    **Separability of Provisions.**    Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

**d)**    **Amendments**.  Amendments to this Agreement may be adopted by the affirmative vote of those Members holding 100% of the membership interest in the Company.

**IN WITNESS WHEREOF,** the Member has executed, or caused this Agreement to be executed, as of the date set forth hereinabove.

MEMBER:
ORION HEALTHCORP, INC.

By: Paul Parmar
Its: President

5

# EXHIBIT A

## **MEMBER**

| <u>NAME</u> | <u>INTEREST</u> |
|---|---|
| ORION HEALTHCORP, INC. | 100% |

**EXHIBIT B**

**INITIAL CAPITAL CONTRIBUTION**

Ten ($10.00) Dollars.

# Exhibit E

# OPERATING AGREEMENT

## OF

## <u>VEGA MEDICAL PROFESSIONALS, LLC</u>

This Operating Agreement (this "Agreement") of VEGA MEDICAL PROFESSIONALS, LLC. (the "**Company**"), a Delaware limited liability company is entered into as of the 31st day of August, 2016 by and among the Company and the sole Member whose name is set forth on <u>Exhibit A</u> attached to this Agreement and incorporated by reference in this Agreement.

**WHEREAS**, the Company was organized as a limited liability company pursuant to the Delaware Limited Liability Company Act (the "**LLC Law**"), as amended from time to time, under the name VEGA MEDICAL PROGESSIONALS, LLC and, for that purpose, a Certificate of Formation was filed with the Delaware Secretary of State on February 2, 2016; and

**WHEREAS**, the Company and the sole Member desire to operate the Company in accordance with the terms and subject to the conditions set forth in this Agreement.

**NOW, THEREFORE**, it is agreed as follows:

**Article I        Formation and Name: Office; Purpose; Term**

**a)        Organization.**    The Company was organized as a limited liability company pursuant to the LLC Law, and a Certificate of Formation was filed with the Delaware Secretary of State on February 2, 2016.

**b)        Name of the Company.**    The name of the Company is VEGA MEDICAL PROFESSIONALS, LLC. The Company may do business under that name and under any other name or names upon which the Member decides.

**c)        Purpose.**    The Company is organized for any lawful purpose and to do any and all things necessary, convenient, or incidental to that purpose.

**d)        Term.**    The term of the Company began upon the filing of the Certificate of Formation with the Delaware Secretary of State and shall have a perpetual existence, unless its existence is sooner terminated pursuant to Article VII of this Agreement.

**e)        Member.**    The name, present mailing address and membership interest of the sole Member is set forth on <u>Exhibit A</u>.

## Article II        Member; Capital; Capital Account and Interests

**1)        Initial Capital Contribution.**  The Member contributed to the Company cash or other assets in the amount set forth in <u>Exhibit B</u> for its interest in the Company (the "**Interest**"). The Interests shall be uncertificated and recorded in the books and records of the Company.

**a)        No Additional Capital Contributions Required.**  The Member shall not be required to contribute any additional capital to the Company.  The Member shall not have any personal liability for any debt, obligation or liability of the Company.

**b)        No Interest on Capital Contributions.**  The Member shall not be paid interest on its capital contribution.

**c)        Return of Capital Contributions.**  Except as otherwise provided in this Agreement, the Member shall not have the right to receive any return of its capital contribution.

**d)        Form of Return of Capital.**  If the Member is entitled to receive a return of its capital contribution, the Company may distribute cash, notes, property, or a combination thereof to the Member in return of the capital contribution.

**e)        Loans.**  The Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms as determined by the Member.

## Article III        Profit, Loss, and Distributions

Cash flow for the Company may be distributed to the Member at such times and in such amounts as determined by the Manager.  For each Fiscal Year, Net Profits and Net Losses shall be allocated as follows: Net Profits shall be allocated in proportion to a Member's respective interest in the Company. Net Losses shall be allocated in proportion to a Member's interests in the Company. "**Net Profits**" and "**Net Losses**" shall mean the net taxable income or net taxable loss of the Company, respectively, as determined for federal income tax purposes, for each fiscal year of the Company, plus any income that is exempt from federal income tax and minus expenditures that are not deductible in computing federal taxable income and not properly chargeable to capital accounts, in each case to the extent such items are not otherwise taken into account in computing Net Profits or Net Losses.

## Article IV        Management: Rights, Powers, and Duties

**a)        Management.**

i)        Until a different Manager is designated by the Member, the Manager shall be Paul Parmar (the "**Manager**").  The Manager shall have the full and exclusive right and power to act for and bind the Company.

ii)        The Manager may cause the Company to employ and retain such other persons as may be necessary or appropriate for the conduct of the Company's business, on such terms as the Manager shall determine, including persons who may be designated as officers. The

officers of the Company shall have the titles, powers, and duties delegated to them by the Manager.  Any number of titles may be held by the same officer.

   iii)  The Manager shall have the power and authority to delegate his right and power to manage and control the business and affairs of the Company to one or more other persons (including one or more committees, managers and agents, employees and/or affiliates of a manager), including delegation by management agreement or other arrangement.

  **b)**  **Liability and Indemnification.**

   i)  Except as otherwise provided by law, the Manager, or any delegate of the Manager, shall not be liable, responsible or accountable in any way for damages or otherwise to the Company for any act or failure to act pursuant to this Agreement or otherwise unless there is a judicial determination that (i) such person acted in bad faith, (ii) the conduct of such person constituted intentional misconduct or a knowing violation of law, (iii) such person gained a financial benefit to which he was not legally entitled or (iv) such person failed to perform his duties, in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances.

   ii)  The Company shall indemnify, defend and hold harmless the Manager, or any delegate of the Manager, from and against any claims, losses, liabilities, damages, fines, penalties, costs and expenses (including, without limitation, reasonable fees and disbursements of counsel and other professionals) arising out of or in connection with any act or failure to act by such person pursuant to this Agreement, or the business and affairs of the Company, to the fullest extent permitted by law; provided, however, that the Manager, or any delegate of the Manager, shall not be entitled to indemnification hereunder if there is a judicial determination that (a) such person's actions or omissions to act were made in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated, or (b) such person personally gained a financial benefit to which he or she was not legally entitled.

## Article V  Transfers of Interest

  The Member may transfer, in whole or in part, his interest in the Company.

## Article VI  Admission of Additional Members

  The Member may admit one or more additional members to the Company.

## Article VII  Dissolution, Liquidation, and Termination of the Company

  The Company shall be dissolved upon the happening of any of the following events:

   i)  upon the consent of the Member;

   ii)  upon the death, retirement, resignation or bankruptcy of the Member or the occurrence of any other event which terminates the continued membership of the Member in the Company; or

   iii)  upon the entry of a decree of judicial dissolution under Section 18-802 of the LLC Law.

## Article VIII General Provisions

 **a)**  **Applicable Law.** All questions concerning the construction, validity, and interpretation of this Agreement and the performance of obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Delaware.

 **b)**  **Article and Section Titles.** The headings herein are inserted as a matter of convenience only and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

 **c)**  **Separability of Provisions.** Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

 **d)**  **Amendments**. Amendments to this Agreement may be adopted by the affirmative vote of those Members holding 100% of the membership interest in the Company.

 **IN WITNESS WHEREOF,** the Member has executed, or caused this Agreement to be executed, as of the date set forth hereinabove.

      MEMBER:

      Orion Healthcorp, Inc.

      By:_____
        Paul Parmar
        Manager

      MANAGER

      By:_____
        Paul  Parmar

4

**EXHIBIT A**

**<u>MEMBER</u>**

<u>NAME</u>                                   <u>INTEREST</u>

Orion Healthcorp, Inc.                        100%

**EXHIBIT B**

## <u>INITIAL CAPITAL CONTRIBUTION</u>

Ten ($10.00) Dollars.

# Exhibit F

# OPERATING AGREEMENT

## OF

## <u>MDRX MEDICAL BILLING, LLC</u>

This Operating Agreement (this "**Agreement**") of MDRX Medical Billing, LLC (the "**Company**"), a Delaware limited liability company is entered into as of the 7th day of December, 2015 by and among the Company and the sole Member whose name is set forth on <u>Exhibit A</u> attached to this Agreement and incorporated by reference in this Agreement.

**WHEREAS**, the Company was organized as a limited liability company pursuant to the Delaware Limited Liability Company Act (the "**LLC Law**"), as amended from time to time, under the name MDRX Medical Billing, LLC, and, for that purpose, a Certificate of Formation was filed with the Delaware Secretary of State on December 7, 2015; and

**WHEREAS**, the Company and the sole Member desire to operate the Company in accordance with the terms and subject to the conditions set forth in this Agreement.

**NOW, THEREFORE**, it is agreed as follows:

**Article I       Formation and Name: Office; Purpose; Term**

   **a)       Organization.**   The Company was organized as a limited liability company pursuant to the LLC Law, and a Certificate of Formation was filed with the Delaware Secretary of State on December 7, 2015.

   **b)       Name of the Company.**   The name of the Company is MDRX Medical Billing, LLC. The Company may do business under that name and under any other name or names upon which the Member decides.

   **c)       Purpose.**   The Company is organized for any lawful purpose and to do any and all things necessary, convenient, or incidental to that purpose.

   **d)       Term.**   The term of the Company began upon the filing of the Certificate of Formation with the Delaware Secretary of State and shall have a perpetual existence, unless its existence is sooner terminated pursuant to Article VII of this Agreement.

   **e)       Member.**   The name, present mailing address and membership interest of the sole Member is set forth on <u>Exhibit A</u>.

## Article II    Member; Capital; Capital Account and Interests

**1)    Initial Capital Contribution.**  The Member contributed to the Company cash or other assets in the amount set forth in Exhibit B for its interest in the Company (the "**Interest**"). The Interests shall be uncertificated and recorded in the books and records of the Company.

**a)    No Additional Capital Contributions Required.**  The Member shall not be required to contribute any additional capital to the Company.  The Member shall not have any personal liability for any debt, obligation or liability of the Company.

**b)    No Interest on Capital Contributions.**  The Member shall not be paid interest on its capital contribution.

**c)    Return of Capital Contributions.**  Except as otherwise provided in this Agreement, the Member shall not have the right to receive any return of its capital contribution.

**d)    Form of Return of Capital.**  If the Member is entitled to receive a return of its capital contribution, the Company may distribute cash, notes, property, or a combination thereof to the Member in return of the capital contribution.

**e)    Loans.**  The Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms as determined by the Member.

## Article III    Profit, Loss, and Distributions

Cash flow for the Company may be distributed to the Member at such times and in such amounts as determined by the Manager.  For each Fiscal Year, Net Profits and Net Losses shall be allocated as follows: Net Profits shall be allocated in proportion to a Member's respective interest in the Company. Net Losses shall be allocated in proportion to a Member's interests in the Company. "**Net Profits**" and "**Net Losses**" shall mean the net taxable income or net taxable loss of the Company, respectively, as determined for federal income tax purposes, for each fiscal year of the Company, plus any income that is exempt from federal income tax and minus expenditures that are not deductible in computing federal taxable income and not properly chargeable to capital accounts, in each case to the extent such items are not otherwise taken into account in computing Net Profits or Net Losses.

## Article IV    Management: Rights, Powers, and Duties

**a)    Management.**

i)    The Company shall be managed by the Member (the "**Manager**").  Until a different Manager is designated by the Member, the Manager shall be Orion Healthcorp Inc.  The Manager shall have the full and exclusive right and power to act for and bind the Company.

ii)    The Manager may cause the Company to employ and retain such other persons as may be necessary or appropriate for the conduct of the Company's business, on such

terms as the Manager shall determine, including persons who may be designated as officers. The officers of the Company shall have the titles, powers, and duties delegated to them by the Manager. Any number of titles may be held by the same officer.

iii)        The Manager shall have the power and authority to delegate his right and power to manage and control the business and affairs of the Company to one or more other persons (including one or more committees, managers and agents, employees and/or affiliates of a manager), including delegation by management agreement or other arrangement.

**b)        Liability and Indemnification.**

i)        Except as otherwise provided by law, the Manager, or any delegate of the Manager, shall not be liable, responsible or accountable in any way for damages or otherwise to the Company for any act or failure to act pursuant to this Agreement or otherwise unless there is a judicial determination that (i) such person acted in bad faith, (ii) the conduct of such person constituted intentional misconduct or a knowing violation of law, (iii) such person gained a financial benefit to which he was not legally entitled or (iv) such person failed to perform his duties, in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances.

ii)        The Company shall indemnify, defend and hold harmless the Manager, or any delegate of the Manager, from and against any claims, losses, liabilities, damages, fines, penalties, costs and expenses (including, without limitation, reasonable fees and disbursements of counsel and other professionals) arising out of or in connection with any act or failure to act by such person pursuant to this Agreement, or the business and affairs of the Company, to the fullest extent permitted by law; provided, however, that the Manager, or any delegate of the Manager, shall not be entitled to indemnification hereunder if there is a judicial determination that (a) such person's actions or omissions to act were made in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated, or (b) such person personally gained a financial benefit to which he or she was not legally entitled.

## Article V        Transfers of Interest

The Member may transfer, in whole or in part, its interest in the Company.

## Article VI        Admission of Additional Members

The Member may admit one or more additional members to the Company.

## Article VII        Dissolution, Liquidation, and Termination of the Company

The Company shall be dissolved upon the happening of any of the following events:

i)        upon the consent of the Member;

3

          ii)       upon the death, retirement, resignation or bankruptcy of the Member or the occurrence of any other event which terminates the continued membership of the Member in the Company; or

          iii)      upon the entry of a decree of judicial dissolution under Section 18-802 of the LLC Law.

## Article VIII   General Provisions

    **a)**    **Applicable Law.**   All questions concerning the construction, validity, and interpretation of this Agreement and the performance of obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Delaware.

    **b)**    **Article and Section Titles.**   The headings herein are inserted as a matter of convenience only and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

    **c)**    **Separability of Provisions.**   Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

    **d)**    **Amendments**.   Amendments to this Agreement may be adopted by the affirmative vote of those Members holding 100% of the membership interest in the Company.

    **IN WITNESS WHEREOF,** the Member has executed, or caused this Agreement to be executed, as of the date set forth hereinabove.

MEMBER:

Orion Healthcorp Inc.

By:          *Paul Parmar*
        Paul Parmar
        Manager

Orion Healthcorp Inc.

By:          *Paul Parmar*
        Paul Parmar
        Manager

4

**EXHIBIT A**

**MEMBER**

<u>NAME</u>                            <u>INTEREST</u>

Orion Healthcorp Inc.                   100%
c/o Adam J. Greene esq.
875 Third Avenue 9th Floor
NY, NY 10028

**EXHIBIT B**

**INITIAL CAPITAL CONTRIBUTION**

Ten ($10.00) Dollars.

# Exhibit G

**OPERATING AGREEMENT**

**OF**

**NYNM ACQUISITION, LLC**

This Operating Agreement (this "**Agreement**") of NYNM ACQUISITION, LLC (the "**Company**"), a Delaware limited liability company is entered into as of the __ day of March, 2017 by and among the Company and the sole Member whose name is set forth on Exhibit A attached to this Agreement and incorporated by reference in this Agreement.

**WHEREAS**, the Company was organized as a limited liability company pursuant to the Delaware Limited Liability Company Act (the "**LLC Law**"), as amended from time to time, under the name NYNM ACQUISITION, LLC and, for that purpose, a Certificate of Formation was filed with the Delaware Secretary of State on March 9, 2017; and

**WHEREAS**, the Company and the sole Member desire to operate the Company in accordance with the terms and subject to the conditions set forth in this Agreement.

**NOW, THEREFORE**, it is agreed as follows:

**Article I          Formation and Name: Office; Purpose; Term**

**a)**      **Organization.**  The Company was organized as a limited liability company pursuant to the LLC Law, and a Certificate of Formation was filed with the Delaware Secretary of State on March 9, 2017.

**b)**      **Name of the Company.**  The name of the Company is NYNM ACQUISITION, LLC. The Company may do business under that name and under any other name or names upon which the Member decides.

**c)**      **Purpose.**  The Company is organized for any lawful purpose and to do any and all things necessary, convenient, or incidental to that purpose.

**d)**      **Term.**  The term of the Company began upon the filing of the Certificate of Formation with the Delaware Secretary of State and shall have a perpetual existence, unless its existence is sooner terminated pursuant to Article VII of this Agreement.

**e)**      **Member.**  The name, present mailing address and membership interest of the sole Member is set forth on Exhibit A.

**Article II**        **Member; Capital; Capital Account and Interests**

**1)**        **Initial Capital Contribution.**  The Member contributed to the Company cash or other assets in the amount set forth in Exhibit B for its interest in the Company (the "**Interest**").  The Interests shall be uncertificated and recorded in the books and records of the Company.

**a)**        **No Additional Capital Contributions Required.**  The Member shall not be required to contribute any additional capital to the Company.  The Member shall not have any personal liability for any debt, obligation or liability of the Company.

**b)**        **No Interest on Capital Contributions.**  The Member shall not be paid interest on its capital contribution.

**c)**        **Return of Capital Contributions.**  Except as otherwise provided in this Agreement, the Member shall not have the right to receive any return of its capital contribution.

**d)**        **Form of Return of Capital.**  If the Member is entitled to receive a return of its capital contribution, the Company may distribute cash, notes, property, or a combination thereof to the Member in return of the capital contribution.

**e)**        **Loans.**  The Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms as determined by the Member.

**Article III**        **Profit, Loss, and Distributions**

Cash flow for the Company may be distributed to the Member at such times and in such amounts as determined by the Manager.  For each Fiscal Year, Net Profits and Net Losses shall be allocated as follows: Net Profits shall be allocated in proportion to a Member's respective interest in the Company. Net Losses shall be allocated in proportion to a Member's interests in the Company. "**Net Profits**" and "**Net Losses**" shall mean the net taxable income or net taxable loss of the Company, respectively, as determined for federal income tax purposes, for each fiscal year of the Company, plus any income that is exempt from federal income tax and minus expenditures that are not deductible in computing federal taxable income and not properly chargeable to capital accounts, in each case to the extent such items are not otherwise taken into account in computing Net Profits or Net Losses.

**Article IV**        **Management: Rights, Powers, and Duties**

**a)**        **Management.**

i)        The Company shall be managed by the Member (the "**Manager**").  Until a different Manager is designated by the Member, the Manager shall be Paul Parmar.  The Manager shall have the full and exclusive right and power to act for and bind the Company.

ii)        The Manager may cause the Company to employ and retain such other persons as may be necessary or appropriate for the conduct of the Company's business, on such terms as the Manager shall determine, including persons who may be designated as officers. The officers of the

2

Company shall have the titles, powers, and duties delegated to them by the Manager.  Any number of titles may be held by the same officer.

iii)    The Manager shall have the power and authority to delegate his right and power to manage and control the business and affairs of the Company to one or more other persons (including one or more committees, managers and agents, employees and/or affiliates of a manager), including delegation by management agreement or other arrangement.

**b)    Liability and Indemnification.**

i)    Except as otherwise provided by law, the Manager, or any delegate of the Manager, shall not be liable, responsible or accountable in any way for damages or otherwise to the Company for any act or failure to act pursuant to this Agreement or otherwise unless there is a judicial determination that (i) such person acted in bad faith, (ii) the conduct of such person constituted intentional misconduct or a knowing violation of law, (iii) such person gained a financial benefit to which he was not legally entitled or (iv) such person failed to perform his duties, in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances.

ii)    The Company shall indemnify, defend and hold harmless the Manager, or any delegate of the Manager, from and against any claims, losses, liabilities, damages, fines, penalties, costs and expenses (including, without limitation, reasonable fees and disbursements of counsel and other professionals) arising out of or in connection with any act or failure to act by such person pursuant to this Agreement, or the business and affairs of the Company, to the fullest extent permitted by law; provided, however, that the Manager, or any delegate of the Manager, shall not be entitled to indemnification hereunder if there is a judicial determination that (a) such person's actions or omissions to act were made in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated, or (b) such person personally gained a financial benefit to which he or she was not legally entitled.

## Article V    Transfers of Interest

The Member may transfer, in whole or in part, its Interest in the Company.

## Article VI    Admission of Additional Members

The Member may admit one or more additional members to the Company.

## Article VII    Dissolution, Liquidation, and Termination of the Company

The Company shall be dissolved upon the happening of any of the following events:

i)    upon the consent of the Member;

ii)    upon the death, retirement, resignation or bankruptcy of the Member or the occurrence of any other event which terminates the continued membership of the Member in the Company; or

{00845859.DOCX;2 }

iii)        upon the entry of a decree of judicial dissolution under Section 18-802 of the LLC Law.

**Article VIII        General Provisions**

**a)        Applicable Law.**  All questions concerning the construction, validity, and interpretation of this Agreement and the performance of obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Delaware.

**b)        Article and Section Titles.**  The headings herein are inserted as a matter of convenience only and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

**c)        Separability of Provisions.**  Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

**d)        Amendments**.  Amendments to this Agreement may be adopted by the affirmative vote of those Members holding 100% of the membership interest in the Company.

**[Signature Page Follows]**

**IN WITNESS WHEREOF,** the Member has executed, or caused this Agreement to be executed, as of the date set forth hereinabove.

MEMBER:

Orion Healthcorp, Inc

By: _____

Name: Paul Parmar
Its: President


MANAGER:

By: _____

Name: Paul Parmar

[Signature Page to NYNM Acquisition, LLC Operating Agreement]

**EXHIBIT A**

**<u>MEMBER</u>**

<table>
<tr><th><u>NAME</u></th><th><u>INTEREST</u></th></tr>
<tr><td>Oion Healthcorp, Inc.</td><td></td></tr>
<tr><td>c/o Adam J. Greene esq.</td><td>100%</td></tr>
<tr><td>875 Third Avenue 9th Floor</td><td></td></tr>
<tr><td>NY, NY 10028</td><td></td></tr>
</table>

{00845859.DOCX;2 }

**EXHIBIT B**

## <u>INITIAL CAPITAL CONTRIBUTION</u>

Ten ($10.00) Dollars.

# Exhibit H

**PROJECTION CHARIOT**
**Flow of Funds - Cash Portion**

| Name | Amount | Wire Information | Notes |
|------|--------|-----------------|-------|
| | | **CASH AT CLOSE** | |
| **SOURCES - CASH TO JV AT CLOSE** | | | |
| Cash to CHT HoldCo | $82,502,160.25 | Bank: JPMorgan Chase Bank, N.A. | Equity contribution |
| | | Address: 270 Park Avenue | |
| | | City, State: New York, NY 10017 | |
| | | ABA/Routing Number: 021000021 | |
| | | Account Name: CC Capital CHT Holdco LLC | |
| | | Account Number | |
| | | FFC Account Name | |
| CONFIRMED BY D NEWTON | | FFC Account Number | |
| | | Attention | |
| | | Reference: Project Chariot | |
| TOTAL SOURCES TO JV ---> | $82,502,160.25 | | |
| **SOURCES - CASH TO CHT AT CLOSE** | | | |
| BANK OF AMERICA | $130,000,000.00 | Bank: JPMorgan Chase Bank, N.A. | Senior credit facilities |
| | | Address: 270 Park Avenue | |
| | | City, State: New York, NY 10017 | |
| | | ABA/Routing Number: 021000021 | |
| | | Account Name: CC Capital CHT Holdco LLC | |
| | | Account Number | |
| | | FFC Account Name | |
| CONFIRMED BY D NEWTON | | FFC Account Number | |
| | | Attention | |
| | | Reference: Project Chariot | |
| TOTAL SOURCES TO CHT ---> | $130,000,000.00 | | |
| **USES - CASH FROM JV AT CLOSE** | | | |
| **CASH MERGER CONSIDERATION** | | | |
| CAPITA REGISTRARS LIMITED | $177,154,981.43 | Bank: Royal Bank of Scotland | 92,081,632 Shares Outstanding |
| | | Address | 24,855,637 Shares Contributed to JV |
| | | City, State | 6,763,544 Shares Direct Pay - Withholding Tax |
| | | ABA/Routing Number | 60,462,451 Net Shares Paid to Capita |
| | | Account Name: Capita Registrars Limited re: CHT Inc. Cash Consideration A/C | |
| | | Account Number: CAPRHTC-USDC | $2.93 Per Share |
| | | Sort Code | |
| | | IBAN | $177,154,981.43 Total Consideration Paid - Capita / $196,972,165.35 Total ex Withholding Shares |
| CONFIRMED BY M. LILLY | | Swift | |
| | | Reference: CHT, Inc. Cash Consideration A/C | |
| Max Edward Royde | $630,067.20 | Bank: UBS AG, Stamford | 215,040 Shares / 6,763,544 |
| | | Swift | $2.93 / Share |
| | | ABA Code | |
| | | | $630,067.20 Total Wire |
| | | For Account: UBS AG, London | |
| | | Swift | |
| CONFIRMED BY M ROYDE | | Account Name: Max Royde | |
| | | IBAN | |
| | | Beneficiary: Mr. Max Royde | |
| | | Reference: Constellation Health Merger Consideration | |
| Canaccord Genuity Wealth - Client Acc | $8,413,495.00 | Bank: HSBC | 2,871,500 Shares |
| Beneficial - Blake Holdings / Richard Griffiths | | Address | $2.93 / Share |
| | | City, State | |
| | | ABA/Routing Number | $8,413,495.00 Total Wire |
| | | Account Name: Canaccord Genuity Wealth - Client Account | |
| CONFIRMED FINNCAP | | Sort Code: 40-05-15 | |
| | | IBAN | |
| | | Beneficiary Bank: MIDLGB22 | |
| | | Reference: Constellation Health 91035082.1001 | |
| Platform Securities KKCLT a/c | $2,930,000.00 | Bank: National Westminster Bank PLC | 1,000,000 Shares |
| Beneficial - Richard Griffiths | | Address | $2.93 / Share |
| | | City, State | |
| | | ABA/Routing Number | $2,930,000.00 Total Wire |
| | | Account Name: TDWCS LLP (Client Money) | |
| | | Account Number | |
| | | Sort Code: 01-10-01 | |
| CONFIRMED FINNCAP | | IBAN | |
| | | Swift: NWBKGB2L | |
| | | Reference: Constellation Healthcare Merger Consideration | |
| AAKB Investments Limited | $7,843,621.72 | Bank: JP Morgan Chase Bank | 2,677,004 Shares |
| Beneficial - Pavan Bakhshi | | City, State: New York, NY | $2.93 / Share |
| | | Swift Address: CHASUS33 | |
| | | ABA/Routing Number | $7,843,621.72 Total Wire |
| | | Account Name: Investec Bank (Channel Islands) Limited | |
| | | Account Number | |
| SEE ATTACHED INSTRUCTION LETTER FROM SCOTT | | Chips UID | |

**PROJECTION CHARIOT**
**Flow of Funds - Cash Portion**

| Name | Amount | Wire Information | | Notes |
|------|--------|-----------------|---|-------|
| | | Swift Address | GMGUGGSP | |
| | | Beneficiary | AAKB Investments Limited | |
| | | Account Number | Investec | |
| | | Reference | Constellation Health Merger Consideration | |
| **TOTAL CASH MERGER CONSIDERATION  --->** | **$196,972,165.35** | | | |
| **Cash for Fees to CHT** | **$10,181,494.18** | | | |
| To CHT for Fees | $10,181,494.18 | Bank | JP Morgan Bank | |
| | | Address | | |
| | | City, State | | |
| | | ABA/Routing Number | 021000021 | |
| | | Account Name | Orion HealthCorp, Inc. | |
| | | Account Number | | |
| | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |
| | | Reference | | |
| ALPHA CEPHEUS, LLC | $5,348,500.72 | Bank | WSFS Bank | Note Portion to Direction by Robinson |
| | | Address | 500 Delaware Avenue | $661,558.28 |
| | | City, State | Wilmington, DE 19801 | |
| | | ABA/Routing Number | 031100102 | |
| | | Account Name | Young Conaway Stargatt & Taylor, LLP Attorney Trust Account | |
| | | Account Number | | |
| | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |
| | | Reference | ter number t____o be transferred to Master Interest Bearing Account | |
| **BUY-SIDE EXPENSES (To be paid by CHT)** | | | | |
| Bank of America | $3,098,019.50 | Bank | Bank of America, N.A., New York, NY | $2,356,250.00 Underwrtiging Fee |
| | | Address | | $725,000.00 Upfront Fee |
| | | City, State | | $10,000.00 Agency Fee |
| | | ABA/Routing Number | 026009593 | $6,769.50 Expenses |
| | | Account Name | Large Corporate Loan Servicing | $3,098,019.50 |
| | | Account Number | | |
| CONFIRMED MVA | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | Credit Services - Charlotte | |
| | | Reference | Orion Healthcorp, Inc. | |
| Moore & Van Allen PLLC | $195,000.00 | Bank | Bank of America, Charlotte, NC | |
| BofA Counsel | | Address | | |
| | | City, State | | |
| | | ABA/Routing Number | 026009593 | |
| | | Account Name | Moore & Van Allen PLLC | |
| | | Account Number | | |
| CONFIRMED MVA | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |
| | | Reference | Thomas L. Mitchell | |
| WINSTON & STRAWN LLP | $2,555,023.91 | Bank | BMO Harris Bank N.A. | $3,000,000.00 Reflecting pay at close discount |
| | | Address | | $55,023.91 Disbursements on behalf of client |
| | | City, State | Chicago, IL | |
| | | ABA/Routing Number | 071000288 | |
| | | Account Name | Winston & Strawn LLP | |
| | | Account Number | | |
| | | FFC Account Name | | |
| | | Attention | | |
| | | Reference | Invoice 2535277 | |
| John Altorelli | $575,000.00 | Bank | Santander Bank N.A. | |
| | | Address | 601 Penn Street | |
| | | City, State | Redding, PA 19601 | |
| | | ABA/Routing Number | 231372691 | |
| | | Account Name | Cityatwork LLC | |
| | | FFC Account Name | | |
| CONFIRMED BY J ALTORELLI | | FFC Account Number | | |
| | | Attention | | |
| | | Swift Code | SVRNUS33 | |
| | | Reference | CC Capital – Constellation Healthcare Technologies, Inc. | |
| KPMG | $500,000.00 | Bank | Bank of New York Mellon | |
| | | Address | 500 Ross Street, RM 0940 | |
| | | City, State | Pittsburgh, PA 15262 | |
| | | ABA/Routing Number | 043000261 | |
| | | Account Name | KPMG | |
| | | Account Number | | |
| CONFIRMED KPMG | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |

**PROJECTION CHARIOT**
**Flow of Funds - Cash Portion**

| Name | Amount | Wire Information | | Notes |
|------|--------|-----------------|---|-------|
| | | Reference | Invoice #8001386626 | |
| Finsbury | $54,799.31 | Bank | Wells Fargo Bank, N.A. | |
| | | Address | 420 Montgomery Street | |
| | | City, State | San Francisco, CA 94104 | |
| | | ABA/Routing Number | 121000248 | |
| | | Account Name | Finsbury LLC | |
| | | Account Number | | |
| | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |
| | | Reference | Invoice #105240 | |
| RICHARDS, LAYTON & FINGER | $350,000.00 | Bank | M&T Bank | |
| | | Address | Rodney Square North | |
| | | City, State | Wilmington, Delaware 19890 | |
| | | ABA/Routing Number | 022000046 | |
| | | Account Name | Richards, Layton & Finger | |
| | | Account Number | | |
| | | FFC Account Name | | |
| CONFIRMED S BIGLER | | FFC Account Number | | |
| | | Attention | | |
| | | Reference | Invoice 527945 | |
| McKinsey & Company | $460,000.00 | Bank | Citibank N.A. | |
| | | Address | | |
| | | City, State | | |
| | | ABA/Routing Number | 021000089 | |
| | | Account Name | McKinsey & Company, Inc. | |
| | | Account Number | | |
| | | FFC Account Name | | |
| | | Attention | | |
| | | Reference | No. NE-KKP001-22710 | |
| ELICIT INSIGHTS CONSULTING | $8,125.00 | Bank | JP Morgan Chase | Invoice Paid by CC Capital Management |
| | | Address | | |
| | | City, State | | |
| | | ABA/Routing Number | 021000021 | |
| | | Account Name | CC Capital Management LLC | |
| CONFIRMED BY D NEWTON | | Account Number | | |
| | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |
| | | Reference | Project Chariot | |
| BLACK DUCK CONSULTING | $62,500.00 | Bank | JP Morgan Chase | Invoice Paid by CC Capital Management |
| | | Address | | |
| | | City, State | | |
| | | ABA/Routing Number | 021000021 | |
| | | Account Name | CC Capital Management LLC | |
| CONFIRMED BY D NEWTON | | Account Number | | |
| | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |
| | | Reference | Project Chariot | |
| CC CAPITAL MANAGEMENT | $25,000.00 | Bank | JP Morgan Chase | Expense Reimbursement |
| | | Address | | |
| | | City, State | | |
| | | ABA/Routing Number | 021000021 | |
| | | Account Name | CC Capital Management LLC | |
| CONFIRMED BY D NEWTON | | Account Number | | |
| | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |
| | | Reference | Project Chariot | |
| FOX ROTHSCHILD LLP | $9,250.00 | Bank | Wells Fargo Bank | BofA Related Fees |
| | | Address | 123 S. Broad Street | |
| | | City, State | Philadelphia, PA | |
| | | ABA/Routing Number | 121000248 | |
| | | Account Name | Fox Rothschild LLP | |
| | | Account Number | | |
| | | FFC Account Name | | |
| CONFIRMED BY FOX ROTHSCHILD | | Attention | | |
| | | Reference | Invoice 738888, Client no 166452 | |
| VORYS, SATER, SEYMOUR AND PEASE LLP | $5,800.00 | Bank | PNC Bank | BofA Related Fees |
| | | Address | | |
| | | City, State | | |
| | | ABA/Routing Number | 41000124 | |
| | | Account Name | Vorys, Sater, Seymour and Pease LLP | |
| | | FFC Account Name | | |
| CONFIRMED BY VORYS | | FFC Account Number | | |
| | | Attention | | |
| | | Reference | Invoice 1180659, Acct 074286.000002 | |
| Parth Mehrotra | $30,000.00 | Bank | Citibank N.A. | Consulting Fees |

**PROJECTION CHARIOT**
**Flow of Funds - Cash Portion**

| Name | Amount | Wire Information | | Notes |
|------|--------|-----------------|--|-------|
| CONFIRMED | | Address | | |
| | | City, State | | |
| | | ABA/Routing Number | 021000089 | |
| | | Account Name | Parth Mehrotra | |
| | | Account Number | | |
| | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |
| | | Reference | Project Chariot | |
| **TOTAL USES FROM JV --->** | **$7,928,517.72** | | | |

**USES - CASH FROM CHT AT CLOSE (SELL-SIDE EXPENSES AND FINANCING FEES)**

| Name | Amount | Wire Information | | Notes |
|------|--------|-----------------|--|-------|
| MCGUIRE WOODS LLP | $387,500.00 | Bank | Bank of America | |
| | | Address | | |
| | | City, State | | |
| | | ABA/Routing Number | 026009593 | |
| | | Account Name | McGuire Woods Operating Account | |
| CONFIRMED BY S OLDER | | Account Number | | |
| | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |
| | | Reference | Stephen Older | |
| DWF LLP | $85,000.00 | Bank | Barclays Bank Plc | |
| | | Address | | |
| | | City, State | | |
| | | ABA/Routing Number | | |
| | | Account Name | DWF USD Office | |
| | | Account Number | 48222200 | |
| CONFIRMED BY M DOUGHTY | | IBAN | | |
| | | SWIFT/BIC | | |
| | | Sort Code | | |
| | | Reference | CHT Invoice No 1791278 | |
| ROBINSON BROG | $380,500.00 | Bank | Wells Fargo Bank, N.A. Paid in December; Balance | |
| | | Address | 150 East 42nd Street, 35th Floor | |
| | | City, State | New York, NY 10017 | |
| | | ABA/Routing Number | 121000248 | |
| | | Account Name | Robinson Brog Leinwand Greene Genovese & Gluck P.C. | |
| CONFIRMED BY A GREENE | | Account Number | | |
| | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |
| | | Reference | Adam Greene / Project Chariot | |
| SPECIAL COMMITTEE FEES | $65,000.00 | Bank | | |
| | | Address | | |
| | | City, State | | |
| | | ABA/Routing Number | | |
| | | Account Name | | |
| | | Account Number | | |
| | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |
| Kirkland & Ellis | $151,000.00 | Bank | Citibank | |
| | | Address | | |
| | | City, State | | |
| | | ABA/Routing Number | 271070801 | |
| | | Account Name | Kirkland & Ellis LLP | |
| CONFIRMED BY KIRKLAND | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |
| | | Reference | 26206-1 | |
| Stifel | $125,000.00 | Bank | | |
| | | Address | | |
| | | City, State | | |
| | | ABA/Routing Number | | |
| | | Account Name | | |
| | | Account Number | | |
| | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |
| | | Reference | | |
| SunTrust | $125,000.00 | Bank | | |
| | | Address | | |
| | | City, State | | |
| | | ABA/Routing Number | | |
| | | Account Name | | |
| | | Account Number | | |
| | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |

**PROJECTION CHARIOT**
**Flow of Funds - Cash Portion**

| Name | Amount | Wire Information | | Notes |
|------|--------|-----------------|--|-------|
| | | Reference | | |
| Cassel Salpeter | $62,500.00 | Bank | | |
| | | Address | | |
| | | City, State | | |
| | | ABA/Routing Number | | |
| | | Account Name | | |
| | | Account Number | | |
| | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |
| | | Reference | | |
| Redleaf | $32,500.00 | Bank | | |
| | | Address | | |
| | | City, State | | |
| | | ABA/Routing Number | | |
| | | Account Name | | |
| | | Account Number | | |
| | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |
| | | Reference | | |
| RRBB | $25,000.00 | Bank | | |
| | | Address | | |
| | | City, State | | |
| | | ABA/Routing Number | | |
| | | Account Name | | |
| | | Account Number | | |
| | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |
| | | Reference | | |
| Young Conway | $375,000.00 | Bank | | |
| | | Address | | |
| | | City, State | | |
| | | ABA/Routing Number | | |
| | | Account Name | | |
| | | Account Number | | |
| | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |
| | | Reference | | |
| FinnCap | $300,000.00 | Bank | | |
| | | Address | | |
| | | City, State | | |
| | | ABA/Routing Number | | |
| | | Account Name | | |
| | | Account Number | | |
| | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |
| | | Reference | | |
| Paul Parmer Deal Fee | $3,227,418.18 | Bank | | |
| | | Address | | |
| | | City, State | | |
| | | ABA/Routing Number | | |
| | | Account Name | | |
| | | Account Number | | |
| | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |
| | | Reference | | |
| Deal Finders Fee | $1,000,000.00 | Bank | | |
| | | Address | | |
| | | City, State | | |
| | | ABA/Routing Number | | |
| | | Account Name | | |
| | | Account Number | | |
| | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |
| | | Reference | | |
| Vincent Serafino Geary Waddell Jenevein | $0.00 | Bank | Sovereign Bank | |
| | | Address | 17950 Preston Road, Suite 500 | |
| | | City, State | Dallas, TX 75252 | |
| | | ABA/Routing Number | 111924994 | |
| | | Account Name | Vincent Serafino Geary Waddell Jenevein PC - Operating Account | |
| | | Account Number | ████████ | |
| | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |
| | | Reference | Project Chariot | |
| Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP | $0.00 | Bank | City National Bank | |

**PROJECTION CHARIOT**

Flow of Funds - Cash Portion

| Name | Amount | Wire Information | | Notes |
|---|---|---|---|---|
| | | Address | 400 N. Roxbury Drive | |
| | | City, State | Beverly Hills, CA | |
| | | ABA/Routing Number | 122016066 | |
| | | Account Name | Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP | |
| | | Account Number | | |
| | | FFC Account Name | | |
| | | FFC Account Number | | |
| | | Attention | | |
| | | Reference | 19425-002 | |
| **TOTAL USES FROM CHT --->** | **$6,341,418.18** | | | |

**Funding Adjustment**

Sources
| | |
|---|---|
| CC Capital | $ 82,502,160.25 |
| BAML | 130,000,000.00 |
| Total Cash Sources | $ 212,502,160.25 |

HoldCo Uses
| | | |
|---|---|---|
| Merger Consideration | $ 196,972,165.35 | |
| Note to Paul | 5,348,500.72 | |
| Cash to CHT for Fee Payments | 10,181,494.18 | |
| Total Cash Sources | $ 212,502,160.25 | $ 0.0000 |

CHT Sources
| | |
|---|---|
| Cash to CHT for Fee Payments | $ 10,181,494.18 |
| Cash at CHT | 5,000,000.00 |
| Total CHT Sources | $ 15,181,494.18 |

CHT Uses
| | | |
|---|---|---|
| Buyside Fees | $ 7,928,517.72 | |
| Sellside Fees | 6,341,418.18 | |
| Cash at Company | 250,000.00 | |
| Total CHT Sources | $ 14,519,935.90 | $ 661,558.2823 |

# Exhibit I

*EXECUTION COPY*

SUBSCRIPTION AGREEMENT

by and among

CC CAPITAL MANAGEMENT, LLC

(solely for purposes of <u>Section 8.2</u> herein),

CHT HOLDCO, LLC,

CC CAPITAL CHT HOLDCO LLC,

ALPHA CEPHEUS, LLC,

FIRST UNITED HEALTH, LLC

CONSTELLATION HEALTH, LLC,

AND

PAUL PARMAR

NOVEMBER 24, 2016

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND TERMS ..................................................................2

    Section 1.1    Definitions ...........................................................................2

ARTICLE II THE SUBSCRIPTION ........................................................................6

    Section 2.1    Subscription and Payment .............................................6
    Section 2.2    Closing ......................................................................6

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE COMPANY
AND THE SELLERS ...............................................................................................7

    Section 3.1    Representations and Warranties Relating to the Company and Sub...........7
    Section 3.2    Representation and Warranties Relating to CHT .........................9
    Section 3.3    Representation and Warranties Relating to the Sellers..............10
    Section 3.4    Voting Support ........................................................13

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SUBSCRIBER.................13

    Section 4.1    Organization ...........................................................13
    Section 4.2    Authorization; Validity of Agreement; Necessary Action .........13
    Section 4.3    Consents and Approvals; No Violations........................14
    Section 4.4    Accredited Investor ..................................................14

ARTICLE V COVENANTS ......................................................................................14

    Section 5.1    Further Assurances.....................................................14
    Section 5.2    No Conduct of Business. ..............................................15
    Section 5.3    Additional Collateral...................................................15
    Section 5.4    Pre-Closing Contribution and Distribution...................16

ARTICLE VI CONDITIONS .....................................................................................16

    Section 6.1    Conditions to the Obligations of the Subscriber .........16
    Section 6.2    Conditions to the Obligations of the Company ...........18

ARTICLE VII INDEMNIFICATION ........................................................................18

    Section 7.1    Survival ..................................................................18
    Section 7.2    Indemnification ........................................................19
    Section 7.3    Limitations and Qualifications ....................................19
    Section 7.4    Matters Involving Third Parties ..................................20
    Section 7.5    Determination of Adverse Consequences; Payments; Other..................21
    Section 7.6    Exclusive Remedy......................................................21

i

**ARTICLE VIII** ....................................................................................................................**22**

    Section 8.1    Termination ...................................................................................22
    Section 8.2    Effect of Termination. ..................................................................22

**ARTICLE IX MISCELLANEOUS** ....................................................................................**23**

    Section 9.1    Notices ..........................................................................................23
    Section 9.2    Interpretation ................................................................................23
    Section 9.3    Counterparts..................................................................................23
    Section 9.4    Entire Agreement; Third-Party Beneficiaries..............................24
    Section 9.5    Severability ..................................................................................24
    Section 9.6    Governing Law .............................................................................24
    Section 9.7    Arbitration....................................................................................24
    Section 9.8    Specific Performance ...................................................................26
    Section 9.9    Assignment ..................................................................................26
    Section 9.10    Expenses .....................................................................................26
    Section 9.11    Headings ......................................................................................26
    Section 9.12    Waivers .......................................................................................27
    Section 9.13    No Recourse ................................................................................27
    Section 9.14    Amendment and Modification......................................................27

# SUBSCRIPTION AGREEMENT

This Subscription Agreement, dated as of November 24, 2016 (this "Agreement"), is being made and entered into by and among CHT Holdco, LLC, a Delaware limited liability company (the "Company"), CC Capital CHT Holdco, LLC, a Delaware limited liability company (the "Subscriber"), CC Capital Management, LLC, a Delaware limited liability company (solely for purposes of Section 8.2 herein) ("CC Capital Management"), First United Health, LLC, a Delaware limited liability company ("FUH"), Alpha Cepheus, LLC, a Delaware limited liability company ("AC"), Constellation Health, LLC, a Delaware limited liability company ("CH") and Paul Parmjit Parmar, in his individual capacity ("Paul Parmar" and with AC, FUH and CH, each a "Seller" and collectively, the "Sellers"). Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in the merger agreement by and among Subscriber, the Company, CHT Mergersub, Inc., a Delaware corporation and wholly-owned subsidiary of the Company ("Sub") and Constellation Healthcare Technologies, Inc. ("CHT"), a Delaware corporation, dated as of even date hereof (the "Merger Agreement"); provided, that references to the "Company" therein shall be deemed to be references to "CHT" for purposes of this Agreement.

## RECITALS

WHEREAS, the Company has offered to the Subscriber and the Subscriber has agreed to accept the Company's offer for that number of Class A Units of the Company ("Class A Units"), set forth on Schedule A attached hereto (the "Subscription"), subject to the terms and conditions of this Agreement;

WHEREAS, pursuant to the CH Contribution Agreement, CH contributed to AC 17,862,074 shares of CHT Common Stock owned and controlled by CH;

WHEREAS, pursuant to the FUH Contribution Agreement, FUH contributed to AC 6,993,563 shares of CHT Common Stock owned and controlled by FUH and the lender's right, title and interest in the CHT Promissory Note;

WHEREAS, pursuant to the AC Contribution Agreement, AC contributed to the Company all the shares of CHT Common Stock owned and controlled by it and the lender's right, title and interest in CHT Promissory Note, in each case, that it received as contributions from CH and FUH;

WHEREAS, simultaneously with the subscription for that number of Class A Units set forth opposite the Subscriber's name on Schedule A attached hereto in exchange for the consideration to be paid by Subscriber therefor as set forth on Schedule A attached hereto (the "Purchase Price"), the Company shall engage in the acquisition of CHT by means of a merger transaction (collectively, with the transactions contemplated by this Agreement, the "Contemplated Transactions") pursuant to which CHT will be merged with and into Sub with CHT becoming a wholly-owned subsidiary of the Company in accordance with the terms of the Merger Agreement;

WHEREAS, the Company, the Subscriber and the Sellers desire to make certain representations, warranties, covenants and other agreements specified herein in connection with this Agreement; and

NOW THEREFORE, in consideration of the mutual covenants hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS AND TERMS

**Section 1.1    Definitions.**  As used in this Agreement, the following terms shall have the meanings set forth below, and any term not so defined, shall have the meaning ascribed to such term in the Merger Agreement:

"AC" has the meaning set forth in the Preamble.

"AC Contribution Agreement" means that certain Contribution Agreement dated as of November 24, 2016, by and between AC and the Company, whereby AC assigned all of its right, title and interest in 24,855,637 shares of CHT Common Stock and the lender's right, title and interest in the CHT Promissory Note.

"Additional Guaranteed Obligations" has the meaning set forth in Section 8.2.

"Adverse Consequences" means, whether direct or indirect, all actions, suits, Legal Proceedings, hearings, investigations, charges, complaints, Claims, damages, demands, injunctions, judgments, Orders, decrees, rulings, damages, dues, penalties, fines, costs, amounts paid in Settlement, Liabilities, obligations, Taxes, Liens, losses, expenses, and fees, including court costs and reasonable attorneys' fees and expenses; provided, that in no event shall "Adverse Consequences" be deemed to include consequential or punitive damages (unless payable to a third party).

"Affiliate" means, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and  policies of such Person, in either case whether by contract or otherwise.

"Agreement" has the meaning set forth in the Preamble.

"Arbitration" has the meaning set forth in Section 9.7(a).

"Arbitrator" has the meaning set forth in Section 9.7(d).

"Award" has the meaning set forth in Section 9.7(g).

"Certificate of Merger" means the certificate of merger contemplated by the Merger Agreement.

"CC Capital Management" has the meaning set forth in the Preamble.

2

"CH" has the meaning set forth in the Preamble.

"CH Contribution Agreement" means that certain Contribution Agreement dated as of November 24, 2016, by and between CH and AC, whereby CH assigned all of its right, title and interest in 17,862,074 shares of CHT Common Stock to AC.

"CHT" has the meaning set forth in the Preamble.

"CHT Common Stock" means each share of common stock, par value $0.0001 per share, of CHT.

"CHT Material Adverse Effect" means a "Company Material Adverse Effect" as defined in the Merger Agreement.

"CHT Promissory Note" means that certain Loan Agreement dated as of August 30, 2016, among FUH, as lender, Paul Parmar, as agent, and CHT, as borrower, in a principal amount equal to $12,000,000, and the promissory note issued by CHT to FUH pursuant thereto, each as assigned as of November 24, 2016, from FUH to AC pursuant to the FUH Contribution Agreement, copies of which are attached hereto as Exhibit A.

"CHT Stockholder Approval" means obtaining both the Company Stockholder Approval and the Majority of the Minority Approval (as such terms are defined in the Merger Agreement).

"Claim" means any claim, dispute, action, charge, assertion, threat or other allegation and any Legal Proceeding.

"Class A Units" has the meaning set forth in the Recitals.

"Closing" has the meaning set forth in Section 2.2.

"Closing Date" has the meaning set forth in Section 2.2.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the Preamble.

"Company Disclosure Schedule" means the disclosure schedules delivered by the Company and Sellers to Subscriber with execution of this Agreement.

"Contemplated Transaction" has the meaning set forth in the Recitals.

"Contributing Entity" means each of CH, AC and FUH.

"Contribution Agreements" mean the AC Contribution Agreement, the CH Contribution Agreement and the FUH Contribution Agreement.

3

"Deductible" has the meaning set forth in Section 7.3(a).

"Dispute" has the meaning set forth in Section 9.7(a).

"Distribution Note" has the meaning set forth in Section 5.4.

"DRAA" has the meaning set forth in Section 9.7(a).

"FUH Contribution Agreement" means that certain Contribution Agreement dated as of November 24, 2016, by and between FUH and AC, whereby FUH assigned all of its right, title and interest in 6,993,563 shares of CHT Common Stock and as lender in the CHT Promissory Note to AC.

"Fundamental Representations" means, collectively, the representations and warranties of the Company and the Sellers in Section 3.1 and Section 3.3 of this Agreement and Section 4.1, Section 4.3, and Section 4.17 of the Merger Agreement.

"Incur" means, with respect to any obligation of a Person, to create, impose, issue, acquire (by conversion, exchange or otherwise), assume, suffer, guarantee or otherwise become liable in respect of any Liability or any other obligation, in each case, whether directly or indirectly incurred.

"Indemnified Party" has the meaning set forth in Section 7.4(a).

"Indemnifying Party" has the meaning set forth in Section 7.4(a).

"Indemnity and Support Agreement" means that certain Indemnity and Support Agreement, dated as of even date herewith, by and among Sub, the Company, Subscriber, CC Capital Management, AC, FUH, CH and Paul Parmar.

"Initial LLC Agreement" means that certain Limited Liability Company Agreement of the Company between the Company and AC dated as of November 14, 2016.

"Liabilities" means any indebtedness, obligations or liabilities of any kind, character or description, whether accrued, absolute, contingent or otherwise, whether known or unknown, fixed or otherwise, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested and whether due or to become due or asserted or unasserted, including charges, judgments, fines, penalties and claims.

"LLC Agreement" means that certain Amended and Restated Limited Liability Company Agreement of the Company executed as of even date herewith by and between Subscriber and AC.

"Merger Agreement" has the meaning set forth in the Preamble.

"Parmar Voting Support Agreements" has the meaning set forth in Section 3.4.

"Paul Parmar" has the meaning set forth in the Preamble.

"Pledge" means that certain pledge of a security interest by (a) AC for the benefit of Subscriber of all of AC's membership interests in the Company, (b) CH for the benefit of Subscriber of all of CH's membership interests in AC and (c) FUH for the benefit of Subscriber of all of FUH's membership interests in AC, in each case, pursuant to the terms and conditions of the Pledge Agreements.

"Pledge Agreements" means (a) a pledge agreement, dated as of even date herewith, by and between Subscriber and AC, substantially in the form of Exhibit B-1 hereto, (b) a pledge agreement, dated as of even date herewith, by and between Subscriber and CH, substantially in the form of Exhibit B-2 hereto, and (c) a pledge agreement, dated as of even date herewith, by and between Subscriber and FUH, substantially in the form of Exhibit B-3 hereto.

"Pre-Closing Distributions" has the meaning set forth in Section 5.4.

"Purchase Price" has the meaning set forth in the Recitals.

"Reorganization" has the meaning set forth in Section 3.3(d)(i).

"Reorganization Documents" means the Contribution Agreements and each document executed by a Seller related to the Reorganization.

"Seller" has the meaning set forth in the Preamble.

"Seller Representative" means Paul Parmar.

"Settlement" means, with respect to any Claim or Legal Proceeding, the settlement, satisfaction or other form of resolution of such Claim or Legal Proceeding.

"Specified Indemnities" has the meaning set forth in Section 7.2(c).

"Sub" has the meaning set forth in the Preamble, and shall be deemed to mean or include CHT and/or the Surviving Corporation from and after the consummation of the Merger.

"Sub Stock" has the meaning set forth in Section 3.1(a)(i).

"Subscriber" has the meaning set forth in the Preamble.

"Subscriber Indemnitees" means, collectively, Subscriber, Subscriber's Affiliates, CC Capital Management, CC Capital Management's Affiliates and each of their respective officers,

directors, stockholders, members, equityholders, managers, employees, partners, representatives, successors, assigns and agents.

"Subscriber Material Adverse Effect" means any Effect that, considered together with all other Effects, has had or would reasonably be expected to have or result in a material adverse effect on the ability of Subscriber to consummate the transactions contemplated by this Agreement.

"Subscription" has the meaning set forth in the Recitals.

"Survival Period" has the meaning set forth in Section 7.1(a).

"Third-Party Claim" has the meaning set forth in Section 7.4(a).

"Transaction Documents" means this Agreement, the Merger Agreement, the LLC Agreement, the Pledge Agreements, Parmar Voting Support Agreements, the Voting and Support Agreements and Releases of Claims, the Distribution Note, the Indemnity and Support Agreement and each Reorganization Document and any other agreement or other document referenced in or otherwise relating to any of the foregoing or the consummation of any of the matters contemplated hereby or thereby, including the Reorganization and the Pre-Closing Distributions.

"Transaction Material Adverse Effect" means any Effect that, considered together with all other Effects, has had or would reasonably be expected to have or result in a material adverse effect on (a) the Sellers or the Company or (b) the ability of any of the Sellers or the Company to consummate the transactions contemplated by this Agreement, the Transaction Documents or the Merger Agreement.

"Voting and Support Agreements and Releases of Claims" means each Voting and Support Agreement and Release of Claims executed by CHT, Company and the relevant CHT stockholder party thereto, in form as attached hereto as Exhibit C.

## ARTICLE II

## THE SUBSCRIPTION

**Section 2.1    Subscription and Payment.** The Company has offered to the Subscriber, and Subscriber hereby agrees to accept the Company's offer for that number of Class A Units set forth opposite the Subscriber's name on Schedule A attached hereto in exchange for the Purchase Price to be paid by Subscriber therefor as set forth on Schedule A attached hereto at the Closing. After payment of the Purchase Price, Subscriber will be issued the number of Class A Units set forth on Schedule A attached hereto and the Sellers agree that the capitalization of the Company will be as reflected on Schedule A attached hereto, with Subscriber receiving 55% of the voting interest in the Company and 50.7% of the economic interest in the Company.

**Section 2.2    Closing.** Subject to the terms and conditions contained in this Agreement, the closing of the Subscription (the "Closing") will take place remotely via the exchange of

documents and signatures simultaneously with the consummation of the transactions contemplated by the Merger Agreement (or such other time specified by the parties hereto), (the date on which the Closing actually takes place being the "Closing Date"); provided, however that no Party shall be obligated to consummate the Closing prior to the satisfaction or waiver of all of the conditions set forth in Article VI hereof) (other than conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions).

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND THE SELLERS

Except as disclosed in the corresponding schedule of the Company Disclosure Schedule, the Company and the Sellers represent and warrant to the Subscriber as follows as of the date hereof and as of the Closing Date:

**Section 3.1    Representations and Warranties Relating to the Company and Sub.**

(a)    **Organization**.

(i)    The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Delaware and has the requisite entity power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted. The Company is duly qualified or licensed to do business and is in good standing (with respect to jurisdictions which recognize such concept) as a foreign entity in each jurisdiction in which the nature of the business conducted by it makes such qualification or licensing necessary. The Company has no, and has never had any, employees or Liabilities and, other than 100% of the equity interests in Sub (the "Sub Stock"), the CHT Promissory Note and the CHT Common Stock, has no, and has never had any, assets. The Company is not conducting, and has never conducted, any business and other than this Agreement, the Initial LLC Agreement, the agreements effectuating the Reorganization and the other Transaction Documents to which it is a party, is not a party, and has never been a party, to any Contract. The Company owns and controls the Sub Stock, the CHT Common Stock (until the effective time of the Pre-Closing Distributions) and the lender's interest in the CHT Promissory Note, in each case, free and clear of all Liens and free and clear of any other limitation or restrictions (including, in the case of the CHT Common Stock and Sub Stock, any restriction on the right to vote, sell or otherwise dispose of such equity interests) that otherwise relate, or could relate, to such ownership and control, and otherwise has good and marketable title to the Sub Stock, the CHT Common Stock and lender's interest in the CHT Promissory Note. All of the Sub Stock and CHT Common Stock owned and controlled by the Company has been duly authorized and validly issued, and is fully paid and nonassessable. At the Closing, the true and correct capitalization of the Company will be as set forth on Schedule A attached hereto.

(ii)    Sub is a corporation duly organized, validly existing and in good standing under the laws of the state of Delaware and has the requisite entity power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted. Sub is duly qualified or licensed to do business and is in good standing (with

respect to jurisdictions which recognize such concept) as a foreign entity in each jurisdiction in which the nature of the business conducted by it makes such qualification or licensing necessary. Sub has no, and has never had any, employees or Liabilities and, other than the CHT Common Stock (after giving effect to the Pre-Closing Distributions), has no, and has never had any, assets. Sub is not conducting, and has never conducted, any business and other than the Transaction Documents to which it is a party, is not a party, and has never been a party, to any Contract. Sub is wholly owned and controlled by the Company.

(b)    **Authorization; Validity of Agreement; Company Action**. Each of the Company and Sub has the requisite entity power and authority to execute and deliver each of the Transaction Documents to which it is a party. The execution, delivery and performance by each of the Company and Sub of each of the Transaction Documents to which it is a party has been duly authorized by the sole manager of the Company or director of Sub. No other entity action on the part of the Company or Sub is necessary to authorize the execution and delivery by the Company or Sub of any of the Transaction Documents to which it is a party. This Agreement has been duly executed and delivered by the Company and (assuming due and valid authorization, execution and delivery hereof by the Subscriber) is a valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except as enforceability may be limited by the Enforceability Exceptions.

(c)    **Consents and Approvals; No Violation; No Legal Proceeding**. Neither the execution, delivery or performance of the Transaction Documents by the Company or Sub nor the consummation by the Company or Sub of the Contemplated Transactions or Pre-Closing Distributions will (i) violate any provision of the organizational documents of the Company or any of its Subsidiaries; (ii) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, lease, license, contract, agreement or other instrument or obligation to which the Company or any of its Subsidiaries is a party or by which any of them or any of their properties or assets may be bound; or (iii) violate any Law applicable to the Company, any of its Subsidiaries or any of their properties or assets. Neither of the Company or Sub is subject to any pending Legal Proceeding or, to the knowledge of the Company and the Sellers, threatened Legal Proceeding.

(d)    **Compliance with Law**.

(i)    (i) Each of the Company and Sub is in compliance in all material respects with all applicable Laws which are necessary for the operation of the business of the Company and Sub as conducted; (ii) neither the Company nor Sub has received any written notice of, or been charged with, the violation of any Laws; and (iii) neither the Company nor Sub is (and has not been during the past three (3) years) subject to any penalty or assessment, or, to the knowledge of the Company and the Sellers, any inspection, investigation or audit by any Governmental Entity, or to any other allegation that the Company or Sub (including any agent, representative or broker acting on behalf of the Company or Sub) violated in any material respects any applicable Law or made a material false statement or omission to any such Governmental Entity, except, in each case, where such failure to be in compliance or violation would not reasonably be expected to have or

8

result in a material adverse effect on the ability of the Company and Sub to perform any of their covenants or obligations under the Transaction Documents.

(ii)    Neither the Company or Sub nor, to the knowledge of the Company or any Seller, any of their respective directors, officers, managing members, members, employees or agents has, with respect to the businesses of the Company and Sub (i) used any funds for any unlawful contribution, endorsement, gift, entertainment or other unlawful expense relating to political activity, (ii) made any direct or indirect unlawful payment to any foreign or domestic official or employee of a Governmental Entity, (iii) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977, as amended, or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any Person.

(e)    **Litigation; Orders**.

(i)    Set forth on Section 3.1(e) of the Company Disclosure Schedule is a true and correct list of each pending Legal Proceeding or Legal Proceeding threatened in writing relating to or which may adversely affect, whether directly or indirectly, the Company, Sub or any of their Affiliates.  Other than as set forth on Section 3.1(e) of the Company Disclosure Schedule, neither the Company nor Sub is subject to any pending Legal Proceeding or threatened Legal Proceeding that has had or would reasonably be expected to have or result in a CHT Material Adverse Effect or a Transaction Material Adverse Effect.

(ii)    There is no Order to which the Company or Sub, or any of the assets owned or used by the Company or Sub, is subject that relates to the CHT Promissory Note or the CHT Common Stock owned and controlled by the Company or Sub or that has had or would reasonably be expected to have or result in a material adverse effect on the ability of the Company or Sub to perform any of their covenants or obligations under the Transaction Documents.

(f)    **Pre-Closing Distributions**.  Upon the occurrence of the contribution of the CHT Common Stock to Sub by the Company, such contribution, when made, will have been made free and clear of all Liens (other than the Lien granted to Subscriber in the Pledge Agreements) and free and clear of any other limitation or restrictions (including any restriction on the right to vote, sell or otherwise dispose of such CHT Common Stock) that otherwise relate, or could relate, to such ownership and control.  Each document or agreement relating to the events contemplated by the Pre-Closing Distributions, will be, when such events occur, duly authorized, executed and delivered by the parties thereto.  The Distribution Note, when issued, will have been duly executed and delivered by the parties that are party thereto and will be a valid and binding obligation of such parties enforceable against such parties in accordance with its terms, except as enforceability may be limited by the Enforceability Exceptions.

**Section 3.2    Representation and Warranties Relating to CHT**

(a)    The representations and warranties of CHT set forth in Article IV (other than Sections 4.2 and 4.28) of the attached Merger Agreement are true and correct.

### Section 3.3    Representation and Warranties Relating to the Sellers

(a)    **Organization.**  Each of the Contributing Entities is a limited liability company, duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and has the requisite entity power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted. Each of the Contributing Entities is duly qualified or licensed to do business and is in good standing (with respect to jurisdictions which recognize such concept) as a foreign limited liability company or other entity in each jurisdiction in which the nature of the business conducted by it makes such qualification or licensing necessary. AC has no, and has never had any, employees or Liabilities and, other than 100% of the equity interests in the Company that it currently owns and controls, and the CHT Common Stock and the lender's right, title and interest in the Promissory Note that it contributed to the Company, has no, and has never had any, assets.  AC is not conducting, and has never conducted, any business and other than the Initial LLC Agreement, the agreements effectuating the Reorganization, this Agreement and the other Transaction Documents to which it is a party, is not a party, and has never been a party, to any Contract.

(b)    **Authorization; Validity of Agreement; Seller Action**. Each of the Contributing Entities has the requisite entity power and authority to execute and deliver each of the Transaction Documents to which it is a party. The execution, delivery and performance by each of the Contributing Entities of each of the Transaction Documents to which it is a party has been duly authorized by the sole manager of FUH and AC and by the board of managers of CH. No other limited liability company action on the part of any Contributing Entity is necessary to authorize the execution and delivery by such Contributing Entity of any of the Transaction Documents to which it is a party. This Agreement has been duly executed and delivered by the Sellers and (assuming due and valid authorization, execution and delivery hereof by the Subscriber) is a valid and binding obligation of the Sellers enforceable against the Sellers in accordance with its terms, except as enforceability may be limited by the Enforceability Exceptions.

(c)    **Consents and Approvals; No Violation; No Legal Proceeding**. Neither the execution, delivery or performance of the Transaction Documents by the Sellers nor the consummation by the Sellers of the Contemplated Transactions and the Reorganization will, with respect to the Contemplated Transactions, or did, with respect to the Reorganization (i) violate any provision of the organizational documents of the Contributing Entities; (ii) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, lease, license, contract, agreement or other instrument or obligation to which any Seller is a party or by which any of them or any of their properties or assets may be bound; or (iii) violate any Law applicable to any Seller or any of their properties or assets; except in the case of clauses "(ii)" and "(iii)" for such violations, breaches, defaults, terminations, cancellations or accelerations that would not have or reasonably be expected to have a Transaction Material Adverse Effect.

(d)    **Reorganization.**

(i)    <u>Transfer of CHT Promissory Note and CHT Common Stock</u>.  On or prior to the date hereof, good and marketable title to (A) the lender's interest in the CHT

Promissory Note and 6,993,563 shares of CHT Common Stock owned and controlled by FUH were contributed to AC pursuant to the FUH Contribution Agreement, (B) 17,862,074 shares of CHT Common Stock owned and controlled by CH were contributed to AC pursuant to the CH Contribution Agreement and (C) the lender's interest in the CHT Promissory Note and 24,855,637 shares of CHT Common Stock were subsequently contributed to the Company by AC pursuant to the AC Contribution Agreement, in each case, free and clear of all Liens and free and clear of any other limitation or restrictions (including any restriction on the right to vote, sell or otherwise dispose of such ownership and control (the "Reorganization").   Each document or agreement relating to the transfer and/or contribution of the lender's interest in the CHT Promissory Note and the CHT Common Stock to AC and to the Company, as applicable, by any holder thereof was, when such transfer and/or contribution occurred, duly authorized, executed and delivered by the parties thereto. There is no defect or deficiency that occurred with respect to the Reorganization that could reasonably be expected to give rise to a determination from a court having competent jurisdiction that the Company does not own and control the CHT Common Stock and the lender's interest in the CHT Promissory Note referenced in this Section 3.3(d)(i), in each case, free and clear of all Liens and free and clear of any other limitation or restrictions (including any restriction on the right to vote, sell or otherwise dispose of such equity interests) that otherwise relate, or could relate, to such ownership and control, or otherwise that the Company does not have good and marketable title to such CHT Common Stock and the lender's rights in the CHT Promissory Note.

(ii)    AC Capitalization.  CH owns and controls 12,877,983 Class A Units and 2,415,794 Class B Units and FUH owns and controls 11,887,369 Class A Units and 2,229,964 Class B Units, in each case, free and clear of all Liens and free and clear of any other limitation or restrictions (including the any restriction on the right to vote, sell or otherwise dispose of such equity interests). The Class A Units and Class B Units owned and controlled by CH and FUH represent 100% of the equity interests in AC. The equity ownership interest in AC has been duly authorized and validly issued. Other than with respect to CH's and FUH's ownership of all of the equity interests in AC, there is no: (i) outstanding subscription, option, call, warrant or right (whether or not currently exercisable) to acquire any shares of the limited liability company interests or other securities of AC; (ii) outstanding security, instrument or obligation that is or may become convertible into or exchangeable for limited liability company interests or other securities of AC; or (iii) equityholder rights plan (or similar plan commonly referred to as a "poison pill") or similar Contract under which AC is or may become obligated to sell or otherwise issue limited liability company interests or any other securities.

(iii)    Company and Sub Capitalization.  AC owns and controls 100% of the equity interests in the Company and the Company owns 100% of the Sub Stock, in each case, free and clear of all Liens and free and clear of any other limitation or restrictions (including any restriction on the right to vote, sell or otherwise dispose of such equity interests). The equity ownership interest in the Company owned by AC and the equity ownership interest in Sub owned by the Company has been duly authorized and validly issued. Other than with respect to Subscriber's rights to acquire Class A Units pursuant to

11

the terms and conditions of this Agreement, there is no: (i) outstanding subscription, option, call, warrant or right (whether or not currently exercisable) to acquire any limited liability company interests or other securities of the Company or Sub; (ii) outstanding security, instrument or obligation that is or may become convertible into or exchangeable for any limited liability company interests or shares of the capital stock or other securities of the Company or Sub; or (iii) stockholder rights plan (or similar plan commonly referred to as a "poison pill") or similar Contract under which the Company or Sub is or may become obligated to sell or otherwise issue any shares of its capital stock or any other securities. The Class A Units to be issued to Subscriber pursuant to the terms and conditions of this Agreement, when issued, will have been duly authorized and delivered and paid for in the manner set forth in this Agreement and will be validly issued, free and clear of all Liens.

(iv)    CHT Promissory Note.  Each of the entities that is a party to the CHT Promissory Note had the requisite entity power and authority to execute and deliver the CHT Promissory Note to which it is a party. The execution, delivery and performance by each of the entities that is a party to the CHT Promissory Note was duly authorized by the sole manager or applicable board of directors of such entity. No other entity action on the part of any such entity was necessary to authorize the execution and delivery by such entity of the CHT Promissory Note to which it is a party. The CHT Promissory Note has been duly executed and delivered by the parties that are party thereto and is a valid and binding obligation of such parties enforceable against such parties in accordance with its terms, except as enforceability may be limited by the Enforceability Exceptions.

(v)    CHT Common Stock.  The shares of CHT Common Stock owned and controlled by the Company have been duly authorized and validly issued, and are fully paid and nonassessable.

(e)    **Compliance with Law**.

(i)    (i) Each Seller is in compliance in all material respects with all applicable Laws which are necessary for the operation of the business of the Seller as conducted; (ii) no Seller has received any written notice of, or been charged with, the violation of any Laws; and (iii) no Seller is now (nor has any been during the past three (3) years) subject to any penalty or assessment, or, to the knowledge of the Sellers, any inspection, investigation or audit by any Governmental Entity, or to any other allegation that any Seller (including any agent, representative or broker acting on behalf of the Company, any Seller or Acquired Corporation) violated in any material respects any applicable Law or made a material false statement or omission to any such Governmental Entity, except, in each case, where such failure to be in compliance or violation would not reasonably be expected to have or result in a material adverse effect on the ability of any Seller to perform any of its covenants or obligations under the Transaction Documents.

(ii)    No Seller or, to the knowledge of any Seller, any of their respective directors, officers, managing members, members, employees or agents has, with respect to the businesses of the Company or any Seller (i) used any funds for any unlawful contribution, endorsement, gift, entertainment or other unlawful expense relating to political activity, (ii) made any direct or indirect unlawful payment to any foreign or

domestic official or employee of a Governmental Entity, (iii) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977, as amended, or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any Person.

(f)    **Litigation; Orders**.

(i)    Set forth on Section 3.3(f) of the Company Disclosure Schedule is a true and correct list of each pending Legal Proceeding or Legal Proceeding threatened in writing relating to or which may adversely affect, whether directly or indirectly, any Seller or any Affiliate of the foregoing. Other than as set forth on Section 3.3(f) of the Company Disclosure Schedule, no Seller is subject to any pending Legal Proceeding or threatened Legal Proceeding that has had or would reasonably be expected to have or result in a CHT Material Adverse Effect or a Transaction Material Adverse Effect.

(ii)    There is no Order to which any Seller, or any of the assets owned or used by any Seller, is subject that relates to the CHT Common Stock owned and controlled by the Company or that has had or would reasonable by expected to have or result in a material adverse effect on the ability of the Company or any Seller to perform any of its covenants or obligations under the Transaction Documents.

**Section 3.4    Voting Support**. Each Parmar Controlled Entity, including the Company and Sub, has duly authorized, executed and delivered Voting and Support Agreements and Release of Claims (the "Parmar Voting Support Agreements"), and such agreement has not been, and will not be at Closing, revoked, rescinded, challenged, terminated or otherwise amended or modified by any Parmar Controlled Entity, including the Company.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SUBSCRIBER

**Section 4.1    Organization**. Subscriber is a limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and has the requisite entity power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted, except where the failure to be so organized, existing and in good standing or to have such power and authority would not, individually or in the aggregate, have a Subscriber Material Adverse Effect. Subscriber is duly qualified or licensed to do business and in good standing (with respect to jurisdictions which recognize such concept) as a foreign entity in each jurisdiction in which the nature of the business conducted by it makes such qualification or licensing necessary, except where the failure to be so duly qualified or licensed and in good standing would not, individually or in the aggregate, have a Subscriber Material Adverse Effect.

**Section 4.2    Authorization; Validity of Agreement; Necessary Action**. Subscriber has the requisite entity power and authority to execute and deliver this Agreement. The execution, delivery and performance by Subscriber of this Agreement has been duly authorized by the sole manager of Subscriber. No other limited liability company action on the part of Subscriber is

necessary to authorize the execution and delivery by Subscriber of this Agreement. This Agreement has been duly executed and delivered by Subscriber and (assuming due and valid authorization, execution and delivery hereof by the Company and the Sellers) is a valid and binding obligation of Subscriber enforceable against Subscriber in accordance with its terms, except as enforceability may be limited by the Enforceability Exceptions.

**Section 4.3**    **Consents and Approvals; No Violations**.

(a)    Except for (i) compliance with the rules and regulations of AIM, and (ii) compliance with any applicable foreign or state securities or "blue sky" laws, neither the execution, delivery or performance of this Agreement by Subscriber nor the consummation by Subscriber of the Contemplated Transactions to which it is party will require on the part of Subscriber any filing or registration with, notification to, or authorization, consent or approval of, any Governmental Entity; except for such filings, registrations, notifications, authorizations, consents or approvals the failure of which to make or obtain would not have a Subscriber Material Adverse Effect.

(b)    Neither the execution, delivery or performance of this Agreement by the Subscriber nor the consummation by the Subscriber of the Contemplated Transactions to which it is party will (i) violate any provision of the certificate of formation or operating agreement of Subscriber, (ii) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, lease, license, contract, agreement or other instrument or obligation to which Subscriber is a party or by which it or any of its properties or assets may be bound or (iii) violate any Law applicable to Subscriber or any of its properties or assets; except in the case of clauses "(ii)" and "(iii)" for such violations, breaches, defaults, terminations, cancellations or accelerations that would not have a Subscriber Material Adverse Effect.

**Section 4.4**    **Accredited Investor**. The Subscriber represents and warrants that it is an "accredited investor," as such term is defined in Rule 501(a) promulgated by the SEC under the Securities Act, and that it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the Subscription of Class A Units contemplated hereby. The Subscriber shall execute and deliver to the Company such documents as the Company may request in order to confirm the accuracy of the foregoing.

## ARTICLE V

## COVENANTS

**Section 5.1**    **Further Assurances**.

(a)    The Company and the Sellers shall cause CHT to perform all obligations and comply with all covenants required by or otherwise set forth in the Merger Agreement and the Voting and Support Agreements and Releases of Claims to be performed or complied with by CHT at or prior to the Closing of the Contemplated Transactions.

(b)    The Company and the Sellers shall, and shall cause their respective Affiliates to, take all actions and do all things, including to execute and deliver any additional documents,

instruments, conveyances and assurances and to take such further actions as may be reasonably necessary, appropriate or desirable to carry out the provisions hereof or any Transaction Document, and to otherwise give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

(c)     The Company and the Sellers shall cause each Parmar Controlled Entity, including the Company and Sub, to perform all obligations and comply with all covenants required by or otherwise set forth in the Merger Agreement and the <u>Parmar Voting Support Agreements</u> to be performed or complied with by such Parmar Controlled Entity at or prior to the Closing of the Contemplated Transactions. The Sellers shall not permit any <u>Parmar Voting Support Agreements</u> to be revoked, rescinded, terminated (except in accordance with its terms) or otherwise amended or modified.

(d)     Sellers and the Company agree that the Subscriber shall have the exclusive right, in its discretion, to direct, or cause the direction of, the Company, in its capacity as Parent under the Merger Agreement, and CHT Mergersub, Inc., in its capacity as Sub under the Merger Agreement, in each case, in the exercise, granting, pursuit, defense or performance of any rights, remedies, preferences, waivers, duties, obligations or other matters arising under or otherwise with respect to the Merger Agreement and the Voting Support Agreements and Releases of Claims. In furtherance of the foregoing, the Sellers and the Company agree that the Company shall, or shall cause Sub to, take action, or omit to take action, solely pursuant to the express written direction of Subscriber, in each case, in their respective capacity as Parent and Sub, with respect to any matter or item arising under or with respect to the Merger Agreement and the Voting Support Agreements and Releases of Claims, and neither the Company nor the Sub, in their respective capacity as Parent and Sub, shall take, and the Sellers shall not permit them to take, any action arising under or with respect to the Merger Agreement and the Voting Support Agreements and Releases of Claims without the prior written consent or direction of Subscriber. For the avoidance of doubt, the foregoing shall not, in any manner, restrict, limit or otherwise affect the right of (i) the Company, in its discretion, to take action, or omit to take action, as a shareholder of CHT in its capacity as a shareholder of CHT, (ii) CHT to take action or omit to take action, in its capacity as the "Company" in the Merger Agreement, or (iii) Paul Parmar to perform his duties or exercise his rights in his capacity as an officer or a director of CHT.

**Section 5.2     <u>No Conduct of Business</u>**. From the date hereof until the Closing, subject to <u>Section 5.4</u>, neither AC, the Company nor Sub shall conduct any business, hire any employees, obtain, dispose of or transfer any assets (including the CHT Common Stock), make any distributions or incur any Liabilities or engage in any other business or operations of any nature, without the prior written approval of the Subscriber. For the avoidance of doubt, from the date hereof until the Closing, neither the Company nor any Seller shall take (or permit any Affiliate to take) any action or series of actions which could reasonably be expected to cause the Company or Sub to be subject to regulation under the Investment Company Act of 1940, as amended, without the prior written approval of the Subscriber.

**Section 5.3     <u>Additional Collateral</u>**. For so long as any indemnification obligations of the Sellers remain under this Agreement, each Seller will place into an escrow account with an escrow agent and pursuant to an escrow agreement, in each case, reasonably acceptable to

Subscriber, all of the net proceeds (or other assets) realized by such Seller in connection with any transfer by CH or AC of any equity interest that is subject to a Pledge Agreement.

    **Section 5.4**   **Pre-Closing Contribution and Distribution.** One Business Day prior to the Closing Date, the Company shall contribute 24,855,637 shares of CHT Common Stock to Sub, free and clear of any Liens, in exchange for a note to be issued by Sub with an aggregate principal amount equal to $10,687,923.91 (the "Distribution Note"); provided, that (i) such Distribution Note shall be in form and substance substantially similar (except that economic terms shall be identical) to the Promissory Note issued pursuant to the Merger Agreement in connection with the consummation of the Merger; provided, that such Distribution Note shall not be subject to off-set as a result of claims by shareholders or former shareholders in connection with the Merger, and (ii) the Distribution Note shall be issued in form and substance reasonably satisfactory to the Subscriber consistent with the Merger Agreement. Immediately upon receipt by the Company of the Distribution Note from Sub, and at least one Business Day prior to the Closing Date, the Company shall distribute the Distribution Note to AC together with all right, title and interest therein. The contribution and distributions contemplated by this Section 5.4 shall be referred to as the "Pre-Closing Distributions".

## ARTICLE VI

## CONDITIONS

    **Section 6.1**   **Conditions to the Obligations of the Subscriber**. The Subscriber's obligation to purchase the Class A Units on the Closing Date is subject to the satisfaction of each of the following conditions:

    (a)     (i) each of the Fundamental Representations shall be true and accurate in all respects, in each case on and as of the date hereof and as of the Closing Date as if made on the Closing Date (other than to the extent any such representation and warranty addresses matters only as of a particular date or only with respect to a specific period of time which representation and warranty needs only be true and accurate as of such date or with respect to such period) and (ii) each of the other representations and warranties made by the Company and the Sellers in or pursuant to this Agreement or any other Transaction Document shall be true and accurate in all material respects, in each case on and as of the date hereof and as of the Closing Date as if made on the Closing Date (other than to the extent any such representation and warranty addresses matters only as of a particular date or only with respect to a specific period of time which representation and warranty needs only be true and accurate in all material respects as of such date or with respect to such period) without giving effect to any limitation as to "materiality", "Material Adverse Effect" or similar language (including with respect to the representation and warranty contained in Section 3.2, to the extent that any such representation and warranty contained in Article IV of the Merger Agreement is qualified as to "materiality", "Material Adverse Effect" or similar language);

    (b)     the Seller and the Company shall have performed all obligations and complied with all covenants, in each case in all material respects, required by this Agreement to be performed or complied with by it at or prior to the Closing, and Subscriber shall have received a certificate signed on behalf of the Company by a senior executive officer of the Company to such effect;

(c)    there shall not have occurred or exist a CHT Material Adverse Effect;

(d)    there shall not have occurred or exist a Transaction Material Adverse Effect, including any new material Legal Proceeding filed or threatened against or otherwise involving or relating to the Company or any Seller;

(e)    the LLC Agreement, which concurrently with the execution of this Agreement has been duly executed and delivered by the parties thereto, shall be in full force and effect, and the Subscriber shall have been issued the Class A Units free and clear of all Liens;

(f)    the duly executed favorable written opinions of Robinson Brog Leinwand Greene Genovese & Gluck PC, counsel for the Sellers, as to the corporate and transaction matters contemplated hereby, including those set forth on Schedule 6.1(f) hereto, in form and substance reasonably satisfactory to the Subscriber;

(g)    the Pledge Agreements, which concurrently with the execution of this Agreement have been duly executed and delivered by the parties thereto, shall remain in full force and effect, and Subscriber shall have a first priority security interest in the collateral pledged thereunder;

(h)    a certificate, dated as of the Closing Date and duly executed by a senior officer of the Company, certifying that the conditions set forth in this Section 6.1 have been satisfied;

(i)    The Pre-Closing Distributions shall have occurred in manner and substance reasonably satisfactory to the Subscriber;

(j)    all conditions to the closing of any debt and/or equity financing by the Company necessary to consummate the Merger (other than the conditions to be satisfied or waived at such closing) have been satisfied or waived and such financing shall be consummated concurrently with the Closing;

(k)    the Parmar Voting Support Agreements shall remain in full force and effect, and shall not have been, at Closing, revoked, rescinded, challenged, terminated or otherwise amended or modified by any Parmar Controlled Entity, including the Company;

(l)    each party with beneficial ownership and/or voting authority with respect to the CHT Common Stock identified on Schedule 6.1(l) shall have duly authorized, executed and delivered a Voting and Support Agreements and Releases of Claims with respect to all such CHT Common Stock, and each such Voting and Support Agreement and Release of Claims shall be in full force and effect, and each such Voting and Support Agreement and Release of Claims has not been, at Closing, revoked, rescinded, challenged, terminated or otherwise amended or modified by any party thereto; and

(m)    all conditions to the closing of the Merger set forth in the Merger Agreement have been satisfied or waived and the Merger shall have been consummated concurrently with the Closing.

**Section 6.2    Conditions to the Obligations of the Company**.  The Company's obligations to sell the Class A Units on the Closing Date are subject to the satisfaction of each of the following conditions:

(a)    each of the representations and warranties made by the Subscriber shall be true and accurate in all respects, in each case on and as of the date hereof and as of the Closing Date as if made on the Closing Date (other than to the extent any such representation and warranty addresses matters only as of a particular date or only with respect to a specific period of time which representation and warranty needs only be true and accurate as of such date or with respect to such period);

(b)    Subscriber shall have performed all obligations and complied with all covenants, in each case in all material respects, required by this Agreement to be performed or complied with by it at or prior to the Closing, and the Company shall have received a certificate signed on behalf of Subscriber by a senior executive officer of Subscriber to such effect;

(c)    Subscriber shall have delivered to the Paying Agent cash in an amount equal to the Purchase Price by wire transfer in immediately available funds, to an account or accounts designated at least two Business Days prior to the Closing Date by the Company in a written notice to Subscriber; and

(d)    all conditions to the closing of the Merger set forth in the Merger Agreement have been satisfied or waived and the Merger shall have been consummated concurrently with the Closing.

## ARTICLE VII

## INDEMNIFICATION

**Section 7.1    Survival**.

(a)    Subject to the limitations set forth in this Article VII, the representations, warranties and covenants of the Company and the Sellers contained in this Agreement shall survive the Closing, until the nine (9) month anniversary of the date hereof (as such period may be extended pursuant to Section 7.1(b), the "Survival Period"); *provided*, that the Fundamental Representations shall survive indefinitely; *provided, further*, that if any claim is made by a Subscriber Indemnitee in accordance with this Agreement with respect to a breach or inaccuracy of any representation, warranty or covenant prior to the expiration of the Survival Period, the representations, warranties and/or covenants that are the subject of such claim shall survive with respect to such claim until such claim is finally resolved.  All rights of the Subscriber Indemnitees to make claims under Sections 7.2(c) and 7.2(d) shall survive indefinitely.

(b)    No Subscriber Indemnitee shall be entitled to indemnification under this Article VII unless such Subscriber Indemnitee makes a claim or commences a Legal Proceeding with respect to any inaccuracy in or breach of any representation, warranty, covenant, obligation or agreement contained in this Agreement prior to the expiration of the applicable survival period (if any).  For the avoidance of doubt, each of the Company and the Sellers acknowledge and agree that to the

18

extent it is given notice of a claim or any Legal Proceeding is commenced prior the end of the applicable survival period, such survival period shall continue as to such claim until such claim is finally resolved.

**Section 7.2    Indemnification**. Subject to the limitations in Section 7.3, from and after the date hereof (or, with respect to Sections 7.2(a) and (b) below, the Closing), each of the Sellers shall on a joint and several basis indemnify and hold harmless the Subscriber Indemnitees from and against any Adverse Consequences Incurred (including either directly as a member of the Company or indirectly as a beneficial owner of CHT) as a result of, in connection with or arising from:

(a)    any failure of any representation or warranty made by or on behalf of the Company or any Seller in this Agreement or by CHT in the Merger Agreement (other than under Sections 4.2 and 4.28 of the Merger Agreement) or in any certificate or other document delivered pursuant to this Agreement, the Merger Agreement or any Transaction Document to be true, correct and complete as of the date of this Agreement or as of the Closing Date (as though made as of the Closing Date);

(b)    any breach of or failure of the Company, any Seller or any of their Affiliates to perform or comply with any covenant, obligation or agreement in this Agreement, any Transaction Document (other than the Indemnity and Support Agreement), in any certificate or other document delivered pursuant to this Agreement or in any Transaction Document;

(c)    any specified indemnity set forth on Section 7.2(c) to the Company Disclosure Schedule (collectively, the "Specified Indemnities"); and/or

(d)    any intentional misrepresentation or fraud on the part of the Company or any Seller.

**Section 7.3    Limitations and Qualifications**. Notwithstanding anything to the contrary herein (but in accordance with Section 7.5), the rights of the Subscriber Indemnitees to receive indemnification and the obligations of the Sellers to provide indemnification pursuant to the provisions of Section 7.2 are subject to the following limitations and qualifications:

(a)    No Subscriber Indemnitee shall be entitled to recover for any Adverse Consequences pursuant to Sections 7.2(a) and 7.2(b) until the aggregate amount of all Adverse Consequences arising under or with respect to Sections 7.2(a) and 7.2(b), combined together, exceeds $4,000,000.00 (the "Deductible"), in which case, the Subscriber Indemnitees shall only be entitled to recover the aggregate amount of Adverse Consequences in excess of the Deductible, subject to the other limitations set forth herein; provided, that the foregoing limitation shall not apply to any Adverse Consequences Incurred as a result of, in connection with or arising from any failure of any Fundamental Representation to be true, correct and complete.

(b)    In no event shall the Subscriber Indemnitees be entitled to recover Adverse Consequences pursuant to Section 7.2 in excess of $80,000,000.00.

(c)    Solely with respect to a claim of a breach of a representation under Section 7.2(a), in no event shall the Subscriber Indemnitees be entitled to claim a breach of a representation to the extent, but only to the extent, that the nature and scope of the Adverse Consequences resulting

19

from such breach were reasonably specifically articulated in the reports set forth on <u>Section 7.3(c)</u> of the Company Disclosure Schedule, copies of which shall be provided to AC as soon as reasonably practical after the date hereof and subject to the execution by AC of any customary confidentiality agreements required by the provider of any report provided; <u>provided</u>, that the foregoing limitation (1) shall not apply to any Adverse Consequences Incurred as a result of, in connection with or arising from any failure of any Fundamental Representation to be true, correct and complete and (2) shall not otherwise limit a Subscriber Indemnitee's right to make an indemnity claim under any other subsection of <u>Section 7.2</u>.

(d)     The Parties further agree that the indemnity provided for herein is and shall be deemed a separate and distinct indemnity obligation from the indemnity obligation set forth in the Indemnity and Support Agreement and, therefore, no indemnification obligation, or other term or condition, hereunder shall reduce or affect, or be deemed to reduce or affect, any indemnity obligation, or other term or condition, set forth in the Indemnity and Support Agreement, and no indemnification obligation, or other term or condition, under the Indemnity and Support Agreement shall reduce or affect, or be deemed to reduce or affect, any indemnity obligation, or other term or condition, set forth hereunder.

### Section 7.4    <u>Matters Involving Third Parties</u>.

(a)     If any third party shall notify any party with respect to any matter (a "<u>Third-Party Claim</u>") which may give rise to a claim for indemnification by a Subscriber Indemnitee on its own behalf or on behalf of the Company against any Seller (the "<u>Indemnified Party</u>") under this Article VII, then such party, if a Seller, shall promptly (and in any event within thirty (30) days after receiving notice of the Third-Party Claim, notify the Subscriber Indemnitee of such Third-Party Claim, and the Indemnifying Party shall promptly (and in any event within thirty (30) days after receiving notice of the Third-Party Claim) notify the Seller Representative thereof in writing; <u>provided</u>, that the failure to so notify the Seller Representative shall not relieve an Indemnifying Party of its obligations hereunder, except to the extent such failure materially prejudices such Indemnifying Party.

(b)     The Seller Representative will have the right at any time to assume and thereafter conduct the defense of the Third-Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party; <u>provided</u>, <u>however</u>, that the Seller Representative will not consent to the entry of any judgment or enter into any settlement with respect to the Third-Party Claim without the prior written consent of the Indemnified Party (not to be unreasonably withheld, conditioned or delayed) unless the judgment or proposed settlement involves only the payment of money damages and does not impose an injunction or other equitable relief upon the Indemnified Party. Notwithstanding the forgoing, the Seller Representative and its designee shall not be entitled to assume (or continue to assume) control of such defense, and shall pay the reasonable fees and expenses of one counsel retained by the Indemnified Party, if (i) the likely amount of Adverse Consequences resulting from such Third-Party Claim (taken together with all other then known Adverse Consequences for which the Indemnifying Party may have to provide indemnification hereunder) will not be indemnifiable by the Indemnifying Party as a result of the operation of the provisions of this Article VII; (ii) in the reasonable opinion of the Indemnified Party (after consulting with the Indemnifying Party), the Indemnifying Party does not have the financial wherewithal to pay for such defense; (iii) the Seller Representative does not acknowledge in

writing its obligation to indemnify and defend the Third-Party Claim; (iv) the Third-Party Claim involves any criminal or quasi-criminal indictment or allegation, seeks any injunctive or other equitable relief, or otherwise arises in connection with any regulatory enforcement action; (v) the Indemnified Party has been advised by legal counsel that a conflict of interest exists between an Indemnifying Party and the Indemnified Party; or (vi) the Indemnifying Party failed or is failing to diligently defend such Third-Party Claim.

(c)    Unless and until the Seller Representative assumes the defense of the Third-Party Claim as provided in Section 7.4(b), the Indemnified Party may defend against the Third-Party Claim in any manner he, she, or it may reasonably deem appropriate.

(d)    In no event shall the Indemnified Party or the Seller Representative consent to the entry of any judgment on or enter into any settlement with respect to the Third-Party Claim without the prior written consent of the other party (not to be unreasonably withheld, conditioned or delayed).

**Section 7.5    Determination of Adverse Consequences; Payments; Other**.

(a)    For purposes of determining (i) whether the failure of any representation or warranty contained in this Agreement or the Merger Agreement to be true, correct and complete (in accordance with the provisions hereof) has occurred, and (ii) the amount of Adverse Consequences arising in connection therefrom, the representations and warranties of the Company and the Sellers in this Agreement and the representations and warranties by CHT in the Merger Agreement, in each case, shall not be deemed qualified or modified by any references to "materiality," "in all material respects," "Material Adverse Effect" or "Material Adverse Change" or words to similar effect that are otherwise set forth therein.

(b)    Any indemnification payment due the Subscriber Indemnitees pursuant to this Article VII shall be effected in U.S. Dollars by wire transfer of immediately available funds within five (5) days after the final determination thereof from the Sellers. Indemnification payments shall be made to the account or accounts designated by the applicable Subscriber Indemnitee to which such indemnification payment is being made from time to time.

(c)    The Sellers' performance of their obligations under this Article VII is secured by a first priority security interest in the collateral specified in the Pledge Agreements.

(d)    For the avoidance of doubt, subject to (and without prejudice to) the rights of the Subscriber Indemnitees under the Pledge Agreements, the Sellers shall have the right to satisfy an indemnification claim arising hereunder by either (i) paying cash to satisfy such claim, or (ii) tendering or otherwise transferring equity interests in the Company then owned by AC to the Subscriber Indemnitees, which equity interests shall be valued at the then current fair market value as of the date of the relevant indemnification payment. For purposes of the foregoing, the fair market value of the equity interests in the Company shall be determined by an independent investment banker selected by the relevant Subscriber Indemnitee in a commercially reasonable manner.

**Section 7.6    Exclusive Remedy**.    Except for claims of fraud or intentional misrepresentation, the party's right to specific performance of any covenant, obligation or

agreement required to be performed by the terms of this Agreement and except as otherwise expressly provided in this Agreement, the Indemnity and Support Agreement or the Pledge Agreements, each party acknowledges and agrees that the indemnification provided pursuant to this Article VII and the remedies provided in this Agreement, the Pledge Agreements, the Indemnity and Support Agreement and the other Transaction Documents shall be the exclusive remedy with respect to any and all claims (including Third-Party Claims), Adverse Consequences or other amounts relating (directly or indirectly) to breach of any covenant or any failure of any representation or warranty made by or on behalf of the Company or any Seller in this Agreement or in any certificate delivered pursuant to this Agreement to be true, correct and complete, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity.

## ARTICLE VIII

## TERMINATION

**Section 8.1** **Termination**. Anything herein or elsewhere to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing Date:

(a)    by the mutual written agreement of the Company and Subscriber.

(b)    by the Company upon a breach of any representation, warranty, covenant or agreement on the part of Subscriber set forth in this Agreement such that (if such breach occurred or was continuing as of the Closing Date) the conditions set forth in Section 6.2(a) or Section 6.2(b) would be incapable of fulfillment and which breach is incapable of being cured, or is not cured, within thirty (30) days following receipt by Subscriber of written notice of such breach.

(c)    by Subscriber upon a breach of any representation, warranty, covenant or agreement on the part of the Company or the Sellers set forth in this Agreement such that such that (if such breach occurred or was continuing as of the Closing Date) the conditions set forth in Section 6.1(a) or Section 6.1(b) would be incapable of fulfillment and which breach is incapable of being cured, or is not cured, within thirty (30) days following receipt by Seller Representative of written notice of such breach.

(d)    by Subscriber upon the termination of the Merger Agreement by any party thereto.

**Section 8.2** **Effect of Termination**. If one party desires to terminate this Agreement in accordance with Section 8.1, written notice thereof shall forthwith be given to the other party or parties specifying the provision hereof pursuant to which such termination is made, and this Agreement shall forthwith become null and void; provided, however, that the indemnity provisions set forth in Sections 7.2(c) and any related provisions thereto, including Section 5.2 hereof, shall survive such termination of this Agreement. Notwithstanding the above, in connection with a termination of this Agreement, (i) upon termination hereof, all rights, title and interest of the Company under and pursuant to the Merger Agreement shall automatically and without further action by any party be assigned to the Subscriber, including any and all rights to receive any payment or reimbursement payable to Company or Sub by CHT, including but not limited to, the right to receive any Company Expense Reimbursement or Termination Fee; and (ii) if (A) a Reverse Termination Fee or Parent Expense Reimbursement is required to be paid pursuant to

Article VIII of the Merger Agreement or if the Company or Sub has any other payment obligation that CC Capital has guaranteed pursuant to Section 9.19 of the Merger Agreement ("Additional Guaranteed Obligations") and (B) the guaranty obligations of CC Capital remain in effect and have not become null and void pursuant to Section 9.19 of the Merger Agreement, then CC Capital shall assume the obligations of the Company to pay such Reverse Termination Fee, Parent Expense Reimbursement or Additional Guaranteed Obligations, as applicable, and shall indemnify and hold harmless the Sellers from and against any Adverse Consequences Incurred by the Sellers as a result of CC Capital's failure to satisfy such obligations; and (iii) if (A) a Reverse Termination Fee, Parent Expense Reimbursement or Additional Guaranteed Obligation is required to be paid pursuant to Article VIII of the Merger Agreement and (B) the guaranty obligations of CC Capital do not remain in effect and have become null and void pursuant to Section 9.19 of the Merger Agreement, then the Company and the Sellers shall jointly and severally indemnify and hold harmless CC Capital and its Affiliates from and against any Adverse Consequences Incurred by CC Capital and its Affiliates as a result of, in connection with or arising from any Legal Proceeding or Claim brought against CC Capital or its Affiliates by the Company, CHT, Sub or any of their respective Affiliates with respect to any claim for any Reverse Termination Fee, Parent Expense Reimbursement or Additional Guaranteed Obligation. Termination of this Agreement shall not preclude the exercise of any other rights or remedies that may now or subsequently be available at law, in equity, by statute, or in any other agreement between the parties or otherwise. This Section 8.2 shall survive termination of this Agreement.

## ARTICLE IX

## MISCELLANEOUS

**Section 9.1    Notices.**  Whenever notice is required or permitted by this Agreement to be given, such notice shall be in writing (including email) and shall be given to a party at its address, or email address shown in Schedule B. Each notice shall be effective and shall be deemed to have been delivered (i) if given personally (including by telephone), upon delivery, (ii) if given by email, upon dispatch if dispatched on or after 7:00 a.m. (New York City time) (and notice dispatched prior to 7:00 a.m. on any day shall be deemed dispatched at 7:00 a.m. on such day) and at or prior to 8:00 p.m. (New York City time) on any day and, thereafter, on the next day, (iii) if given by mail, three (3) Business Days after it is deposited in the mails (certified mail, return receipt requested with postage prepaid) addressed as aforesaid, (iv) if given by courier, upon the earlier of actual delivery and one (1) day after deposit with a nationally recognized overnight courier specifying next day delivery and (v) if given by any other means, when delivered to the address of such party specified as aforesaid.

**Section 9.2    Interpretation.**  The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**Section 9.3    Counterparts.**  This Agreement may be executed in multiple counterparts, all of which shall together be considered one and the same agreement. The exchange of a fully

executed Agreement (in counterparts or otherwise) by electronic delivery in .pdf format shall be sufficient to bind the parties to the terms and conditions of this Agreement.

**Section 9.4    Entire Agreement; Third-Party Beneficiaries**.    This Agreement, including Company Disclosure Schedule and the exhibits hereto, together with the other instruments referred to herein and the other Transaction Documents, (a) constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof and thereof, and (b) is not intended to confer upon any Person other than the parties hereto any rights or remedies hereunder.

**Section 9.5    Severability**.    If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

**Section 9.6    Governing Law**. THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.

**Section 9.7    Arbitration**.

(a)    The parties hereto agree that any dispute or controversy arising out of, relating to, or in connection with this Agreement or the transactions contemplated hereby (a "Dispute") shall be arbitrated pursuant to the Delaware Rapid Arbitration Act, 10 Del. C. § 5801, et seq. (the "DRAA"). The parties agree to take all steps necessary or advisable to submit any Dispute that cannot be resolved by the parties for arbitration under the DRAA (the "Arbitration") in accordance with this Section 9.7, and each party represents and warrants that it is not a "consumer" as such term is defined in 6 Del. C. § 2731. By executing this Agreement, (i) each party hereby waives, and acknowledges and agrees that it shall be deemed to have waived, any objection to the application of the procedures set forth in the DRAA, (ii) consents to the procedures set forth in the DRAA, and (iii) acknowledges and agrees that it has chosen freely to waive the matters set forth in subsections (b) and (c) of Section 5803 of the DRAA. IN CONNECTION THEREWITH, EACH PARTY UNDERSTANDS AND AGREES THAT IT SHALL RAISE NO OBJECTION TO THE SUBMISSION OF THE DISPUTE TO ARBITRATION IN ACCORDANCE WITH THIS SECTION 9.7 AND THAT IT WAIVES ANY RIGHT TO LAY CLAIM TO JURISDICTION IN ANY VENUE AND ANY AND ALL RIGHTS TO HAVE THE DISPUTE DECIDED BY A JURY.

(b)    The Arbitration shall be conducted in accordance with the Model Rules for Arbitration under the DRAA, as such Rules may be amended or changed from time to time; provided that the parties to such Arbitration may agree to depart from the Model Rules by (i) adopting new or different rules to govern the Arbitration or (ii) modifying or rejecting the application of certain of the Model Rules.

(c)    The Arbitration shall take place in Wilmington, Delaware, or such other location in the State of Delaware as the parties and the Arbitrator may agree.

(d)    The Arbitration shall be presided over by one arbitrator (the "Arbitrator") who shall be mutually agreed to by the Seller Representative and Subscriber. In the event that the parties are unable to agree upon the identity of the Arbitrator within forty-five (45) days of the commencement of the Arbitration, then either party may file a petition with the Court of Chancery pursuant to Section 5805 of the DRAA.

(e)    No discovery shall be taken in support of the Arbitration, although each side shall exchange such documents and other information as may be required by this Agreement. In addition, each side shall exchange such additional information as may be directed by the Arbitrator, either on his own motion or on application of any party for good cause shown.

(f)    The Arbitrator shall conduct the hearing, administer oaths, and make such rulings as are appropriate to the conduct of the proceedings. The Arbitrator shall allow each of the parties an opportunity to present evidence and witnesses and to cross examine witnesses presented by the opposing party. In no event, however, shall witnesses other than employees or experts retained or employed by the parties, or former employees of the parties, be called to testify at the Arbitration.

(g)    The arbitral award (the "Award") shall (i) be rendered within 120 days after the Arbitrator's acceptance of his or her appointment; (ii) be delivered in writing; (iii) be the sole and exclusive final and binding remedy with respect to the Dispute between and among the parties without the possibility of challenge or appeal, which are hereby waived; and (iv) be accompanied by a form of judgment. The Award shall be deemed an award of the United States, the relationship between the parties shall be deemed commercial in nature, and any Dispute arbitrated pursuant to this Section 9.7 shall be deemed commercial. The Arbitrator shall have the authority to grant any equitable or legal remedies, including, without limitation, entering preliminary or permanent injunctive relief; provided, however, that the Arbitrator shall not have the authority to award (and the parties waive the right to seek an award of) punitive or exemplary damages.

(h)    The parties hereto agree that, subject to any non-waivable disclosure obligations under federal law, the Arbitration, and all matters relating thereto or arising thereunder, including, without limitation, the existence of the Dispute, the Arbitration and all of its elements (including any pleadings, briefs or other documents submitted or exchanged, any testimony or other oral submissions, and any decision of the Arbitrator or Award), shall be kept strictly confidential, and each party hereby agrees that such information shall not be disclosed beyond: (i) the Arbitrator and necessary support personnel; (ii) the participants in the Arbitration; (iii) those assisting the parties in the preparation or presentation of the Arbitration; and (iv) other employees or agents of the parties with a need to know such information. In all events, the parties participating in the Arbitration proceedings shall treat information pertaining to the Arbitration with the same care that they treat their most valuable proprietary secrets. In the event that federal law imposes upon either party an obligation to disclose the fact of the Arbitration or the nature of the claims or counterclaims asserted, such party(ies) shall disclose no more than the minimum information required by law after first consulting with and attempting in good faith to reach agreement with the opposing party(ies) regarding the scope and content of any such required disclosure.

(i)      Each party hereto shall bear its own legal fees and costs in connection with the Arbitration; provided, however, that each of Seller Representative and Subscriber shall pay one-half of any filing fees, fees and expenses of the Arbitrator or other similar costs incurred by the parties in connection with the prosecution of the Arbitration.

(j)      Notwithstanding any provisions of this Agreement, or any statute protecting the confidentiality of the Arbitration and proceedings taken in connection therewith, in the event that either party in the Arbitration is required to defend himself, herself or itself in response to later proceedings instituted by the other in any court, relating to matters decided in the Arbitration, such party shall be relieved of any obligation to hold confidential the Arbitration and its proceedings in order to submit, confidentially if and to the extent possible, sufficient information to such court to allow it to determine whether the doctrines of res judicata, collateral estoppel, bar by judgment, or other, similar doctrines apply to such subsequent proceedings.

(k)      Notwithstanding anything to the contrary set forth in this <u>Section 9.7</u>, if any amendment to the Act or the DRAA is enacted after the date of this Agreement, and such amendment would render any provision of this <u>Section 9.7</u> unenforceable thereunder, such provision shall be excluded and the remaining provisions of this <u>Section 9.7</u> shall be enforced to the fullest extent permitted by law.

**Section 9.8    Specific Performance**.  The parties recognize and agree that if for any reason any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached, immediate and irreparable harm or injury would be caused for which money damages would not be an adequate remedy.  Accordingly, the parties agree that if specific performance is either (i) granted to CHT against Parent and Sub pursuant to the Merger Agreement or (ii) granted to Parent and Sub against CHT pursuant to the Merger Agreement, then each party shall be entitled to seek and obtain specific performance of the terms and agreements hereof (without the requirement to post a bond in connection therewith), in addition to any other remedy at law or equity.  In the event that any action shall be brought in equity to enforce the provisions of this Agreement, neither party shall allege, and each party hereby waives the defense, that there is an adequate remedy at law.

**Section 9.9    Assignment**.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other parties. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective permitted successors and assigns.

**Section 9.10    Expenses**.  All costs and expenses incurred in connection with this Agreement shall be paid by the party incurring such costs and expenses, whether or not the Contemplated Transactions are consummated.

**Section 9.11    Headings**.  Headings of the articles and sections of this Agreement and the table of contents, schedules and exhibits are for convenience of the parties only and shall be given no substantive or interpretative effect whatsoever.

**Section 9.12    Waivers**.  Except as otherwise provided in this Agreement, any failure of any of the parties to comply with any obligation, covenant, agreement or condition herein may be waived by the party or parties entitled to the benefits thereof only by a written instrument signed by the party expressly granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

**Section 9.13    No Recourse**.  This Agreement may only be enforced against, and any claims or causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement may only be made against the entities that are expressly identified as parties hereto and no past, present or future, direct or indirect, equityholder, controlling person, Affiliate, director, officer, employee, incorporator, member, manager, partner, shareholder, agent, attorney or representative of any party hereto shall have any Liability for any obligations or Liabilities of the parties to this Agreement or for any claim based on, in respect of, or by reason of, the Contemplated Transactions.

**Section 9.14    Amendment and Modification**.    Subject to applicable Law, this Agreement may be amended, modified and supplemented in any and all respects at any time prior to the Closing, with respect to any of the terms contained herein by written agreement of the parties hereto.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the Agreement has been executed by the parties hereto as of the date first written above.

CHT HOLDCO, LLC

By: _____

Name:  Paul Parmjit Parmar

Title:  Manager

ALPHA CEPHEUS, LLC

By: _____

Name: Paul Parmjit Parmar

Title:  Manager

CONSTELLATION HEALTH, LLC

By: _____

Name: Paul Parmjit Parmar

Title:  Manager

FIRST UNITED HEALTH, LLC

By: _____

Name: Paul Parmjit Parmar

Title:  Manager

PAUL PARMAR, in his individual capacity

_____

CC CAPITAL CHT HOLDCO LLC

By: _____

Name: CHINH CHU

Title: MANAGING DIRECTOR

[Signature Page to Subscription Agreement]

CC CAPITAL MANAGEMENT, LLC
(solely for purposes of Section 8.2 herein)

By:
Name: CHINH CHU
Title: MANAGING DIRECTOR

**SCHEDULE A**

**Capital Contributions, Issuance and Post-Closing Capitalization**

| Name, Address and Email Address | Capital Contributions | Class A Units | Percentage Voting Interest (A Units) | Class B Units | Percentage Economic Interest (A + B Units) |
|---|---|---|---|---|---|
| **ALPHA CEPHEUS, LLC** | ■ 24,855,637 shares of common stock of CHT; and ■ $13,347,534 note of CHT (as borrower) (1) | 24,765,352 | 45.0% | 4,645,758 | 49.3% |
| **CC CAPITAL CHT HOLDCO LLC** | ■ $88,687,476.20 of cash (Purchase Price at Closing) | 30,268,763 (subscribed Units at Closing) | 55.0% | | 50.7% |
| **TOTAL:** | | 55,034,115 | 100% | 4,645,758 | 100% |

(1) Includes $12,000,000 of principal, 2% closing fee of $240,000, lender fee of $150,000, 5% termination fee of $600,000, and $357,534.25 of accrued interest (7.5% from 9/23/16 to 2/15/17).

## SCHEDULE B

## Notice Information

if to Subscriber, to:

CC Capital CHT Holdco LLC
c/o CC Capital Management, LLC
555 Madison Avenue, 26th Floor
New York, NY 10022
Facsimile: (212) 588-8713
Attention: Chinh Chu

with copies (which shall not constitute notice) to:

Winston & Strawn LLP
1700 K Street, N.W.
Washington, DC  20006-3817
Facsimile: (202) 282-5100
Attention: Chris Zochowski, Esq.

(b)      if to the Company or the Sellers, to:

c/o Robinson Brog Leinwand Greene Genovese & Gluck P.C.
875 Third Avenue
New York, NY 10022
Facsimile: (212) 956-2164
Attention: Adam Greene, Esq.

## SCHEDULE 3.1(E)

## **Legal Proceedings (Company)**

None.

## SCHEDULE 3.3(F)

### Legal Proceedings (Seller)

1. <u>Wimbledon Financing Master Fund, Ltd. v. Weston Capital Management LLC, et al.</u>, Index No. 653468/2015, Sup. Ct. NY, County of New York.
2. <u>Michael Keister v. Parmjit Singh Parmar, et al.</u>, CASE NO.: 07-33032CA32, 11th Judicial Cir., Dade County, Florida
3. <u>Global Jet Shares v. Jet First, Inc. and Parmjit Singh Parmar</u>, Docket No. DJ-163482-13, Sup. Ct. N.J., Monmouth County.
4. <u>Aquila Alpha, LLC v. Paul Parmar</u>, Docket No. F-030093-16, Sup. Ct. N.J., Monmouth County.
5. <u>IRS Matter</u>, the IRS has alleged that Paul Parmar owes roughly $185,000 in taxes. An offer in compromise has been presented to the IRS.

**SCHEDULE 6.1(F)**

**Legal Opinions**

(i) Matters relating to Contributed Property:

   a. The due organization, valid existence, corporate power and authority of CHT, with corporate power and authority to issue the CHT Common Stock and the CHT Promissory Note subject to the Reorganization;

   b. The due authorization, execution, delivery, performance and enforceability[1] of the CHT Promissory Note;

   c. The due authorization, valid issuance, full payment[2] and nonassessability of the CHT Common Stock contributed to the Company as contemplated in this Agreement, and, to actual knowledge, that the contributing entity with respect to such CHT Common Stock was the registered holder of such stock on the books and records of the Company;

   d. No consent of governmental authorities[3] or scheduled agreements and no violation of organizational documents, applicable Delaware entity law or scheduled agreements with respect to the issuance of the CHT Common Stock and the CHT Promissory Note subject to the Reorganization;

(ii) Matters relating to the Reorganization and Pre-Closing Distributions:

   a. The due organization, valid existence, corporate power and authority of each entity a party to the Reorganization or Pre-Closing Distributions;

   b. The due authorization of the Reorganization and Pre-Closing Distributions by each such entity, and the due authorization, execution, delivery, performance and enforceability of each document or agreement relating to the Reorganization and Pre-Closing Distributions;

   c. No consent of governmental authorities or scheduled agreements and no violation of organizational documents, applicable Delaware entity law or scheduled agreements with respect to the Reorganization and Pre-Closing Distributions;

(iii) Matters relating to Pledge of equity securing indemnity:

   a. The due organization, valid existence, corporate power and authority of the grantors under the Pledge Agreements;

   b. The due authorization and valid issuance of the equity interest serving as the pledge collateral under the Pledge Agreements;

   c. The due authorization, execution, delivery, performance and enforceability of the Pledge Agreements;

   d. The Pledge Agreements are sufficient to create a perfected security interest in the pledge collateral and perfection based on possession of certificated units[4];

---

[1] All enforceability opinions will be New York law opinions in which counsel assumes Delaware law is the same as New York law

[2] To include customary assumptions related to the CHT Common Stock being fully paid.

[3] To include customary assumptions related to issuing securities pursuant to an exemption from registration.

[4] Based on certificated units and opting in to Article 8 of the UCC.

       e.  No consent of governmental authorities or scheduled agreements and no violation of organizational documents, applicable Delaware entity law or scheduled agreements with respect to the execution of the Pledge Agreements;

(iv)   <u>Matters relating to the existence, status and capitalization of the Company</u>:

       a.  The due organization, valid existence, corporate power and authority of the Company;

       b.  The due authorization, execution, delivery, performance and enforceability of the Transaction Documents;

       c.  The due authorization and valid issuance of the Class A Units and Class B Units;

       d.  No consent of governmental authorities or scheduled agreements and no violation of organizational documents, applicable Delaware entity law or scheduled agreements with respect to the issuance of the Class A Units and Class B Units;

       e.  To actual knowledge, the capitalization of the Company at Closing, and that no other Persons hold rights to acquire an equity interest in the Company;

**SCHEDULE 6.1(L)**

**Voting and Support Agreements and Releases of Claims Parties**

All shares of CHT Common Stock attributable or otherwise relating to the following:

- Shares of CHT Common Stock owned or to be issued to each U.S. director of CHT
- Shares of CHT Common Stock issued in connection with the acquisition of NORTHSTAR FIRST HEALTH LLC
- Shares of CHT Common Stock issued in connection with the acquisition of PHOENIX HEALTH LLC
- Shares of CHT Common Stock issued in connection with the acquisition of VEGA

## SCHEDULE 7.2(C)

### Specified Indemnitees

Any Adverse Consequences arising from or relating to any Legal Proceeding involving or Claim against any Seller or Affiliate of any Seller (other than the Company, CHT or its Subsidiaries) whether arising prior to, at or after the Closing and any Adverse Consequences arising from or relating to any Legal Proceeding involving the Company, CHT or its Subsidiaries arising prior to or at the Closing, including, but not limited to the Legal Proceedings set forth on Schedule 3.3(f).

**SCHEDULE 7.3(C)**

**<u>Reports</u>**

1) KPMG Quality of Earnings report with Disclaimer
2) Trish Rivard Technology Report with Disclaimer
3) Black Duck IT List with Disclaimer

## EXHIBIT A

**CHT PROMISSORY NOTE**

THIS LOAN AGREEMENT ("**Agreement**"), dated as of August 30, 2016, is among First United Health, LLC a Delaware limited liability company with an address at 838 Walker Road, Suite 22-1, Dover, DE 19904 ("**Lender**"), Paul Parmar, an individual as administrative agent (in such capacity, the "**Agent**"), and Constellation Healthcare Technologies, Inc. a Delaware corporation publically traded on the AIM market with an address at 3400 Highway 35 South, Suite 9A Hazlet NJ 07730 (the "**Borrower**").

## BACKGROUND

The Agent, Lender and the Borrower desire to set forth the terms and conditions under which the Lender will lend to the Borrower $12,000,000 for the purposes specified in this Agreement. Accordingly, the Agent, the Lender and the Borrower, each intending to be legally bound hereby, agree as follows:

## ARTICLE I.

## DEFINITIONS

Terms used herein without definition that are defined in the Uniform Commercial Code shall have the meanings ascribed to them therein, unless the context requires otherwise. The following terms shall have the following meanings in this Agreement:

"**Advance**" shall mean the $12,000,000.

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (i) to vote five percent (5%) or more of the securities having ordinary voting power for the election of directors of such Person, or (ii) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise. Notwithstanding anything to the contrary herein, in no event shall the Agent or any Lender be considered an "Affiliate" of the Borrower.

"**Agent**" shall have the meaning specified in the initial paragraph of this Agreement, together with his successors and assigns.

"**Agreement**" shall mean this agreement, together with all exhibits, amendments, modifications and supplements hereto as may be in effect from time to time.

"**Borrower**" shall have the meaning specified in the initial paragraph of this Agreement, together with its successors and assigns.

{00809919.DOCX;2 }

"**Business Day**" shall mean any day upon which the Agent is open for business at its main office in New York, New York.

"**Breakage Fee**" shall mean with respect to the prepayment in full, and the termination of, the Loan and the prepayment in full of the Loan (i) during the period of time from and after the Closing Date up to the date that is the first anniversary of the Closing Date, an amount equal to 5% of the Advance (ii) during the period of time from and after the first anniversary of the Closing Date up to the date that is the second anniversary of the Closing Date, an amount equal to 3% of the Advance and (iii) during the period of time from and after the second anniversary of the Closing Date up to the date that is the third anniversary of the Closing Date, an amount equal to 2% of the Advance.

"**Capital Expenditures**" means, with respect to any Person for any applicable period, the sum, without duplication, of the aggregate amount of all expenditures of such Person during such period which, pursuant to and in accordance with GAAP, would be classified as capital expenditures including, without limitation, Capital Lease Obligations.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**Closing**" shall mean the execution and delivery to the Agent of all of the documents and instruments required by the terms of this Agreement and the closing of the transactions (other than the Second Advance) contemplated by this Agreement.

"**Closing Date**" shall mean the date on which the Closing takes place.

"**Closing Fee**" shall mean 2% of the Advance e.g. $240,000.00

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Encumbrance**" shall mean, as to any Person, any mortgage, lien, pledge, adverse claim, charge, security interest or other encumbrance in or on, or any interest or title of any vendor, lessor, lender to, or other secured party of the Person under any conditional sale or other title retention agreement or Capital Lease with respect to, any property or asset of the Person.

"**ERISA**" shall mean the federal Employee Retirement Income Security Act of 1974, as amended.

"**Event of Default**" shall have the meaning set forth in **Article VI** of this Agreement.

"**GAAP**" shall mean generally accepted accounting principles, as in effect at the time of application to the provisions hereof, and consistently applied.

{00809919.DOCX;2 }

2

"<u>**Governmental Authority**</u>" shall mean any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"<u>**Indebtedness**</u>" shall mean any obligation for borrowed money, including, without limitation: any obligation owed for all or any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, other than accounts payable included in current liabilities and incurred in respect of property purchased in the ordinary course of business; any reimbursement obligations and other obligations under any letter of credit, currency swap agreement, interest rate swap, cap, collar or floor agreement or other interest rate management devise, or any forward sale or purchase agreement for foreign currencies.

"<u>**Judgment**</u>" shall have the meaning set forth in this Agreement.

"<u>**Lender**</u>" shall have the meaning set forth in the initial paragraph of this Agreement, together with its successors and assigns.

"<u>**Lender Fee**</u>" shall mean $150,000 per annum

"<u>**Lien**</u>" means any mortgage, pledge, hypothecation, right of others, claim, security interest, encumbrance, lease, sublease, license, occupancy agreement, adverse claim or interest, easement, covenant, encroachment, burden, title defect, title retention agreement, voting trust agreement, interest, equity, option, lien, right of first refusal, charge or other restrictions or limitations of any nature whatsoever, including but not limited to such as may arise under any contracts.

"<u>**Loan Documents**</u>" shall mean this Agreement, and the Note, and all agreements, amendments, certificates, financing statements, schedules, reports, notices, and exhibits now or hereafter executed or delivered in connection with any of the foregoing, as may be in effect from time to time.

"<u>**Loan**</u>" shall mean the loan made by the Lender to the Borrower pursuant to <u>**Section 2.1**</u> hereof.

"<u>**Material Adverse Change**</u>" means, collectively or individually, any material adverse change in the business, financial condition, operations, liabilities (fixed or contingent), assets, properties or prospects of the Borrower; provided, however, that a determination of a Material Adverse Change shall exclude any effect, after the date of this Agreement, resulting from (i) changes affecting the general economic, financial or political conditions, to the extent such changes do not have a disproportionate adverse impact on the Borrower relative to other comparable companies; (ii) changes affecting the industry in which the Borrower operates, to the extent such changes do not have a disproportionate adverse impact on the Borrower relative to other comparable companies; (iii) acts of terrorism, war or other force majeure events; (iv) changes in legal requirements or GAAP (or any interpretation of GAAP) applicable to the Borrower; or (v) failure of the Borrower to meet any internal projection or forecast.

"**Material Adverse Effect**" means, collectively and with respect to any event, occurrence, or condition of any kind or nature, a material adverse effect on (i) the assets, liabilities, operations, profits, financial condition, business or prospects (whether present or prospective) of the Borrower, (ii) the ability of the Borrower to perform its obligations under this Agreement or any of the Loan Documents to which it is a party in a manner which could reasonably be expected to materially impair the prospect of timely repayment and performance of the Obligations, or (iii) the validity or enforceability of this Agreement, any of the other Loan Documents, or any of the rights and remedies of the Lender hereunder or thereunder other than as a result of an act or omission by the Lender or a Lender; provided, however, that a determination of a Material Adverse Effect shall exclude any effect, after the date of this Agreement, resulting from (a) changes affecting the general economic, financial or political conditions, to the extent such changes do not have a disproportionate adverse impact on the Borrower relative to other comparable companies; (b) changes affecting the industry in which the Borrower operates, to the extent such changes do not have a disproportionate adverse impact on the Borrower relative to other comparable companies; (c) acts of terrorism, war or other force majeure events; (d) changes in legal requirements or GAAP (or any interpretation of GAAP) applicable to the Borrower; or (e) failure of the Borrower to meet any internal projection or forecast.

"**Maturity Date**" shall have the meaning set forth in **Section 2.1** of this Agreement.

"**Note**" shall have the meaning set forth in **Section 2.1** of this Agreement, together with all supplements, amendments and renewals thereof.

"**Obligations**" shall mean the obligations of the Borrower:

    (a) To pay the principal, interest and any other liabilities of the Borrower to the Agent and the Lender under this Agreement and the other Loan Documents in accordance with the terms hereof and thereof;

    (b) To satisfy all of the other direct or indirect liabilities of the Borrower to the Lender under the Loan Documents, whether now existing or hereafter incurred, whether or not evidenced by any note or other instrument, matured or unmatured, direct, absolute or contingent, joint or several, including any extensions, modifications, renewals thereof and substitutions therefor;

    (c) To repay the Agent or the Lender all amounts advanced by the Agent or the Lender hereunder or otherwise on behalf of the Borrower, including, but without limitation, advances for principal or interest payments to prior secured parties, mortgagors or lienors, or for taxes, levies, insurance, rent, wages, repairs to or maintenance or storage of any Collateral; and

    (d) To reimburse the Agent and Lender, on demand, for all of the Agent and Lender's expenses and costs, including the reasonable fees and expenses of its counsel, in connection with the negotiation, preparation, administration, amendment, modification, or enforcement of this Agreement and the documents required hereunder.

"**Person**" shall mean any individual, corporation, limited liability company, partnership, association, joint-stock company, trust, unincorporated organization, joint venture, court or governmental or political subdivision or agency thereof.

"**Plan**" shall have the meaning set forth in **Section 4.9** of this Agreement.

"**Potential Default**" shall have the meaning set forth in **Section 2.6** of this Agreement.

"**Requirement of Law**" shall mean, as to any Person, the Certificate of Incorporation, By-Laws, Operating Agreement or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Subsidiary**" of any Person shall mean any corporation, entity or association the outstanding shares or other equity interests of which having sufficient voting power (not depending on the happening of a contingency) to elect at least a majority of the members of its board of directors or other controlling body, are at the time owned by the designated Person.

## ARTICLE II.

## CREDIT ACCOMMODATIONS

2.1.    Term Loan.

(a)    Generally. The Lender agrees, on the terms and conditions set forth herein to make available to the Borrower on the Closing Date a term loan (collectively, the "**Loan**") for the purpose of paying acquisition and acquisition related expenses. On the date that is three years from the Closing Date (the "**Maturity Date**"), the Borrower shall repay the Loan by paying an amount equal to (i) the Advance plus (ii) all accrued and unpaid interest plus (iii) the Closing Fee plus (iv) all of the Lender's and Agent's fees associated with the making of the Loan including the Breakage Fee and the Lender Fee ("**Fees**").

(b)    Interest shall accrue on the outstanding principal of the Loan from the date of the Loan at the rate of twelve percent (7.5%) per annum. Interest on the Loan shall accrue but shall not be payable until the earlier of the Maturity Date or the earlier repayment of the Loan.

(c)    Loan Note.  The obligations of the Borrower to repay the Advance and to pay accrued interest thereon shall be evidenced by a promissory note, to be executed and delivered to the Agent concurrently with the execution and delivery of this Agreement (the "**Note**").

2.2.    Payments and Computations.  All amounts payable by the Borrower to the Lender under this Agreement or the Note shall be paid directly to the Agent for disbursement to the Lender in immediately available funds at the address of the Agent set forth in **Section 11.3** hereof or at such other address of which the Agent shall give notice to the Borrower pursuant to **Section 11.3** hereof.  All computations of interest hereunder shall be made by the Agent on the basis of a year of 360 days for the actual number of days elapsed.  All payments under each of the Notes shall be applied first to the payment of interest due and payable thereunder and then to the reduction of the outstanding principal balance thereof.

2.3.    INTENTIONALLY OMITTED

2.4.    Prepayment and Conversion to Equity.

(a)  The Borrower may make prepayments of the Loan in whole or in part at any time and from time to time upon notification to the Agent not later than 2:30 p.m. New York, New York time on the date of the proposed prepayment; provided, however that all prepayments shall be applied first to the payment of accrued and unpaid interest; and provided, further that the Borrower shall be required to pay a prepayment premium of 5% ("**Prepayment Penalty**") on all principal prepayments made on or prior to the second anniversary of the Closing.  To the extent any voluntary prepayments are made on the Loan, each such prepayment shall be in the minimum amount of $50,000.

(b)  If the Borrower does an equity financing,  pursuant to which it sells shares of a series of stock to the public market  (the "**Stock**") with an aggregate sales price of not less than $45,000,000 (excluding the Note), (a "**Qualified Equity Financing**"), then the (i) outstanding principal amount of the Note, plus (ii) all accrued interest under the Note, plus (iii) the Fees including the Breakage Fee and the Administrative Fee for the then current year shall upon the election of either the Borrower or the Lender convert into shares of Stock at the price per share of the Qualified Equity Financing .

(c)  Upon the Borrower's closing of the Vega Medical Professionals, LLC, transaction the (i) outstanding principal amount of the Note, plus (ii) all accrued interest under the Note, plus (iii) the Fees including the Breakage Fee and the Lender Fee for the then current year shall upon the election of either the Borrower or the Lender convert into shares of stock of the Borrower at the price per share as mutually agreed upon by the Borrower and the Lender.

(d)  Notwithstanding any other provision of this Agreement or any other Loan Document to the contrary, all amounts collected or received by the Agent or any Lender after acceleration of the Loan pursuant to terms of this Agreement or in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant

to the exercise by the Agent of its remedies shall be applied by the Agent in the following order of priority

      i.    To pay the out-of-pocket costs and expenses of the Agent incurred in collection and recovery;

      ii.    to pay accrued and unpaid late charges to the Lender

      iii.    to pay accrued and unpaid interest to the Lender; and

      iv.    to pay the unpaid principal amount of the Loan.

    2.5.   <u>Default Rate</u>.  To the extent not contrary to any Requirement of Law, upon the occurrence and during the continuation of an Event of Default and after written notice thereof from the Agent to the Borrower, any principal, past due interest, fee or other amount then outstanding hereunder shall bear interest for each day thereafter until paid in full (after as well as before judgment) at a rate per annum which shall be equal to ten percent (10%) above the rate of interest otherwise payable for such Loan.  The Borrower acknowledges that such increased interest rate reflects, among other things, the fact that such Loan or other amounts have become a substantially greater risk given their default status and that the Lender is entitled to additional compensation for such risk.

ARTICLE III.

INTENTIONALLY OMITTED

ARTICLE IV.

<u>REPRESENTATIONS AND WARRANTIES OF THE BORROWER</u>

    In order to induce the Lender to execute and deliver this Agreement and to make the Loan available to the Borrower, the Borrower represents and warrants to the Lender that, as of the date hereof:

    4.1.   <u>Good Standing of the Borrower; Authorization</u>.  The Borrower is duly formed, organized and existing in the State of Delaware and is duly qualified as a foreign corporation and authorized to do business in all other jurisdictions wherein the nature of its business or property makes such qualification necessary, and has the power to own its properties and to carry on its business as now conducted.  The execution, delivery and performance of this Agreement, and the Loan Documents have been duly authorized by all necessary corporate proceedings on the part of the Borrower.

    4.2.   <u>Compliance with Laws and Other Agreements</u>.  The Borrower is in compliance with all laws, rules, regulations, judgments, decrees, orders, agreements and requirements which affect in any material way the Borrower, its assets or the operation of its business and has not received, and has no knowledge (after due inquiry) of, any written order or notice of any governmental investigation or of any violation or claim of violation of any law, regulation, judgment, decree, order, agreement, or other governmental requirement.

7

**4.3.    No Conflict; Governmental Approvals.** The execution, delivery, and performance of this Agreement and each of the Loan Documents will not (i) conflict with, violate, constitute a default under, or result in a breach of any provision of any applicable law, rule, regulation, judgment, decree, order, instrument or other agreement, or (ii) conflict with or result in a breach of any provision of the certificate of incorporation, by-laws, or other applicable governing document of the Borrower. No authorization, permit, consent or approval of or other action by, and no filing, registration or declaration with, any Governmental Authority or regulatory body is required to be obtained or made by the Borrower for the due execution, delivery and performance of this Agreement or any of the Loan Documents, except such as have been duly obtained or made prior to the Closing Date and are in full force and effect as of the Closing Date (copies of which have been delivered to the Agent on or before the Closing Date).

**4.4.    Financial and Other Information Regarding Borrower.**

(a) The Borrower has furnished to the Agent financial statements of Borrower, including a balance sheet, statement of income, statement of cash flows, for the following periods: fiscal year ending December 31, 2015; fiscal year ending December 31, 2014. Such financial statements present fairly the financial condition of Borrower as of the close of such periods and the results of its operations and its cash flows during such period, in accordance with GAAP (except that the financial statements may not contain all footnotes required by GAAP).

**4.5.    Taxes.** The Borrower is not delinquent in payment of any income, property or other tax, except for any delinquency in the payment of a tax which is contested in good faith by the Borrower and for which appropriate reserves have been established in accordance with GAAP.

**4.6.    Material Adverse Changes.** Since delivery of the most recent financial statements delivered by Borrower to Agent, there has not been any Material Adverse Change in the business, operations, properties or financial position of the Borrower. The Borrower does not know (after due inquiry) of any fact (other than matters of a general economic or political nature) which materially adversely affects, or, so far as the Borrower can now reasonably foresee, will materially adversely affect, the business, operations, properties or financial position of the Borrower or the performance by the Borrower of its obligations under this Agreement and the other Loan Documents.

**4.7.    Margin Securities.** The assets of the Borrower do not include any "margin securities" within the meaning of Regulations G or U of the Board of Governors of the Federal Reserve System (12 C.F.R. 207, 221), and the Borrower does not have any present intention of acquiring any margin security.

**4.8.    ERISA.** The provisions of each employee benefit plan as defined in Section 3(3) of ERISA ("**Plan**") maintained by the Borrower comply with all applicable requirements of ERISA and of the Code, and with all applicable rulings and regulations issued under the provisions of ERISA and the Code setting forth those requirements. No reportable event, as defined in Section 4043 of ERISA, has occurred with respect to any Plan; no Plan to which Section 4021 of ERISA applies has been terminated; no Plan has incurred any liability to PBGC

as provided in Section 4062, 4063 and 4064 of ERISA; no Plan has been involved in any prohibited transaction within the meaning of Section 406 of ERISA or Section 4975 of the Code; and there are no unfunded liabilities with respect to any Plan which have not been disclosed in writing to the Agent.

4.9.    Pending Litigation.  There are no actions, suits, proceedings or investigations pending, or, to the knowledge of the Borrower, after due inquiry, threatened against or affecting the Borrower, before any court, arbitrator or administrative or governmental body which, in the aggregate, might adversely affect any action taken or to be taken by the Borrower under this Agreement and the other Loan Documents or which, in the aggregate, might materially adversely affect the business, operations, properties or financial position of the Borrower, or the ability of the Borrower to perform its obligations under this Agreement and the other Loan Documents.

4.10.    Valid, Binding and Enforceable.  This Agreement and the Loan Documents have been duly and validly executed and delivered by the parties thereto (other than the Agent and the Lender) and constitute the valid and legally binding obligations of such parties enforceable in accordance with their respective terms, except as enforcement of this Agreement and the other Loan Documents may be limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights and except as enforcement is subject to general equitable principles.

4.11.    No Untrue Statements.  Neither this Agreement, the Loan Documents nor any other document, certificate or statement furnished or to be furnished by the Borrower to the Agent in connection herewith contains, or at the time of delivery will contain, any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements contained herein and therein not misleading.

## ARTICLE V.

## EVENTS OF DEFAULT

An event of default ("**Event of Default**") under this Agreement shall be deemed to exist if any one or more of the following events occurs and is continuing, whatever the reason therefor:

5.1.    Borrower's Failure to Pay.  The Borrower fails to pay any amount of principal interest, fees or other sums as and when due under this Agreement or any of the Loan Documents, or any other Obligations, whether upon stated maturity, acceleration, or otherwise.

5.2.    Defaults in Other Agreements.  The Borrower fails to perform or observe any term, covenant, agreement or condition contained in, or there shall occur any default under or as defined in, any agreement other than the Loan Documents applicable to the Borrower or by which Borrower is bound involving a material liability of the Borrower, which shall not be remedied within the period of time (if any) within which such other agreement permits such default to be remedied, unless such default is waived by the other party thereto or excused as a matter of law.

5.3.    _Agreements Invalid_.  The validity, binding nature of, or enforceability of any material term or provision of any of the Loan Documents is disputed by, on behalf of, or in the right or name of the Borrower or any material term or provision of any such Loan Document is found or declared to be invalid, avoidable, or non-enforceable by any court of competent jurisdiction.

5.4.    _False Warranties; Breach of Representations_.  Any warranty or representation made by the Borrower in this Agreement or any other Loan Document or in any certificate or other writing delivered under or pursuant to this Agreement or any other Loan Document, or in connection with any provision of this Agreement or related to the transactions contemplated hereby shall prove to have been false or incorrect or breached in any material respect on the date as of which made.

5.5.    _Judgments_.  A final judgment or judgments is entered, or an order or orders of any judicial authority or governmental entity is issued against the Borrower (such judgment(s) and order(s) hereinafter collectively referred to as "**Judgment**") (i) for payment of money, which Judgment, in the aggregate, exceeds one million dollars ($1,000,000.00) outstanding at any one time; or (ii) for injunctive or declaratory relief which would have a material adverse effect on the ability of the Borrower to conduct its business, and such Judgment is not discharged or execution thereon or enforcement thereof stayed pending appeal, within thirty days after entry or issuance thereof, or, in the event of such a stay, such Judgment is not discharged within thirty days after such stay expires.

5.6.    _Bankruptcy or Insolvency of the Borrower_.

(a) The Borrower becomes insolvent, or generally fails to pay, or is generally unable to pay, or admits in writing its inability to pay, its debts as they become due or applies for, consents to, or acquiesces in, the appointment of a trustee, receiver or other custodian for the Borrower, or a substantial part of its property, or makes a general assignment for the benefit of creditors.

(b) The Borrower commences any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any state or federal bankruptcy or insolvency law, or any dissolution or liquidation proceeding.

(c) Any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any state or federal bankruptcy or insolvency law, or any dissolution or liquidation proceeding, is involuntarily commenced against or in respect of the Borrower, or an order for relief is entered in any such proceeding.

(d) A trustee, receiver, or other custodian is appointed for the Borrower or a substantial part of Borrower's property.

5.7.    _Material Adverse Change_.  The Borrower has suffered a Material Adverse Change.

{00809919.DOCX;2 }

10

## ARTICLE VI.

## REMEDIES

6.1.  Acceleration.

(a) Upon the occurrence of any one or more Events of Default hereunder, the Agent shall, in its sole discretion, by notice to the Borrower, declare the Loan hereunder, with accrued interest thereon, and all other Obligations under this Agreement, the Notes and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable.  Except as expressly provided in this **Section 6.1**, presentment, demand, protest and all other notices of any kind are hereby expressly waived;

(b) Notwithstanding anything else contained herein, automatically upon the occurrence of any Event of Default under this Agreement, the unpaid principal balance of all Loan, all interest and fees accrued and unpaid thereon, and all other amounts and Obligations payable by the Borrower under this Agreement and the other Loan Documents shall immediately become due and payable in full, all without protest, presentment, demand, or further notice of any kind to the Borrower, all of which are expressly waived by the Borrower;

6.2.  Further Remedies.  Upon the occurrence of any one or more Events of Default, the Agent may, in its sole discretion, proceed to protect and enforce the Lender's rights under this Agreement and the other Loan Documents and may exercise such remedies as are available to the Lender in respect thereof under applicable law, either by suit in equity or by action at law, or both, whether for specific performance of any provision contained in this Agreement or any of the other Loan Documents or in aid of the exercise of any power granted in this Agreement or any of the other Loan Documents.

## ARTICLE VII.

## THE AGENT

7.1.  Authorization and Action.  Each Lender hereby appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Agent by the terms hereof, together with such powers as are reasonably incidental thereto.

7.2.  Successor Agent.  The Agent may resign at any time by giving written notice thereof to the Lender.

## ARTICLE VIII

## MISCELLANEOUS

8.1  Amendment, Etc.  No amendment or waiver of any provision of this Agreement or any of the other Loan Documents nor consent to any departure by the Borrower therefrom,

shall in any event be effective unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no amendment, waiver or consent shall, unless in writing and signed by the Lender affected thereby, do any of the following: (a) forgive any portion of the principal or any of the accrued interest on any of the Loan; (b) modify the interest rate or interest payable on any of the Loan; (c) postpone the date on which any interest or principal is payable under any of the Note; (d) modify the maximum principal amount of the Loan; provided, further, that no amendment, waiver or consent shall, unless in writing and signed by the Agent in addition to the Lender required above to take such action, affect the rights or duties of the Agent under this Agreement or any other Loan Document.

      8.2   Remedies Cumulative; No Waiver.  The rights, powers and remedies of the Agent and Lender provided in this Agreement and the other Loan Documents are cumulative and not exclusive of any right, power or remedy provided by law or equity, and no failure or delay on the part of the Agent or Lender in the exercise of any right, power, or remedy shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy.

      8.3   Notices.  All notices, requests, demands and other communications which are required or may be given under this Agreement shall be in writing and signed by the party giving such notice and shall be deemed to have been duly given or made: if by hand, immediately upon delivery with receipt acknowledged; if by Federal Express, Express Mail or any other overnight delivery service, on delivery by such service with proof thereof by such service; if sent by email, immediately upon the date of receipt (with a copy sent by one of the other methods of notice provided herein to such address no later than the following day); and if mailed by certified mail, return receipt requested, three (3) business days after mailing.  All notices, requests, and demands are to be given or made to the parties at the following addresses (or to such other address as either party may designate by notice in accordance with the provisions of this section) to the address set forth above.

      8.4   Costs, Expenses and Attorneys' Fees.  Whether or not the transactions contemplated by this Agreement and the other Loan Documents are fully consummated, the Borrower shall promptly pay (or reimburse, as the Agent may elect) all reasonable costs and expenses which the Agent has incurred or may hereafter incur in connection with the negotiation, preparation, reproduction, interpretation and enforcement of this Agreement and the other Loan Documents, the collection of all amounts due hereunder and thereunder, and any amendment, modification, consent or waiver which may be hereafter requested by the Borrower or otherwise required.  Such costs and expenses shall include, without limitation, the reasonable fees and disbursements of counsel to the Agent, the costs of appraisal fees, searches of public records, costs of filing and recording documents with public offices, and similar costs and expenses incurred by the Agent; provided, however that the Borrower's obligation to pay or reimburse the fees of Agent's counsel in connection with the negotiation and preparation of the Loan Documents.  The Borrower's reimbursement obligations under this Section shall survive any termination of this Agreement.

      8.5   Survival of Covenants.  This Agreement and all covenants, agreements, representations and warranties made herein and in any certificates delivered pursuant hereto shall

survive the making of the Loan and the execution and delivery of the Notes and, subject to the provisions of **Section 11.16** hereof, shall continue in full force and effect until all of the Obligations have been fully paid, performed, satisfied and discharged.

8.6    Counterparts; Effectiveness. This Agreement may be executed in any number of counterparts and may be delivered by facsimile or PDF transmission, each of which shall be deemed an original, but all of which together shall constitute one and the same document. This Agreement shall be deemed to have been executed and delivered when the Agent has received counterparts hereof executed by all parties listed on the signature page(s) hereto.

8.7    Headings. The headings of sections have been included herein for convenience only and shall not be considered in interpreting this Agreement.

8.8    Payment Due On A Day Other Than A Business Day. If any payment due or action to be taken under this Agreement or any Loan Document falls due or is required to be taken on a day which is not a Business Day, such payment or action shall be made or taken on the next succeeding Business Day and such extended time shall be included in the computation of interest.

8.9 Judicial Proceedings and Governing Law . Each party to this Agreement agrees that any suit, action or proceeding, whether claim or counterclaim, brought or instituted by any party hereto or any successor or assign of any party, on or with respect to this Agreement or any of the other Loan Documents or the dealings of the parties with respect hereto, or thereto, shall be tried only by a court and not by a jury. EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION OR PROCEEDING. Further, each party waives any right it may have to claim or recover, in any such suit, action or proceeding, any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages. THE BORROWER ACKNOWLEDGES AND AGREES THAT THIS SECTION IS A SPECIFIC AND MATERIAL ASPECT OF THIS AGREEMENT AND THAT THE LENDER WOULD NOT EXTEND CREDIT TO THE BORROWER IF THE WAIVERS SET FORTH IN THIS SECTION WERE NOT A PART OF THIS AGREEMENT.This Agreement shall be construed in accordance with and governed by the internal laws of the State of New York. The Borrower irrevocably appoints each and every officer of the Borrower (notwithstanding the provisions of **Section 11.3**) as its attorneys upon whom may be served, by regular or certified mail at the address set forth in **Section 11.3** hereof, any notice, process or pleading in any action or proceeding against it arising out of or in connection with this Agreement or any of the other Loan Documents; and the Borrower hereby (i) consents that any action or proceeding against it be commenced and maintained in any court within the County of New York in the State of New York or in the United States District Court for the Southern District of New York by service of process on any such officer; (ii) agrees that the courts of the State of New York located in the County of New York and the United States District Court for the Southern District of New York shall have jurisdiction with respect to the subject matter hereof and the person of the Borrower and the Collateral, and (iii) waives any objection that such Borrower may now or hereafter have as to the venue of any such suit, action or proceeding brought in such a court or that such court is an inconvenient forum. Notwithstanding the foregoing, the Agent, in its absolute discretion may

also initiate proceedings in the courts of any other jurisdiction in which the Borrower may be found or in which any of its properties or the Collateral may be located.

8.10 Integration. This Agreement and the other Loan Documents constitute the sole agreement of the parties with respect to the subject matter hereof and thereof and supersede all oral negotiations and prior writings with respect to the subject matter hereof and thereof.

8. 11 Successors and Assigns. Generally. This Agreement (i) shall be binding upon the Borrower, the Agent and the Lender and their respective successors and assigns, and (ii) shall inure to the benefit of the Borrower, the Agent and the Lender and its respective successors and assigns, provided, however, that the Borrower may not assign its rights hereunder or any interest herein without the prior written consent of the Agent, and any such assignment or attempted assignment by the Borrower shall be void and of no effect with respect to the Agent.

8.12 Severability of Provisions. Any provision in this Agreement that is held to be inoperative, unenforceable, voidable, or invalid in any jurisdiction shall, as to that jurisdiction, be ineffective, unenforceable, void or invalid without affecting the remaining provisions, and to this end the provisions of this Agreement are declared to be severable.

11.1.   Indemnification.

(a) If, after receipt of any payment of all or any part of the Obligations, the Lender is compelled to surrender such payment to any Person or entity for any reason (including, without limitation, a determination that such payment is void or voidable as a preference or fraudulent conveyance, an impermissible setoff, or a diversion of trust funds), then this Agreement and the other Loan Documents shall continue in full force and effect, and the Borrower shall be liable for, and shall indemnify, defend and hold harmless the Lender with respect to the full amount so surrendered.

(b) Except for losses caused by the Lender's or Agent's gross negligence or willful misconduct, the Borrower shall indemnify, defend and hold harmless the Agent and the Lender with respect to any and all claims, expenses, demands, losses, costs, fines or liabilities of any kind, including reasonable attorneys' fees and costs, arising from or in any way related to (i) acts or conduct of the Borrower under, pursuant to or related to this Agreement and the other Loan Documents, (ii) Borrower's breach or violation of any representation, warranty, covenant or undertaking contained in this Agreement or the other Loan Documents, and (iii) Borrower's failure to comply with any or all laws, statutes, ordinances, governmental rules, regulations or standards, whether federal, state, or local, or court or administrative orders or decrees, including without limitation those resulting from any Hazardous Materials or dangerous environmental condition within, on, from, related to or affecting any real property owned or occupied by the Borrower, unless resulting from the acts or conduct of the Agent or the Lender constituting gross negligence or willful misconduct.

(c) The provisions of this section shall survive the termination of this Agreement and the other Loan Documents and shall be and remain effective notwithstanding the payment of the Obligations, the cancellation of any of the Notes, the release of any

Encumbrance securing the Obligations or any other action which the Agent may have taken in reliance upon its receipt of such payment.  Any cancellation of any of the Notes, release of any Encumbrance or other such action shall be deemed to have been conditioned upon any payment of the Obligations having become final and irrevocable.

## Schedule 1

### Lender Commitments

| Lender | Lender Commitment –Advance |
|---|---|
| First United Health LLC | $12,000,000 |

IN WITNESS WHEREOF, the undersigned have caused this Loan Agreement to be executed by their duly authorized officers on the date first above written.

Constellation Healthcare Technologies, Inc.

By: _Sam Zaharis_
Name:
Title:

By: _Paul Parmar_
Name: Paul Parmar
as Agent


First United Health LLC as Lender

By: _Paul Parmar_
Name:
Title: _MANAGER_


{00809919.DOCX:2 }

## PROMISSORY NOTE

$12,000,000.00                                                                      August 30, 2016

FOR VALUE RECEIVED, Constellation Healthcare Technologies, Inc. (the "Borrower"), hereby promises to pay to the order of First United Health LLC (the "Lender") the principal amount of TWELVE MILLION DOLLARS ($12,000,000.00) pursuant to the terms of the Loan Agreement (the "Loan Agreement") dated the date hereof by and between the Borrower, the Lender, and Paul Parmar as administrative agent (the "Agent"). Terms capitalized but not defined herein shall have the meanings given to them respectively in the Loan Agreement. Reference is made to the Loan Agreement for a statement of the terms and conditions under which the loan evidenced hereby has been made, and may be prepaid or accelerated.

Until maturity (whether by acceleration or otherwise) interest shall accrue and be payable on the outstanding principal balance hereof at the annual rate of interest set forth in the Loan Agreement. Subsequent to maturity or the occurrence of any Event of Default, and continuing after the entry of any judgment against the Borrower with respect to the obligations evidenced by this Note, interest shall accrue at an annual rate which shall be ten percent (10%) above the rate of interest otherwise payable hereunder. Principal and accrued interest shall be payable in accordance with the terms and conditions of the Loan Agreement.

All amounts payable by the Borrower to the Lender hereunder shall be paid to the Agent for the benefit of the Lender in immediately available funds.

The Borrower hereby waives the requirements of demand, presentment, protest, notice of protest and dishonor and all other demands or notices of any kind in connection with the delivery, acceptance, performance, default, dishonor, or enforcement of this Note.

The construction, interpretation and enforcement of this Note shall be governed by the internal laws of the State of New York.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the Borrower has caused this Note to be executed by its duly authorized officer as of the day and year first above written.

Constellation Healthcare Technologies, Inc.

By: _Sam Zaharis_

Name:

Title:  DIRECTOR AND CFO
           CHT.

{00809986.DOC;1 }

# CONTRIBUTION AGREEMENT

**CONTRIBUTION AGREEMENT** (the "**Agreement**"), dated as of November ___, 2016, by and between **First United Health, LLC**, a Delaware limited liability company with a mailing address c/o A. Mitchell Greene, Esq., Robinson Brog Leinwand Greene Genovese & Gluck P.C., 875 Third Avenue, 9th Floor, New York, New York 10022 ("**FUH**"), and **Alpha Cepheus, LLC**, a Delaware limited liability company with a mailing address c/o A. Mitchell Greene, Esq., Robinson Brog Leinwand Greene Genovese & Gluck P.C., 875 Third Avenue, 9th Floor, New York, New York 10022 ("**ACLLC**").

**WHEREAS**, FUH owns not less than 6,993,563 shares of common stock of Constellation Healthcare Technologies, Inc., a Delaware Corporation ("**CHT**");

**WHEREAS**, FUH desires to contribute (i) 6,993,563 shares of common stock of CHT (the "**Shares**") and (ii) that certain Loan Agreement dated as of August 30, 2016, among FUH as lender, Paul Parmar, as agent, and CHT, as borrower, in the principal amount of Twelve Million Dollars ($12,000,000.00) and the Promissory Note issued pursuant thereto (collectively, the "**Note**") to ACLLC in exchange for 11,887,369 Class A Units and 2,229,964 Class B Units in ACLLC (the "**Interests**") and ACLLC wishes to accept the contribution of the Shares and the Note in exchange for the issuance of the Interests.

**NOW, THEREFORE**, in reliance upon the covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## 1. ACQUISITION OF SHARES

Section 1.1  <u>Acquisition of Shares</u>  FUH hereby transfers, assigns and conveys to ACLLC, and ACLLC acquires from FUH, all of FUH's right, title and interest in and to the Shares, free and clear of all liens, charges, security interests, rights or claims of others, restrictions on transfer or other encumbrances (collectively, "**Liens**"), and all of FUH's right, title and interest in and to the Note, and ACLLC issues to FUH the Interests free and clear of all Liens.

Section 1.2  <u>Deliveries</u>.  Concurrently with signing this Agreement, (i) FUH shall cause CHT's transfer agent to transfer the ownership of the Shares on CHT's books and records from FUH to ACLLC, (ii) FUH shall deliver the Note to ACLLC, and (iii) FUH shall be entered into the share ledger of ACLLC as having been allotted the Interests.

## 2. REPRESENTATIONS AND WARRANTIES OF FUH

FUH hereby represents and warrants to ACLLC as follows:

Section 2.1    <u>Organization</u>. FUH is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

Section 2.2    <u>Due Authorization</u>. FUH has all requisite power and authority to execute and deliver this Agreement and the other documents required to be executed and delivered by FUH hereunder, to perform fully FUH's obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by FUH of this Agreement and the other documents required to be executed and delivered by FUH hereunder, the performance by FUH of its obligations hereunder and thereunder, and the consummation by FUH of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary limited liability company action on the part of FUH. This Agreement has been duly executed and delivered by FUH. This Agreement is, and each other agreement contemplated hereby to which FUH will be a party will be, upon execution and delivery thereof by FUH, a legal, valid and binding obligation of FUH, enforceable against FUH in accordance with its terms (except as enforceability may be limited by any applicable bankruptcy, insolvency or other laws affecting creditors' rights generally or by general principles of equity, regardless of whether such enforceability is considered in equity or at law).

Section 2.3    <u>No Conflict</u>. Neither the execution and delivery of this Agreement or any of the other documents contemplated hereby nor the consummation of the transactions contemplated hereby or thereby by FUH will (a) conflict with, result in a breach or violation of or constitute (or with notice or lapse of time or both constitute) a default under (i) the certificate of formation or operating agreement or other formation or operating documents of FUH, (ii) any law, statute, regulation, order, judgment or decree or (iii) any instrument, contract or other agreement to which FUH is a party or by which FUH (or any of its properties or assets) is subject or bound; (b) terminate or modify, or give any third party the right to terminate or modify, the provisions or terms of any instrument, contract or other agreement to which FUH is a party or by which FUH (or any of its properties or assets) is subject or bound; or (c) require FUH to obtain any authorization, consent, approval or waiver from, to give any notification to, or to make any filing with, any governmental body or authority or to obtain the approval or consent of any other person.

Section 2.4    <u>Ownership of Shares</u>. FUH is the legal and beneficial owner of the Shares. FUH owns the Shares free and clear of all Liens. Upon consummation of the transactions contemplated hereby, ACLLC will have acquired all the rights of FUH in the Shares free of any adverse claim, any Lien created by FUH or any restrictions on transfer. FUH is not a party to any agreement, arrangement or other understanding with any person or entity (other than ACLLC) with respect to sale of the Shares.

Section 2.5    <u>Ownership of the Note</u>. FUH is the legal holder of the Note. FUH holds the Note free and clear of all Liens. Upon consummation of the transactions contemplated hereby, ACLLC will have acquired all the rights of FUH in the Note free of any adverse claim, any Lien created by FUH or any restrictions on transfer. FUH is not a party to any agreement, arrangement or other understanding with any person or entity (other than ACLLC) with respect to sale of the Note.

3.    **REPRESENTATIONS AND WARRANTIES OF ACLLC**

ACLLC hereby represents and warrants to FUH as follows:

Section 3.1    Organization.    ACLLC is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

Section 3.2    Due Authorization. ACLLC has all requisite power and authority to execute and deliver this Agreement and the other documents required to be executed and delivered by ACLLC hereunder, to perform fully ACLLC's obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by ACLLC of this Agreement and the other documents required to be executed and delivered by ACLLC hereunder, the performance by ACLLC of its obligations hereunder and thereunder, and the consummation by ACLLC of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary limited liability company action on the part of ACLLC. This Agreement has been duly executed and delivered by ACLLC. This Agreement is, and each other agreement contemplated hereby to which ACLLC will be a party will be, upon execution and delivery thereof by ACLLC, a legal, valid and binding obligation of ACLLC, enforceable against ACLLC in accordance with its terms (except as enforceability may be limited by any applicable bankruptcy, insolvency or other laws affecting creditors' rights generally or by general principles of equity, regardless of whether such enforceability is considered in equity or at law).

Section 3.3    No Conflict. Neither the execution and delivery of this Agreement or any of the other documents contemplated hereby nor the consummation of the transactions contemplated hereby or thereby by ACLLC will (a) conflict with, result in a breach or violation of or constitute (or with notice or lapse of time or both constitute) a default under (i) the certificate of formation or operating agreement or other formation or operating documents of ACLLC, (ii) any law, statute, regulation, order, judgment or decree or (iii) any instrument, contract or other agreement to which ACLLC is a party or by which ACLLC (or any of its properties or assets) is subject or bound; (b) terminate or modify, or give any third party the right to terminate or modify, the provisions or terms of any instrument, contract or other agreement to which ACLLC is a party or by which ACLLC (or any of its properties or assets) is subject or bound; or (c) require ACLLC to obtain any authorization, consent, approval or waiver from, to give any notification to, or to make any filing with, any governmental body or authority or to obtain the approval or consent of any other person.

Section 3.4    Ownership. Upon consummation of the transactions contemplated hereby, FUH will own 45% of the equity in ACLLC.

4.    **COVENANTS.**

Section 4.1    Post-Closing Matters. At any time and from time to time hereafter, each party shall execute and deliver such additional instruments and other documents and shall take such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement and the transactions contemplated hereby.

5.    **MISCELLANEOUS**

Section 5.1    <u>Amendments and Waivers</u>.  This Agreement shall not be amended or modified except by a writing duly executed by FUH and ACLLC. Waiver of any term or condition of this Agreement by any party shall only be effective if in writing.  No waiver by any party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent occurrence.

Section 5.2    <u>Entire Agreement</u>.    This Agreement, including the instruments, agreements and documents delivered at the Closing in connection with the transactions contemplated by this Agreement, contains all of the terms, conditions and representations and warranties agreed upon by the parties relating to the subject matter of this Agreement and supersedes all prior agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter. No party shall be deemed to make any representation, warranty or covenant to any other party with respect to this Agreement or the transactions contemplated hereby except for the representations, warranties and covenants contained herein.

Section 5.3    <u>Headings</u>.  The headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the parties to this Agreement.

Section 5.4    <u>Notices</u>.  All notices, requests, demands and other communications made in connection with this Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of delivery, if delivered by hand, (b) one business day after delivery to a nationally recognized overnight courier service marked for overnight delivery or (c) seven calendar days after mailing if mailed, with proper postage, by certified or registered first-class mail, postage prepaid, return receipt requested, addressed to the address set forth at the beginning of this Agreement.  Such addresses and numbers may be changed, from time to time, by means of a notice given in the manner provided in this Section.

Section 5.5    <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

Section 5.6    <u>Assignment</u>.    This Agreement may not be assigned by any party without the prior written consent of the other parties and this Agreement, and the terms, covenants and

conditions hereof, shall be binding upon and inure to the benefit of the parties hereto, and their respective heirs, successors, legal representatives and assigns.

Section 5.7    Counterparts.  This Agreement may be signed in two or more counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement.  For purposes of this Agreement, a facsimile or .pdf copy of a party's signature shall be sufficient to bind such party.

Section 5.8    Governing Law.  This Agreement shall be governed by and construed in accordance with the law of the State of New York, without regard to the conflicts of laws principles thereof.

Section 5.9    Third Parties.  Except as specifically set forth or referred to herein, nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person other than the parties hereto and their successors or assigns any rights or remedies under or by reason of this Agreement.

Section 5.10    Construction.  The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  The word "including" shall mean "including without limitation." The parties intend that each representation, warranty, and covenant contained herein shall have independent significance.  If any party has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the party has not breached shall not detract from or mitigate the fact that the party is in breach of the first representation, warranty, or covenant.

IN WITNESS WHEREOF, the undersigned have duly executed this Contribution Agreement as of the date set forth above.

**First United Health, LLC**

By: _____
      Name:
      Title:

**Alpha Cepheus, LLC**

By: _____
      Name:
      Title:

6

## EXHIBIT B-1

**AC PLEDGE AGREEMENT**

EXECUTION COPY

# PLEDGE AND SECURITY AGREEMENT

dated as of November 24, 2016

by and between

**ALPHA CEPHEUS, LLC**
as Grantor,

in favor of

**CC CAPITAL CHT HOLDCO LLC,**
as Secured Party

# TABLE OF CONTENTS

Page

1.  Definitions. .................................................................................................................... 1

2.  Assignment, Pledge and Grant of Security Interest. .......................................................... 2

3.  Obligations Secured. ......................................................................................................... 3

4.  Use of Collateral. .............................................................................................................. 3

5.  Remedies. .......................................................................................................................... 4

6.  Remedies Cumulative; Delay Not Waiver. ....................................................................... 5

7.  Marshalling. ...................................................................................................................... 5

8.  Representations and Warranties of Grantor. ...................................................................... 6

9.  Covenants of Grantor. ....................................................................................................... 6

10. Certain Consents and Waivers. ......................................................................................... 7

11. Attorney-in-Fact. ............................................................................................................... 8

12. Perfection; Further Assurances. ........................................................................................ 9

13. [Reserved]. ....................................................................................................................... 10

14. Notices. ............................................................................................................................ 10

15. Continuing Assignment and Security Interest. ............................................................... 11

16. Termination. ..................................................................................................................... 11

17. Severability. ..................................................................................................................... 11

18. Successors and Assigns. ................................................................................................... 11

19. Amendment. ..................................................................................................................... 11

20. Headings. .......................................................................................................................... 11

21. Attorneys' Fees. ............................................................................................................... 12

22. GOVERNING LAW; WAIVER OF JURY; JURISDICTION. ....................................... 12

23. References to Other Documents. ...................................................................................... 12

24. Information Concerning Collateral. .................................................................................. 12

25. Agreement for Security Purposes. ................................................................. 12

26. Remedies Cumulative. ................................................................................. 12

27. Delay Not Waiver. ...................................................................................... 12

28. Execution in Counterparts; Electronic Delivery. ............................................ 13

29. Entire Agreement. ....................................................................................... 13

30. Anti-Deficiency. ......................................................................................... 13

31. Other Secured Parties. ................................................................................ 13

## PLEDGE AND SECURITY AGREEMENT

This PLEDGE AND SECURITY AGREEMENT, dated as of November 24, 2016 (this "Agreement"), is entered into by and between Alpha Cepheus, LLC, a Delaware limited liability company ("Grantor"), in favor of CC Capital CHT Holdco LLC, a Delaware limited liability company ("Secured Party"), for its benefit and the benefit of the Other Secured Parties.

RECITALS:

A.      The Grantor is a party to that certain Subscription Agreement, dated as of even date hereof (as may be amended, restated, modified and supplemented from time to time, the "Subscription Agreement"), with Secured Party.

B.      Grantor owns 100% of the equity interests in CHT Holdco, LLC, a Delaware limited liability company (the "Company"), as such equity interests are designated as 24,765,352 Class A Units (as defined in the LLC Agreement) and 4,645,758 Class B Units (as defined in the LLC Agreement) and are set forth in Schedule I (the "Membership Interests") pursuant to that certain Limited Liability Company Agreement of the Company, dated as of even date herewith (as such agreement may be amended, amended and restated, supplemented or otherwise modified and in effect from time to time, the "LLC Agreement").

C.      It is a requirement under the Subscription Agreement that the Grantor execute and deliver this Agreement.

AGREEMENT:

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Grantor hereby agrees with the Secured Party as follows:

1.      Definitions.

(a)      The following terms used herein shall have the following meanings:

"Event of Default" means (a) a material breach by any Seller of its covenants under the Subscription Agreement that are to be satisfied prior to or at the Closing and such breach continues for 5 days after the earlier of Grantor (i) becoming aware of the existence of such breach or (ii) receiving notice from Secured Party of the existence of such breach, and (b) the failure by any Seller to make an indemnification payment to a Subscriber Indemnitee under the Subscription Agreement within 5 days after the earlier of (i) the written acceptance by a Seller of an indemnity claim made by a Subscriber Indemnitee under the Subscription Agreement or (ii) a rendering by the Arbitrator of an Award confirming Seller's obligation to make an indemnity payment under the Subscription Agreement.

"Obligations" means (a) the covenants of the Sellers under the Subscription Agreement that are to be satisfied prior to or at the Closing, and (b) the Sellers' indemnity obligations under the Subscription Agreement.

"Other Secured Parties" means each of the Subscriber Indemnities under the Subscription Agreement.

"UCC" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of Delaware; provided, however, in the event that, by reason of mandatory provisions of law, any or all of the perfection or priority of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Delaware, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions related to such provisions.

(b)     Each other capitalized term used and not otherwise defined herein shall have the meaning assigned to such term (whether directly or by reference to another agreement or document) in the Subscription Agreement, and unless otherwise defined in accordance with the foregoing, all capitalized terms that are defined in the UCC and used but not otherwise defined herein shall have the respective meanings given to those terms in the UCC.

2.     Assignment, Pledge and Grant of Security Interest.

(a)     The Grantor, as collateral security for the performance and prompt payment in full when due of all Obligations, does hereby assign, grant and pledge to Secured Party, for its own benefit and for the benefit of the Other Secured Parties, a security interest in and continuing lien on all the rights, title and interest of Grantor in, to and under all of the following, whether now existing or hereafter from time to time arising and whether now owned or hereafter from time to time acquired by Grantor (collectively, the "Collateral"):

(i)     The LLC Agreement, as it may be amended, restated, supplemented or otherwise modified from time to time and all of Grantor's rights thereunder;

(ii)     the Membership Interests and any and all certificates representing the Membership Interests, and all dividends, cash, options, warrants, Instruments, Chattel Paper, any Accounts, General Intangibles and any other rights, property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for the Membership Interests, including (A) all additional membership interests or other equity interest of Grantor in the Company, at any time acquired by Grantor in connection with the foregoing, and the certificates representing such additional membership interests or other equity interest of Grantor in the Company (any such additional membership interests or other equity interest of Grantor in the Company shall constitute part of the Membership Interests), and all dividends, cash, options, warrants, Instruments, Chattel Paper, any Accounts, General Intangibles and any other rights, property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such membership interests or such equity interest of Grantor in the Company; (B) all of Grantor's rights to receive all income, gain, profit, loss or other items allocated or distributed to Grantor under the LLC Agreement in connection with the foregoing; (C) all rights to receive all distributions of any nature whatsoever by Grantor with respect to such Membership Interests; (D) all of Grantor's capital or ownership interest, including capital accounts, in the Company, in connection with the Membership Interests and the foregoing, and all accounts, deposits or credits of any kind with the Company in connection with the Membership Interests and the foregoing; (E) all of Grantor's voting rights in or rights to control or direct the affairs of the Company in connection with the Membership Interests and the foregoing; (F) all of Grantor's right, title and interest, as a member of the Company in connection with the Membership Interests and the foregoing, in or to any and all of the Company's assets or properties; (G) all other right, title and interest in or to the Company, and all rights to receive income, profit or other distributions from the Company, of any nature whatsoever, in each case, as such rights are derived from Grantor's Membership Interests in the Company; (H) all claims of

2

Grantor for damages arising out of or for breach of or default relating to the Collateral (including under or in connection with the LLC Agreement); (I) all rights of Grantor to terminate, amend, supplement, modify or waive performance under the LLC Agreement, to perform thereunder and to compel performance and otherwise exercise all remedies thereunder in connection with the Membership Interests and the foregoing; (J) all other rights, powers, privileges, interests, claims and other property in any manner arising out of or relating to any of the foregoing, in whatever kind or character (including any tangible or intangible property or interests therein) and whether provided by contract or available under applicable law; and (K) all replacements, renewals or substitutions of any of the above; and

(iii)    the Proceeds of all of the foregoing, including (A) all rights of Grantor to receive moneys due and to become due under or pursuant to the Collateral; (B) all claims of Grantor for damages with respect to the Membership Interests arising out of or for breach of or default under the LLC Agreement or any other Collateral; (D) all rights of Grantor to terminate, amend, supplement, modify or waive performance under the LLC Agreement, to perform thereunder and to compel performance and otherwise exercise all remedies thereunder in connection with the Membership Interests and the foregoing; and (E) to the extent not included in the foregoing, all proceeds receivable or received when any and all of the foregoing Collateral is sold, collected, exchanged or otherwise disposed, whether voluntarily or involuntarily.

(b)    All certificates, notes and other instruments representing or evidencing any Collateral (including the certificates described on Schedule I hereto) shall be delivered to and held by or on behalf of, and, in the case of notes, endorsed to the order of Secured Party or its respective designee pursuant hereto, in the manner set forth in Section 12(a) of this Agreement.

(c)    Notwithstanding anything to the contrary contained herein, Grantor shall remain liable under the LLC Agreement to perform all of the obligations undertaken by it thereunder, to the extent applicable, all in accordance with and pursuant to the terms and provisions thereof, and Secured Party shall have no obligation or liability under such LLC Agreement by reason of or arising out of this Agreement, nor shall Secured Party be required or obligated in any manner to perform or fulfill any obligations of Grantor thereunder or to make any payment, or to make any inquiry as to the nature or sufficiency of any payment received by it, or present or file any claim, or take any action to collect or enforce the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(d)    The granting of the foregoing security interest does not make Secured Party a successor to Grantor as the member of the Company, and none of Secured Party or any of its successors or assigns hereunder shall be deemed to have become a member of the Company by accepting this Agreement or exercising any right granted herein unless and until such time, if any, when Secured Party or any such successor or assign expressly becomes a member in the Company after a foreclosure upon the Collateral. Notwithstanding anything herein to the contrary, none of Secured Party or any of its successors or assigns shall be deemed to have assumed or otherwise become liable for any debts or obligations of any of the Company or of Grantor by virtue of the security interest granted hereunder (except to the extent (with respect to the Company only), if any, that Secured Party or any of its successors or assigns hereafter expressly becomes a member in the Company after a foreclosure upon the Collateral).

3.    Obligations Secured. This Agreement and all of the Collateral secure the payment and performance when due of all Obligations.

4.    Use of Collateral. So long as no Event of Default has occurred and is continuing, Grantor