Thomas R. Califano, Esq.
Richard A. Chesley, Esq. (admitted *pro hac vice*)
**DLA PIPER LLP (US)**
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile:  (212) 335-4501
thomas.califano@dlapiper.com
richard.chesley@dlapiper.com

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Orion HealthCorp, Inc. | : | Case No. 18-71748 (AST) |
| Constellation Healthcare Technologies, Inc. | : | Case No. 18-71749 (AST) |
| NEMS Acquisition, LLC | : | Case No. 18-71750 (AST) |
| Northeast Medical Solutions, LLC | : | Case No. 18-71751 (AST) |
| NEMS West Virginia, LLC | : | Case No. 18-71752 (AST) |
| Physicians Practice Plus, LLC | : | Case No. 18-71753 (AST) |
| Physicians Practice Plus Holdings, LLC | : | Case No. 18-71754 (AST) |
| Medical Billing Services, Inc. | : | Case No. 18-71755 (AST) |
| Rand Medical Billing, Inc. | : | Case No. 18-71756 (AST) |
| RMI Physician Services Corporation | : | Case No. 18-71757 (AST) |
| Western Skies Practice Management, Inc. | : | Case No. 18-71758 (AST) |
| Integrated Physician Solutions, Inc. | : | Case No. 18-71759 (AST) |
| NYNM Acquisition, LLC | : | Case No. 18-71760 (AST) |
| Northstar FHA, LLC | : | Case No. 18-71761 (AST) |
| Northstar First Health, LLC | : | Case No. 18-71762 (AST) |
| Vachette Business Services, LTD. | : | Case No. 18-71763 (AST) |
| MDRX Medical Billing, LLC | : | Case No. 18-71764 (AST) |
| Vega Medical Professionals, LLC | : | Case No. 18-71765 (AST) |
| Allegiance Consulting Associates, LLC | : | Case No. 18-71766 (AST) |
| Allegiance Billing & Consulting, LLC | : | Case No. 18-71767 (AST) |
| Phoenix Health, LLC | : | Case No. 18-71789 (AST) |
| New York Network Management, L.L.C. | : | Case No. 18-74545 (AST) |
| | : | |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------------------------x

ORION HEALTHCORP, INC.                                                   :   Adv. Pro. No. 18-08104
CONSTELLATION HEALTHCARE TECHNOLOGIES, INC.       :
NEMS ACQUISITION, LLC                                               :
NORTHEAST MEDICAL SOLUTIONS, LLC                        :
NEMS WEST VIRGINIA, LLC                                           :
PHYSICIANS PRACTICE PLUS, LLC                                :
PHYSICIANS PRACTICE PLUS HOLDINGS, LLC             :
MEDICAL BILLING SERVICES, INC.                               :
RAND MEDICAL BILLING, INC.                                     :
RMI PHYSICIAN SERVICES CORPORATION                   :
WESTERN SKIES PRACTICE MANAGEMENT, INC.        :
INTEGRATED PHYSICIAN SOLUTIONS, INC.                :
NYNM ACQUISITION, LLC                                             :
NORTHSTAR FHA, LLC                                                  :
NORTHSTAR FIRST HEALTH, LLC                                :
VACHETTE BUSINESS SERVICES, LTD.                         :
MDRX MEDICAL BILLING, LLC                                    :
VEGA MEDICAL PROFESSIONALS, LLC                       :
ALLEGIANCE CONSULTING ASSOCIATES, LLC          :
ALLEGIANCE BILLING & CONSULTING, LLC              :
PHOENIX HEALTH, LLC                                                 :
NEW YORK NETWORK MANAGEMENT, L.L.C.,           :
                                                                                       :
                                    Plaintiffs,                             :
            v.                                                                       :
                                                                                       :
ROBINSON BROG LEINWAND GREENE GENOVESE      :
 & GLUCK P.C., A. MITCHELL GREENE, AND ADAM       :
GREENE,                                                                           :
                                    Defendants.                          :
-------------------------------------------------------------------x

# DEBTORS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ....................................................................................................... 4

    A.    The Parties ............................................................................................ 4

    B.    The Fraudulent Schemes..................................................................... 5

    C.    Robinson Brog's Involvement in the Fraudulent Schemes.................... 6

            i.    The sham acquisitions.............................................................7

            ii.    The IOLA escrow account .......................................................8

            iii.    The real estate purchases .......................................................9

LEGAL STANDARD.................................................................................................9

ARGUMENT ......................................................................................................... 12

I.    THE *WAGONER* RULE AND THE *IN PARI DELICTO* DOCTRINE DO NOT
    BAR THE DEBTORS' CLAIMS............................................................... 12

    A.    Choice of Law.................................................................................... 12

            i.    New Jersey law applies to all claims. ....................................12

            ii.    Under New Jersey Law, the *in pari delicto* defense does not bar
                the Debtors' claims. ..............................................................15

    B.    If Any Questions Remain Regarding the Inapplicability of New York
        Law, the Motion Must Be Denied....................................................... 17

            i.    To the extent Defendants contend that New York law applies,
                the choice-of-law decision is not ripe. ....................................17

            ii.    The adverse interest exception applies to New York's Wagoner
                Rule and the *in pari delicto* defense. ....................................18

II.    THE RELEASE DOES NOT PRECLUDE THIS ACTION ........................... 19

    A.    The Debtors Are Not a Releasing Party............................................... 19

    B.    To The Extent Further Questions Remain, The Release Is Ambiguous and
        Cannot Be Used to Shield Defendants Through a Motion to Dismiss. ................ 21

III.    SUFFICIENCY OF PLEADING.......................................................................................... 22

    A.    The Debtors State a Claim for Legal Malpractice. ................................................ 22

    B.    The Debtors State a Claim for Aiding and Abetting Breach of Fiduciary
        Duty........................................................................................................................ 25

        i.    Rule (9)(b)'s particularity requirement does not apply.............................25

        ii.    Even if Rule 9(b) does apply, the Debtors adequately plead
            "actual knowledge" and "substantial assistance" elements. ......................26

    C.    The Debtors State a Claim for Breach of Fiduciary Duty. ................................... 28

    D.    The Debtors State a Claim for Unjust Enrichment. .............................................. 30

IV.    OBJECTION TO ROBINSON BROG'S CLAIMS ......................................................... 30

CONCLUSION................................................................................................................................32

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 1031 Tax Grp., LLC,*
　420 B.R. 178 (Bankr. S.D.N.Y. 2009) ...................................................................18

*Achtman v. Kirby, McInerney & Squire, LLP,*
　464 F.3d 328 (2d Cir. 2006)...............................................................................23

*Adelphia Recovery Tr. v. Bank of Am., N.A.,*
　624 F. Supp. 2d 292 (S.D.N.Y. 2009).................................................................26

*Allied Irish Banks, PLC v. Citibank, N.A.,*
　No. 03-CV-3748, 2015 WL 4104703 (S.D.N.Y. June 30, 2015) ...........................18

*Alpha Cepheus, LLC, et al., v. Chinh Chu, et al.,*
　No. 3:18-cv-14322 (D.N.J. Sept. 26, 2018)..........................................................13

*Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.,*
　821 F.3d 352 (2d Cir. 2016)................................................................................10

*Appriva Shareholder Litigation Co., LLC v. EV3, Inc.,*
　937 A.2d 1275 (Del. 2007) .................................................................................21

*Ashcroft v. Iqbal,*
　556 U.S. 662 (2009).............................................................................................10

*Babcock v. Jackson,*
　191 N.E.2d 279 (N.Y. 1963)................................................................................14

*Barnett v. Schwartz,*
　848 N.Y.S.2d 663 (N.Y. App. Div. 2007) ............................................................24

*Bogart v. Nat'l Cmty. Banks, Inc.,*
　Civ. No. 90-5032, 1992 WL 203788 (D.N.J. Apr. 25, 1992) ................................27

*Bondi v. Citigroup, Inc.,*
　32 A.3d 1158 (N.J. App. Div. 2011).....................................................................15

*Bondi v. Citigroup, Inc.,*
　No. BER-L-10902-04, 2005 WL 975856 (N.J. Super. Ct. Law Div.
　Feb. 28, 2005) ....................................................................................................16

*Bristol-Myers Squibb Co. v. Matrix Labs. Limited,*
　No. 15–1922–cv, 2016 WL 3553442 (2d Cir. June 30, 2016) ...............................17

*Capitol First Corp. v. Todd*,
    No. CIV A 04-6439 MLC, 2006 WL 3827329 (D.N.J. Dec. 27, 2006) ..................................26

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002)....................................................................................9, 10, 11

*Ciocca v. Neff*,
    No. 02CIV-5067(LTS)(HBP), 2005 WL 1473819 (S.D.N.Y. June 22, 2005) .......................28

*Concord Capital Mgt., LLC v. Bank of Am., N.A.*,
    102 A.D.3d 406 (N.Y. App. Div. 2013) .............................................................................19

*Conklin v. Hannoch Weisman*,
    678 A.2d 1060 (N.J. 1996).................................................................................................24

*Cromer Finance Ltd. v. Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001).................................................................................28

*Crowley v. Chait*,
    No. CIV.85-2441(HAA), 2004 WL 5434953 (D.N.J. Aug. 25, 2004) .................................29

*Curley v. AMR Corp.*,
    153 F.3d 5 (2d Cir. 1998)...................................................................................................13

*Equiom (Isle of Man) Ltd. v. Jacobs*,
    No. CV 16-4362, 2017 WL 6550481 (D.N.J. Dec. 22, 2017) ..............................................28

*Erickson v. Pardus*,
    551 U.S. 89 (2007).............................................................................................................9

*Faulkner v. Beer*,
    463 F.3d 130 (2d Cir. 2006)...............................................................................................11

*Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*,
    414 F.3d 325 (2d Cir. 2005)...............................................................................................13

*In re Food Mgmt. Grp., LLC*,
    280 B.R. 677 (Bankr. S.D.N.Y. 2008) ................................................................................10

*In re Fruehauf Trailer Corp.*,
    250 B.R. 168 (D. Del. 2000)...............................................................................................22

*Gallara v. Koskovich*,
    836 A.2d 840 (N.J. Super. 2003) .......................................................................................24

*Glob. Network Commc'ns, Inc. v. City of New York*,
    458 F.3d 150 (2d Cir. 2006)...............................................................................................10

*GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc.*,
    449 F.3d 377 (2d Cir. 2006).................................................................................14

*Greenberger v. Varus Ventures LLC*,
    No. CIV.A. 13-7920, 2014 WL 6991993 (D.N.J. Dec. 10, 2014).............................30

*Hacohen v. Bolliger Ltd.*,
    108 A.D.2d 357 (N.Y. Sup. Ct. 1985) .................................................................14

*In re ICP Strategic Credit Income Fund Ltd.*,
    568 B.R. 596 (S.D.N.Y. 2017)............................................................................19

*Jurista v. Amerinox Processing, Inc.*,
    492 B.R. 707 (D.N.J. 2013) ...............................................................................30

*Kaufman v. Cohen*,
    760 N.Y.S.2d 157 (N.Y. App. Div. 2003) .............................................................26

*Kirschner v. KPMG LLP*,
    938 N.E.2d 941 (N.Y. 2010) ....................................................................13, 18, 19

*Kramer v. Time Warner*,
    937 F.2d 767 (2d Cir. 1991)..........................................................................11, 12

*Lerner v. Fleet Bank, N.A.*,
    318 F.3d 113 (2d Cir. 2003)...............................................................................10

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006)...............................................................................27

*In re Luxottica Group S.p.A., Sec. Litig.*,
    293 F. Supp. 2d 224 (E.D.N.Y. 2003) ..................................................................25

*Meserole v. Sony Corp. of Am., Inc.*,
    No. 08 Cv. 8987(RPP), 2009 WL 1403933 (S.D.N.Y. May 19, 2009) .....................17

*Milbank, Tweed, Hadley & McCloy v. Boon*,
    13 F.3d 537 (2d Cir. 1994).................................................................................28

*Milwaukee Engraving Co., Inc.*,
    219 F.3d 635 (2d Cir. 2000)...............................................................................32

*NCP Litigation Trust v. KPMG LLP*,
    901 A.2d 871 (N.J. 2006)................................................................14, 15, 16, 17

*Neogenix Oncology, Inc. v. Gordon*,
    133 F. Supp. 3d 539 (E.D.N.Y. 2015) ..................................................................24

*Official Comm. of Unsecured Creditors v. Donaldson, Lufkin*
    *& Jenrette Sec. Corp.*,
    No. 00 Civ. 8688, 2002 WL 362794 (S.D.N.Y. Mar. 6, 2002) ...............................25

*Oster v. Kirschner*,
    905 N.Y.S.2d 69 (N.Y. App. Div. 2010) ...............................27

*Padula v. Lilarn Properties Corp.*,
    644 N.E.2d 1001 (N.Y. 1994)...............................14

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
    89 F. Supp. 3d 602 (S.D.N.Y. 2015)...............................11

*Rahl v. Bande*,
    328 B.R. 387 (S.D.N.Y. 2005)...............................25

*Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer*,
    867 N.E.2d 385 (N.Y. 2007)...............................24

*Sage Realty Corp. v. Proskauer Rose L.L.P.*,
    251 A.D.2d 35 (N.Y. App. Div. 1998) ...............................28

*Schupak v. Florescue*,
    No. 92 Civ. 1189 (JFK), 1993 WL 256572 (S.D.N.Y. July 8, 1993) ...............................26

*Silsby v. Icahn*,
    17 F. Supp. 3d 348 (S.D.N.Y. 2014)...............................11

*Sitar v. Sitar*,
    854 N.Y.S.2d 536 (N.Y. App. Div. 2008) ...............................24

*Speedmark Transp., Inc. v. Mui*,
    778 F. Supp. 2d 439 (S.D.N.Y. 2011)...............................17

*Estate of Spencer v. Gavin*,
    946 A.2d 1051 (N.J. Super. Ct. App. Div. 2008)...............................29

*Symbol Techs., Inc. v. Deloitte & Touche, LLP*,
    69 A.D.3d 191 (N.Y. App. Div. 2009) ...............................18

*Thabault v. Chait*,
    541 F.3d 512 (3d Cir. 2008)...............................15

*Travelers Indem. Co. v. Levy*,
    195 A.D.2d 35 (N.Y. Sup. Ct. 1993) ...............................14

*Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*,
    789 F.2d 98 (2d Cir. 1986)...............................31

*Tucker v. Albun, Inc.*,
  No. CIV. A. 97C-04-025, 1999 WL 1241073 (Del. Super. Ct. Sept. 27, 1999)....................21

*U.S. Securities and Exchange Commission v. Parmjit Parmar, et al.*,
  No. 2:18-cv-09284 (D.N.J. May 16, 2018)...........................................................................12

*United States v. 50 Riverside Boulevard, Unit 21B New York, New, York, et al.*,
  No. 2:18-cv-09293 (D.N.J. May 16, 2018)...........................................................................12

*United States v. Parmjit Parmar, et al.*,
  No. 18-8040 (D.N.J May 15, 2018).......................................................................................12

*Villager Pond, Inc. v. Town of Darien*,
  56 F.3d 375 (2d Cir. 1995)....................................................................................................10

*Watts v. Jackson Hewitt Tax Serv. Inc.*,
  579 F. Supp. 2d 334 (E.D.N.Y. 2008) ..................................................................................11

*Wiatt v. Winston & Strawn LLP*,
  838 F. Supp. 2d 296 (D.N.J. 2012) ..................................................................................23, 24

*Xu Hong Bin v. Heckmann Corp.*,
  No. 4637-CC, 2009 WL 3440004 (Del. Ch. 2009)...............................................................22

**Statutes**

11 U.S.C. § 328(c) .................................................................................................................32

17 C.F.R 240.12b-2.................................................................................................................20

**Other Authorities**

Fed. R. Bankr. P. 3001 ...........................................................................................................31

Fed. R. Bankr. P. 3001(f)........................................................................................................31

Fed. R. Bankr. P. 3007 ...........................................................................................................31

Fed. R. Bankr. P. 7001 ...........................................................................................................32

Fed. R. Bankr. P. 7002 .............................................................................................................9

Fed. R. Bankr. P. 7012 .......................................................................................................9, 31

Fed. R. Bankr. P. 7056 ...........................................................................................................12

Fed. R. Bankr. P. 9014 ...........................................................................................................31

Fed. R. Bankr. P. 9014(c) .......................................................................................................32

Fed. R. Civ. P. 8(a) ...................................................................................................25

Fed. R. Civ. P. 8(a)(2) ..............................................................................................26

Fed. R. Civ. P. 9(b) ............................................................................................25, 26

Fed. R. Civ. P. 12(b)(6) ....................................................................................9, 10, 21

http://www.robinsonbrog.com/section/contact_us .........................................................5

## PRELIMINARY STATEMENT[1]

The Debtors' former outside counsel, Robinson Brog Leinwand Greene Genovese & Gluck, P.C. ("Robinson Brog"), and two of its partners, A. Mitchell Greene and Adam Greene (collectively, the "Defendants"), were instrumental in furthering the brazenly fraudulent schemes perpetrated by Paul Parmar ("Parmar") and his lieutenants (collectively, "Former Management"). As alleged in the Complaint, Robinson Brog allowed its client, Parmar, to loot the Debtors, who were also clients of the firm, through a series of sham and fraudulent transactions.  As alleged in the Complaint, Robinson Brog acted well beyond the typical role of counsel, by, among other things, facilitating sham transactions, creating corporate entities after the fact and allowing its IOLA account to be used as Parmar's check book to "wash" his ill-gotten gains.  Accordingly, this is an action for legal malpractice, aiding and abetting breach of fiduciary duty, breach of fiduciary duty, and unjust enrichment against the Defendants, as well as the concomitant disallowance or subordination of a number of secured and priority proofs of claims asserted by Robinson Brog in the Debtors' chapter 11 cases (the "Bankruptcy Cases").  (Compl. ¶ 1.)

In a calculated effort to once again delay a determination of their culpability in the scheme orchestrated by Former Management, Defendants have filed a Motion to Dismiss (the "Motion") which is accompanied by an affidavit attaching nearly 500 pages of "evidence."  Thus, before even addressing the arguments set forth in the Motion, it is important to note that this procedural salvo is, at best, a thinly veiled motion for summary judgment.  As such, the Motion should be denied as premature, misguided, and legally deficient.

---

[1] All capitalized terms not otherwise defined in the Preliminary Statement shall have the meanings ascribed to them in the Complaint or this Response.

Before turning to the merits, or lack thereof, of the Motion, it is critical to highlight those factual assertions set forth in the Complaint that Defendants conveniently chose to ignore, and which of course must be taken as true for the purposes of evaluating the Motion:

- Defendants represented both the Debtors and Parmar in countless transactions and litigation matters without any proper waiver of the actual and real conflict of interest caused by such joint representation. (Compl. ¶¶ 45-46.)

- Defendants improperly maintained an IOLA account that was used as a conduit to transfer over $160 million, much of it for Parmar's sham transactions. (Compl. ¶¶ 87-99.) In fact, five days after Parmar was replaced by the Debtors' Board of Directors, Defendants distributed more than $5 million to Ranga Bhoomi, LLC, an entity that was formed by Defendants and used to funnel tens of millions of dollars to Parmar from the Debtors *through the Robinson Brog IOLA account*. (Compl. ¶¶ 54-56, 99.)

- Defendants were instrumental in a number of Parmar's personal real estate transactions that attempted to shield his ill-gotten gains (Compl. ¶¶ 100 *et seq*.), including the purchase of 2 River Terrace from the uncle of Robinson Brog's lead partner. (Compl. ¶ 109.)

Moreover, Defendants' efforts to minimize their direct role in aiding Parmar in orchestrating the sham transactions is belied again by the well-pleaded allegations contained in the Complaint:

- *Northstar*: Defendants assisted in the creation of the sham Northstar entities several months before they were acquired by Defendants' own client, CHT, for almost $18 million. (Compl. ¶¶ 62-64.) Defendants also served as counsel to Northstar in its acquisition of Vachette Business Services, Ltd. mere weeks before Northstar was acquired by CHT, solely in an effort to create a "legitimate" business to acquire. (Compl. ¶ 65.)

- *Phoenix*: Defendants assisted in the formation of Phoenix just one week prior to CHT's announcement of the acquisition of Phoenix for $14 million. (Compl. ¶ 69.) At the time of the acquisition, Defendants knew Phoenix did not have an EIN, offices, or operations. (Compl. ¶¶70-72.)

- *MDRX*: Defendants assisted in the formation of MDRX, a fake medical-billing business created by Former Management. (Compl. ¶ 76.) Just one month after CHT announced its acquisition of MDRX for $28 million, an EIN was issued to MDRX at the address of Robinson Brog. (Compl. ¶ 77.)

- ***Go-Private Transaction***: The IOLA Escrow Account maintained by Robinson Brog was the "piggy bank" for the funding of the Go-Private Transaction and, more critically, the distribution of over $45 million to Parmar-related entities, as well as to Robinson Brog itself. (Compl. ¶ 93). Much of these amounts were then used by Parmar and entities controlled by him to quickly purchase personal real estate, through transactions completed by the Defendants and the transfers of cash from the Robinson Brog IOLA account. (Compl. ¶ 95).

In addition to failing to address Debtors' well-pleaded facts, Defendants' Motion fails for three reasons. *First*, the Defendants place near wholesale reliance upon the Second Circuit's *Wagoner* rule, which effectively shields third parties (such as the Defendants) where management's conduct is imputed to the corporation, on the theory that the company cannot recover for wrongs that it committed through its agents. This argument fails for two very basic reasons. First, as pled in the Complaint, the law of New Jersey applies to the claims against the Defendants, which obviates the application of the *Wagoner* rule and the related doctrine of *in pari delicto* under New York law. And, even if these rules applied in the context of a motion to dismiss, based upon the well-pleaded allegations in the Complaint, these doctrines are irrelevant because the conduct of Parmar and his fellow fraudsters provided no benefit to the Debtors' estates.

*Second*, the Defendants attempt a "Hail Mary" by incredibly claiming that they were able to garner a full release from any and all of their malfeasance through the Voting and Support Agreement and Release of Claims executed in connection with the Go-Private Transaction. This argument first requires the creation of a fiction that would allow Parmar—who is the effective recipient of the release from stockholders in the Go-Private Transaction—to release Robinson Brog and its partners from *all conduct from the commencement of their hopelessly conflicted representation*. Of course, this theory simply ignores the allegations in the Complaint that are based on Robinson Brog's conduct well before and after the Go-Private Transaction that facilitated Parmar's scheme. Putting these facts aside, actual scrutiny of the language of the release defeats the Defendants' Motion.

*Third*, the Defendants only half-heartedly contend that the well-pleaded allegations contained in the Complaint fail to state causes of action for legal malpractice, aiding and abetting breach of fiduciary duty, breach of fiduciary duty, and unjust enrichment against the Defendants. Even the most cursory review of the Complaint, when judged against the applicable law and the pleadings standards, requires the denial of the Motion.

*Finally*, apparently having failed to actually review this Court's Turnover Order, Robinson Brog contends that the Debtors are somehow barred from objecting to their myriad proofs of claim. Of course, this argument has no merit, and thus the Debtors' objections to the proofs of claim must proceed.

In the end, what becomes abundantly clear is that the Motion is just the latest in Robinson Brog's efforts at obfuscation and delay. Fortunately, the applicable law does not countenance these efforts; discovery and an eventual trial on the merits must proceed. Accordingly, the Motion should be denied.

## BACKGROUND[2]

### A.    The Parties

The Debtors are a consolidated enterprise of several companies aggregated through a series of acquisitions, which operated in four key business lines: (a) outsourced revenue cycle management for physician practices, (b) physician practice management, (c) group purchasing services for physician practices, and (d) an independent practice association business. (Compl. ¶¶ 5-6.) Prior to the commencement of the Bankruptcy Cases, the Debtors' principal place of business was in New Jersey, and the acts and omissions that led to the fraudulent schemes occurred largely in New Jersey. (Compl. ¶ 7.)

---

[2] The applicable facts are set forth at length in the Complaint. Certain facts are repeated here for the Court's convenience.

Robinson Brog is a law firm and professional corporation that "serves clients throughout New York City as well as the tri-state area of New York, New Jersey and Connecticut."[3] A. Mitchell Greene and Adam Greene are partners at Robinson Brog. (Compl. ¶¶ 9-10.) As detailed in the Complaint, Defendants acted as the Debtors' outside general counsel from May 2012 through October 31 2017, when they were terminated. (Compl. ¶ 45.) At the same time, Defendants represented Parmar individually in myriad litigation and corporate matters. (Compl. ¶ 45.) Despite the concurrent representation, Defendants never sought nor obtained a waiver of unmistakable conflicts of interest. (Compl. ¶¶ 46, 51-52.)

### B.    The Fraudulent Schemes

The Debtors are victims of a large, complex, and brazenly fraudulent scheme perpetrated by Former Management:  Parmar, Sotirios "Sam" Zaharis and Ravi Chivukula. (Compl. ¶ 2.) As is now well-known, Former Management orchestrated an elaborate scheme to defraud investors out of hundreds of millions of dollars, which culminated in  a transaction to take private Constellation Healthcare Technologies, Inc. ("CHT")—a Debtor and the direct or indirect parent of all remaining Debtors ("Go-Private Transaction"). (Compl. ¶¶ 23, 33.)

In order to conceal their fraudulent activity, Former Management needed to present a positive picture of CHT's financial health. (Compl. ¶ 29.) To do so, Former Management sought to raise tens of millions of dollars in the public markets, purportedly to fund CHT's acquisitions of various operating businesses. In reality, a number of those entities either did not exist, but for Robinson Brog's help in creating the sham businesses, or had only a fraction of the operating income attributed to them. (Compl. ¶ 29.) Former Management orchestrated these equity raises not to benefit the Debtors, but rather, with Robinson Brog's assistance, funneled the proceeds of

---

[3] http://www.robinsonbrog.com/section/contact_us.

these secondary offerings through bank accounts they controlled, and used the money for a variety of purposes that had nothing to do with acquiring the purported targets. (Compl. ¶ 30.) Former Management went to great lengths to make it appear that these funds were revenue by, among things, falsifying and fabricating records, generating fake income streams and phony customers, and making material misrepresentations and omissions to private investment firms and others. (Compl. ¶ 32.)

These actions by Former Management caused a private investment firm, C.C. Capital, LLC, to value CHT at more than $300 million for purposes of financing the Go-Private Transaction. (Compl. ¶ 33.) On January 30, 2017, CHT consummated the Go-Private Transaction by obtaining financing from C.C. Capital totaling $82.5 million of cash (as equity) and $130 million in financing from certain institutional lenders (plus a $15 million commitment). The transaction valued CHT at $309.4 million, or $3.36 per share, a 45% premium to CHT's stock price. (Compl. ¶ 34.)

It did not take long for CHT's new owners to uncover Former Management's fraud, and in September 2017, Parmar resigned, and Zaharis and Chivukula were placed on administrative leave. (Compl. ¶¶ 36-40.) On March 16, 2018, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of New York. (Compl. ¶ 41.) Former Management is now the subject of far-reaching criminal and civil prosecution from the United States Department of Justice and the Securities and Exchange Commission in the District of New Jersey. (Compl. ¶¶ 2, 42-44.)

## C.    Robinson Brog's Involvement in the Fraudulent Schemes

The Defendants were instrumental to Former Management's fraudulent schemes in, among other ways: (1) providing material assistance in furthering the consummation of the sham transactions; (2) using Robinson Brog's IOLA Escrow Account as a conduit for conversion of the

Debtors' funds to Former Management and payment to themselves; and (3) aiding Former Management in funneling ill-gotten gains in multiple real estate transactions.

### i.    The sham acquisitions

With Robinson Brog's assistance, Former Management orchestrated three sham acquisitions to inflate CHT's revenues, which served as the foundation for the Go-Private transaction: Northstar, Phoenix, and MDRX. (Compl. ¶ 57.) Each transaction followed a similar pattern: CHT raised money for the purported acquisition through a secondary stock offering on the AIM sub-market of the London Stock Exchange; the target or acquired company was formed only shortly before the announced acquisition with the assistance of Defendants; and the funds raised for the acquisition were transferred through an escrow account maintained by Defendants. (Compl. ¶ 58.)

In May 2015, CHT raised approximately $15.8 million through a secondary offering on the AIM. (Compl. ¶ 60.) In June 2015, Defendants formed Northstar on behalf of Former Management; Northstar had no assets or operations at the time of its formation. (Compl. ¶ 62.) Four months later, CHT announced its acquisition of Northstar for almost $18 million. In order to complete the acquisition, Defendants also created Northstar FHA LLC ("Northstar FHA") and prepared an operating agreement on behalf of Former Management. (Compl. ¶¶ 63-64.) Ultimately, Former Management, with the assistance of Defendants, executed a "Unit Purchase Agreement" between and among Northstar, Northstar FHA, and a "Bobby Kumar"—the purported owner of all of Northstar's equity. (Compl. ¶ 64.) Defendants also served as counsel to Northstar in its acquisition of Vachette Business Services, Ltd. mere weeks before Northstar was acquired by Defendants' own client, CHT. (Compl. ¶ 65.) CHT acquired Northstar for total consideration of $17.39 million, almost $15 million more than Northstar paid that same month for Vachette. (Compl. ¶ 66.)

Two days after the announced Northstar transaction, CHT announced its acquisition of Phoenix Health LLC ("Phoenix"). (Compl. ¶ 67.) The press release stated that the acquisition was funded, in part, from the secondary equity offering conducted earlier in the year. (Compl. ¶ 67.) Defendants assisted in the formation of Phoenix just one week prior to CHT's announcement of the acquisition. (Compl. ¶ 69.) Phoenix was acquired by CHT for $14 million, despite not having an employer identification number ("EIN"), offices, or operations—facts known by the Defendants. (Compl. ¶¶ 70-72.)

On February 10, 2016, following a $37 million stock offering, CHT announced its acquisition of MDRX Medical Billing, LLC ("MDRX") for $28 million cash and an additional $2 million due to be paid over the following two years. (Compl. ¶ 73-74.) MDRX was a fabrication Former Management created from whole cloth, based on a genuine medical-billing business. (Compl. ¶76.) Robinson Brog filed MDRX's certificate of formation just two months before the acquisition (Compl. ¶75), and again, a month after CHT announced its acquisition, an EIN was issued to MDRX at the address of Robinson Brog (Compl. ¶ 77).

### ii. The IOLA escrow account

Dating back to at least 2013, Robinson Brog maintained an "interest on" lawyer escrow account with Wells Fargo Bank, N.A. (the "IOLA Escrow Account"). (Compl. ¶ 87.) Between 2013 and 2018, over $161 million was deposited into the IOLA Escrow Account, and approximately $159.5 million was distributed from the IOLA Escrow Account. Of these amounts, approximately $4.3 million was paid directly to Robinson Brog, including $2.5 million transferred on March 15, 2017, from proceeds of the Go-Private Transaction. (Compl. ¶ 89.) On multiple occasions, the IOLA Escrow Account was used to hold and distribute proceeds from the sham transactions and Go-Private Transaction. (Compl. ¶¶ 95-96.) On at least four occasions, funds were distributed by Robinson Brog from the IOLA Escrow Account to purchase real property for

Parmar personally.  (Compl. ¶¶ 95-96.)  Funds were also transferred to Ranga Bhoomi, the non-Debtor entity controlled by Parmar and formed by Robinson Brog.  (Compl. ¶ 94.)  Most audaciously, five days after Parmar resigned, Robinson Brog wired $5.4 million from the IOLA Escrow Account to Ranga Bhoomi.  (Compl. ¶ 99.)

### iii.    The real estate purchases

Parmar used the funds generated from the fraudulent stock offerings and the fraudulently induced Go-Private Transaction to purchase multiple real properties.  (Compl. ¶ 100.)  Parmar's diversion of the Debtors' funds would not have been possible without the representation and assistance of Robinson Brog.  (Compl. ¶¶ 103-134.)  First, the funding for the real estate transactions came directly from the fraudulent stock offerings and the Go-Private Transaction proceeds and passed through Robinson Brog's IOLA Escrow Account.  (Compl. ¶¶ 101, 107-108, 115, 118-119.)  Second, in addition to wiring the funds, Robinson Brog represented Parmar in the real estate negotiations, including one transaction with a relative of one of the Defendants.  (Compl. ¶¶ 103, 109, 113, 130-134.)

## LEGAL STANDARD

In ruling on a motion to dismiss made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure,[4] courts must accept all well-pleaded factual allegations in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  In addition, courts must "construe[] the complaint liberally" and "draw[] all reasonable inferences in the plaintiff's favor."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citation omitted).  To survive a motion to dismiss, a complaint need only set forth

---

[4] The Federal Rules of Civil Procedure are made applicable to bankruptcy cases under Rule 7002 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").  Rule 12(b)(6) of the Federal Rules of Civil Procedure is made applicable under Bankruptcy Rule 7012.

"sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Twombly*, 550 U.S. at 570). As a result, the question before this Court "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). A defendant moving for dismissal under Rule 12(b)(6) bears the burden of proof. *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003) (abrogation on other grounds recognized by *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016)).

In addition to accepting all well-pleaded factual allegations as true, absent very limited exceptions, courts cannot consider material outside of the complaint on a motion to dismiss. *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 154 (2d Cir. 2006). Recognizing, as they must, that the well-pleaded allegations in the Complaint defeat their Motion, it is important to first address the Defendants' attempt to shoehorn nearly 500 pages of evidence into two narrowly construed exceptions to the Rule 12 pleading requirements. (*See* Rice Decl. Exs. A-L.) Defendants initially contend that these extensive materials are somehow "integral" to the Complaint. (Mot. at 3). *See also In re Food Mgmt. Grp.*, *LLC*, 280 B.R. 677 (Bankr. S.D.N.Y. 2008). A document is "integral" to the complaint only where "the complaint relies heavily upon its terms and effects." *Chambers*, 282 F.3d at 153 (citations omitted). "[A] plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Id.* (emphasis in original).

The Defendants casually attempt to characterize the Go-Private Transaction documents as "integral" to the Complaint. (Mot. at 3.) Lost in this argument is the simple fact that the Go-

Private Transaction is far from the focal point of the Complaint. Rather, the Complaint is focused on Robinson Brog's active assistance in the sham transactions that **pre-dated** the Go-Private Transaction; Robinson Brog's hopeless conflicts of interests in representing the Debtors and Parmar in countless transactions and litigations; the improper use of the firm's IOLA Escrow Account for running over $160 million in and out over a period of five years; and Robinson Brog's integral involvement in assisting Parmar in spending his ill-gotten gains on multiple real estate transactions, including a transaction with one of the Defendants' relatives. Were this not enough, neither the Merger Agreement, nor any of the exhibits, including the Voting and Support Agreement and Release of Claims are mentioned, much less "relied upon," in the Complaint. Thus, if the Court were to consider these materials for the purposes of a motion to dismiss, it would "depriv[e] the parties of a fair adjudication of the claims by examining an incomplete record." *See Chambers*, 282 F.3d at 153; *see also Watts v. Jackson Hewitt Tax Serv. Inc.*, 579 F. Supp. 2d 334, 344 (E.D.N.Y. 2008) ("The court declines to transform this motion into one for summary judgment, finding that, without access to additional discovery, the plaintiffs lack sufficient notice to allow them to contest the defendants' disclosures properly."); *Faulkner v. Beer*, 463 F.3d 130, 135 (2d Cir. 2006).

Second, the Defendants assert that the Court can take judicial notice of "the contents of relevant public disclosure documents." (Mot. 3.) Courts may indeed take judicial notice of "public disclosure documents" that must be filed with the Securities and Exchange Commission ("SEC") and documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law." *Kramer v. Time Warner*, 937 F.2d 767 (2d Cir. 1991); *see also Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 607-08 (S.D.N.Y. 2015); *Silsby v. Icahn*, 17 F. Supp. 3d 348, 353-54 (S.D.N.Y. 2014). Here, however, it

is unclear which, if any, of the documents attached to the Rice Declaration are "public disclosure documents" or SEC disclosures. And of course, this is not a securities litigation where such judicial notice is central to the allegations in the underlying complaint.

Because the Defendants relied upon extraneous documents in their Motion, the Court should deny the Motion. In the alternative, if the Court wishes to convert the motion to dismiss into a motion for summary judgment under Bankruptcy Rule 7056, the Debtors respectfully submit that they should be afforded adequate opportunity to conduct necessary discovery and submit pertinent materials in opposition to the Motion. *See Kramer*, 937 F.2d at 773.

## ARGUMENT

I. **THE *WAGONER* RULE AND THE *IN PARI DELICTO* DOCTRINE DO NOT BAR THE DEBTORS' CLAIMS**

    A. **Choice of Law**

        *i.* **New Jersey law applies to all claims.**

Defendants attempt to make short shrift of the Complaint by claiming that it is barred by the Second Circuit's *Wagoner* Rule and the New York doctrine of *in pari delicto*. (Mot. at 11-15.) In making this argument, Defendants ignore the plain fact that various federal agencies have determined that the underlying schemes in question *occurred in New Jersey*. (Compl. ¶¶ 7, 42-44); *United States v. Parmjit Parmar, et al.*, No. 18-8040 (D.N.J May 15, 2018) ("Beginning in or about May 2015 through in or about September 2017, in the District of New Jersey and elsewhere, defendants . . . knowingly and intentionally conspired and agreed with each other and others to commit an offense against the United States, namely securities fraud . . . ."); *United States v. 50 Riverside Boulevard, Unit 21B New York, New, York, et al.*, No. 2:18-cv-09293 (D.N.J. May 16, 2018) ("Venue is proper in this district . . . because acts and omissions giving rise to the forfeiture occurred in the District of New Jersey."); *U.S. Securities and Exchange Commission v.*

*Parmjit Parmar, et al.*, No. 2:18-cv-09284 (D.N.J. May 16, 2018) ("Venue lies in this District . . . because Defendants reside in the District of New Jersey . . . , many of the acts, practices, events, transactions, communications, courses of business, and other matters alleged herein occurred in the District of New Jersey."). Furthermore, prior to the commencement of the Bankruptcy Cases, the Debtors' principal place of business was in New Jersey.[5] (Compl. ¶ 7.)

This Court applies the choice-of-law rules of the forum state. Thus, under New York law, the Court must resolve, as a threshold matter, whether there is an actual conflict between the bodies of law that each party seeks to have applied. *Curley v. AMR Corp.,* 153 F.3d 5, 12 (2d Cir. 1998). An actual conflict exists when a difference in the substantive law of each jurisdiction is relevant to, and has a significant possible effect on, the outcome of the suit. *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.,* 414 F.3d 325, 331 (2d Cir. 2005). If a conflict exists, then the court must conduct a choice-of-law analysis. *Curley,* 153 F.3d at 12.

While there is scant difference in the substantive law on the majority of the causes of action set forth in the Complaint, there are substantive conflicts between New York and New Jersey law concerning the *in pari delicto* defense. Under New York law, an agent's intentionally wrongful conduct is imputed to its principal unless the agent has "totally abandoned his principal's interests and [is] acting entirely for his own or another's purposes." *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 948 (N.Y. 2010) (quoting *Ctr. v. Hampton Affiliates, Inc.*, 488 N.E.2d 828, 830 (N.Y. 1985)). Imputation of that conduct may give rise to the defense of *in pari delicto* or application of *Wagoner's* prudential standing doctrine. *Id.* In contrast, under New Jersey law, one who is alleged

---

[5] It is also more than of passing interest that the Parmar entities have commenced litigation against the C.C. Capital parties **in the New Jersey courts**, claiming that New Jersey is the appropriate forum to adjudicate claims relating to the Go-Private Transaction. Complaint, *Alpha Cepheus, LLC, et al., v. Chinh Chu, et al.*, No. 3:18-cv-14322 (D.N.J. Sept. 26, 2018).

to have contributed to the misconduct cannot invoke imputation as a defense. *NCP Litigation Trust v. KPMG LLP*, 901 A.2d 871, 882 (N.J. 2006).

The choice-of-law principles of New York, the forum state in the present case, call for the application of an interest analysis to determine the governing law in the context of a tort. *See Padula v. Lilarn Properties Corp.*, 644 N.E.2d 1001 (N.Y. 1994). Where there is a conflict of law, New York courts "giv[e] controlling effect to the law of the jurisdiction which, because of its relation or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Babcock v. Jackson*, 191 N.E.2d 279 (N.Y. 1963); *see also Travelers Indem. Co. v. Levy*, 195 A.D.2d 35 (N.Y. Sup. Ct. 1993) (for choice of law matters relating to tort claims, New York focuses on which jurisdiction has the greater interest in a dispute). The interest analysis test relating to tort claims is as follows:

> [T]orts are divided into two types, those involving the appropriate standards of conduct, rules of the road, for example and those that relate to allocating losses that result from admittedly tortious conduct . . . such as those limiting damages in wrongful death actions, vicarious liability rules, or immunities from suit. If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders.

*GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 385 (2d Cir. 2006) (internal citations and quotation marks omitted); *see also Hacohen v. Bolliger Ltd.*, 108 A.D.2d 357 (N.Y. Sup. Ct. 1985) ("Where, as here, it is the defendant's standard of conduct that is to be judged, 'it is appropriate to look to the place of the tort so as to give effect to that jurisdiction's interest in regulating conduct within its borders . . . .'") (quoting *Bing v. Halstead*, 495 F. Supp. 517, 520 (S.D.N.Y. 1980)).

As alleged in the Complaint, prior to the commencement of the Bankruptcy Cases, the Debtors' principal place of business was in New Jersey, and the acts and omissions that led to the fraudulent schemes occurred largely in New Jersey. (Compl. ¶ 7.) The United States Department of Justice and the Securities and Exchange Commission have also made clear that New Jersey has the closet ties to Former Management and their fraudulent schemes. (Compl. ¶¶ 42-44.). Furthermore, New Jersey has an interest in enforcing its legal doctrines that protect the rights of companies and shareholders of companies which are located there Based upon applicable choice of law principles, the law of New Jersey, and not New York, should apply.

### ii.  Under New Jersey Law, the in pari delicto defense does not bar the Debtors' claims.

The basis of the *in pari delicto* defense is that management's misconduct must be imputed to the corporation, which is barred from recovering for a wrong it "essentially took part in." *See, e.g.*, *Bondi v. Citigroup, Inc.*, 32 A.3d 1158 (N.J. App. Div. 2011). However, under New Jersey law, one who is alleged to have contributed to the misconduct cannot invoke imputation as a defense. *NCP*, 901 A.2d at 882. In *NCP*, a litigation trust acting as a bankrupt corporation's successor-in-interest brought an action against the corporation's auditor to recover for negligent failure to uncover fraud by corporate officers. The New Jersey Supreme Court held that the purpose of the imputation doctrine is to "protect the innocent"—like innocent shareholders. *Id.* As such, the doctrine does not protect parties who contribute to the misconduct, because allowing wrongdoers to invoke the defense would fail to deter wrongdoing. *Id.* ("Allowing KPMG to avoid liability for its allegedly negligent conduct would not promote the purpose of the imputation doctrine—to protect the innocent."). Accordingly, the *NCP* Court found that an auditor who allegedly defrauded the corporation and its creditors was not an innocent party that the doctrine was intended to protect. *Id.; see also Thabault v. Chait*, 541 F.3d 512, 522 (3d Cir. 2008) (applying

*NCP* to preclude auditor from asserting *in pari delicto* doctrine in defense against professional negligence claim).

The Debtors allege that Defendants facilitated Former Management's fraudulent scheme. (Compl. ¶¶ 55-77, 87-99, 100-134.)  The allegations in the Complaint demonstrate that, like the auditor in *NCP*, the Defendants are complicit in Former Management's wrongdoing.  For this reason, Defendants cannot avail themselves of the imputation defense to avoid liability.  Because imputation is the basis for the *in pari delicto* doctrine, and because imputation is inapplicable here, so too is the defense of *in pari delicto*.

Moreover, under New Jersey law, the *in pari delicto* defense does not bar the Debtors' claims because Former Management acted in their own self-interest, not for the benefit of the Debtors.  Under New Jersey law, the adverse interest exception defeats the *in pari delicto* defense where the wrongful acts are carried out by rogue agents who act adversely to the interests of the principal.  *See Bondi v. Citigroup, Inc.*, No. BER-L-10902-04, 2005 WL 975856, at *14 (N.J. Super. Ct. Law Div. Feb. 28, 2005) ("[I]f the actions of management are adverse to the corporation and benefit management or a third party, a court will not impute those actions to the corporation."). In *NCP*, the New Jersey Supreme Court held that "inflating a corporation's revenues and enabling a corporation to continue in business 'past the point of insolvency' cannot be considered a benefit to the corporation."  901 A.2d at 888.

Here, the Complaint alleges that "[d]uring the entirety of their fraudulent schemes, Former Management totally abandoned the Debtors' interests and were acting solely for their own pecuniary gain." (Compl. ¶¶ 28, 30.)  The Complaint specifically details how Former Management orchestrated "large, complex, and brazen fraudulent schemes that resulted in the theft of over $300 million" and the demise of Debtors.  (Compl. ¶ 2.)  Furthermore, as alleged in the Complaint,

Former Management transferred the proceeds of the fraud from the Debtors to entities they controlled through the Robinson Brog IOLA account; thus benefitting personally from the fraud at the expense of the Debtors. (Compl. ¶¶ 90; 94-99.) Finally, even the Go-Private Transaction had the effect of lining Parmar (and Robinson Brog's pockets) while leaving the Debtors laden with $130 million of debt that it could never repay, let alone service. (Compl. ¶¶ 34-35; 89.) Under New Jersey law, allegations that Former Management's fraudulent schemes temporarily inflated the Debtors' revenues do not establish that the Debtors benefited from the fraud. *See NCP*, 901 A.2d at 888. For these reason, Defendants' imputation affirmative defense must fail, and their Motion must be denied.

**B.      If Any Questions Remain Regarding the Inapplicability of New York Law, the Motion Must Be Denied.**

> **i.      To the extent Defendants contend that New York law applies, the choice-of-law decision is not ripe.**

As noted, without any legal support, the Motion is based on the presumption that New York law should apply to all of the Debtors' claims. Debtors disagree. Consequently, Defendants are asking this Court to engage in a choice-of-law analysis at this early stage in the litigation where Defendants have not yet filed an answer to the Complaint and no discovery has been conducted. Choice-of-law determinations are fact-intensive inquiries that would be premature to resolve at the motion to dismiss stage. *See Speedmark Transp., Inc. v. Mui*, 778 F. Supp. 2d 439, 444 (S.D.N.Y. 2011) ("Such a choice-of-law determination is premature on this motion to dismiss, since the record lacks facts necessary to conduct the context-specific . . . analysis required by New York's choice-of-law principles."); *Meserole v. Sony Corp. of Am., Inc.*, No. 08 Cv. 8987(RPP), 2009 WL 1403933, at *3 n.6 (S.D.N.Y. May 19, 2009) ("[A]t this early stage of the litigation . . . a detailed choice of law analysis would be premature."); *Bristol-Myers Squibb Co. v. Matrix Labs. Limited*,

No. 15–1922–cv, 2016 WL 3553442, *3 (2d Cir. June 30, 2016) (summary order) (same).

Accordingly, Defendants' Motion is premature and should be denied.

> ii.    **The adverse interest exception applies to New York's Wagoner Rule and the in pari delicto defense.**

Even if the Court were to disregard the critical nexus of New Jersey to the underlying claims **and** determine that the choice-of-law analysis can occur at this stage without any evidentiary showing, the applicable law **still** does not support the Defendants' imputation defense.[6] Under New York law, an agent's conduct is not imputed where the agent has "totally abandoned its principal's interests and [is] acting entirely for his own or another's purpose." *Kirschner*, 938 N.E.2d at 952 (quotations omitted).  In other words, the adverse interest exception applies where the corporation is "the victim of a scheme undertaken by the agent to benefit himself or a third party personally." *Id.*; *see also Allied Irish Banks, PLC v. Citibank, N.A.*, No. 03-CV-3748, 2015 WL 4104703, at *8 (S.D.N.Y. June 30, 2015) (rejecting *in pari delicto* defense raised in summary judgment motion when fraud was "directed at defrauding [the company], not defrauding others on its behalf"); *Symbol Techs., Inc. v. Deloitte & Touche, LLP*, 69 A.D.3d 191, 198 (N.Y. App. Div. 2009) (denying motion to dismiss on basis of *in pari delicto* defense where company sufficiently alleged "that members of its senior management committed accounting fraud for their own benefit and totally abandoned its interest").

Here, Former Management's fraud was committed "against the corporation, rather than on its behalf."  *Kirschner*, 938 N.E.2d at 952.  As alleged in the Complaint, Former Management "totally abandoned the Debtors' interests" and acted entirely for their own benefit.  (Compl. ¶¶ 28, 30.)  Contrary to Defendants' unsupported claims that the Debtors benefited from the fraudulent

---

[6] Because the *Wagoner* Rule and the *in pari delicto* defense are "grounded in substantive agency law, and identical tests apply to both doctrines . . ." courts analyze the arguments together.  *In re 1031 Tax Grp., LLC*, 420 B.R. 178, 198 (Bankr. S.D.N.Y. 2009) (citing *In re Food Mgmt. Grp., LLC*, 380 B.R. 677, 692 (Bankr. S.D.N.Y. 2008)).

scheme, Debtors allege that Former Management's fraudulent scheme was used to *divert* company funds. (*See* Compl. ¶ 3.) Accordingly, the adverse interest exception bars Defendants' affirmative defense.[7]

## II.    THE RELEASE DOES NOT PRECLUDE THIS ACTION

### A.    The Debtors Are Not a Releasing Party.

Next, Defendants incredibly claim that they effectively have been released from the claims brought by Debtors in the Complaint due to the Voting and Support Agreement and Release of Claims ("Release Agreement") that was "integral" to the Go Private Merger Agreement. (Mot. at 3.) However, in attempting to reach this conclusion, Defendants gloss over the clearly stated intent of the Release Agreement, as well as the specific language of that agreement.

Defendants seek to create the impression that Debtor CHT, which was a "Released Party" under the Release Agreement by the Stockholders in the Go-Private Transaction, magically was also a Releasing Party—***as the Stockholder***—under the very same agreement. This sleight of hand would then have had effect of releasing a host of parties, including apparently Robinson Brog which is, of course, not identified in the Release Agreement. Recognizing as much, this convoluted argument is relegated to a footnote, where Defendants claim that CHT Holdco—through Parmar—signed the release both as the acquiring Stockholder, as well as the stockholder

---

[7] Unlike the plaintiff entities in *In re ICP Strategic Credit Income Fund Ltd.*, 568 B.R. 596, 612 (S.D.N.Y. 2017) and *Concord Capital Mgt., LLC v. Bank of Am., N.A.*, 102 A.D.3d 406 (N.Y. App. Div. 2013), the Debtors have not alleged that the Go-Private transaction "enable[d] the business to survive" or "preserve[d] an investment vehicle." The actions by Former Management were not merely "selfish" acts or "bad business decision[s]" that "caused the company's ultimate bankruptcy." *Concord Capital Mgt., LLC*, 102 A.D.3d at 406; *Kirschner*, 938 N.E.2d at 952, 953. To the contrary, Former Management's fraudulent schemes were entirely self-interested, and were  designed to, and as pled in the Complaint, line their own pockets. (Compl. ¶¶ 100, et seq.) Furthermore, Defendants' argument that the adverse interest exception should not apply is limited to the facts surrounding the Go-Private transaction. As detailed above, the Go-Private transaction was simply the culmination of Former Management's overall fraudulent scheme, to which the Defendants' assistance was integral.

of the acquired company, CHT.  (Mot. at 18.)  As sole support for this contention, Defendants rely upon a single signature page without any supporting evidence.  (Rice Decl. Ex. K.)

The contrived argument begins to collapse upon a review of the actual language of the Release Agreement, which states in relevant part:  "[T]he Stockholder on behalf of itself, and its affiliates, predecessors, successors, assigns, heirs, executors, legatees, administrators, beneficiaries, representatives and agents (the 'Releasing Parties'), fully, finally and irrevocably releases . . ." the Released Parties, which was defined as CHT, its affiliates and, among others, its "legal representatives."  (Rice Decl. Ex. K.)  In order to avoid the clear language of the Release Agreement, Defendants claim Debtor CHT is not only a Released Party, but also a "Releasing Party" as an "affiliate" of the Stockholder under the Release Agreement. (Mot. at 18.)

A closer read of the relevant documents belies this very notion.  The Release Agreement refers to the Merger Agreement throughout, including for undefined terms (of which "affiliate" is one), and notes that the Release Agreement is being entered into pursuant to and in support of the Merger Agreement.  (Rice Decl. Ex. K.)

The Merger Agreement provides that "Affiliate":

> has the meaning given to such term in Rule 12b-2 under the Exchange Act; provided that **(a) neither Parent, Sub nor any other member of the Purchaser Group shall be deemed to be Affiliates of any Acquired Corporation and (b) no Acquired Corporation shall be deemed to be an Affiliate of Parent, Sub or any other member of the Purchaser Group for any purpose hereunder.**

(Rice Decl. Ex. K.) (emphasis added).  Rule 12b-2 under the Exchange Act provides that an "affiliate" of, or a person "affiliated" with, a specified person, "is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified."  17 C.F.R. 240.12b-2.  "Purchaser Group" means Parent (CHT

Holdco, LLC), Sub (CHT Mergersub, Inc.), Paul Parmar, each Contributing Entity,[8] and C.C. Capital. "Acquired Corporations" means: (a) the Company (CHT); (b) each of the Company's Subsidiaries; and (c) any other Entity that has been merged with or into, or that is a predecessor to, any of the Entities identified in clauses "(a)" or "(b)" above.

Therefore, pursuant to the terms of the Merger Agreement, Debtor CHT is **not** an "Affiliate" of Stockholder, and Defendants cannot rely on the charade of CHT being an "affiliate" for purposes of the Release Agreement and no other purpose and, in so doing, conjure up a release for any claims from the beginning of Robinson Brog's conflicted engagement.

**B.    To The Extent Further Questions Remain, The Release Is Ambiguous and Cannot Be Used to Shield Defendants Through a Motion to Dismiss.**

What the above description makes clear is that either the Release Agreement is hopelessly inconsistent or that Parmar was actually seeking to obtain a release for himself and others from the Stockholders in the Go-Private Transaction, as well as then release himself and countless others, including Robinson Brog and its partners, with the stroke a pen for any claim or cause of action regardless of any nexus to the Go-Private Transaction.  Where the intent of the parties is not clear on the face of the release, the Court is presented with an issue of fact that is not properly resolved on a motion to dismiss.[9]  *Appriva Shareholder Litigation Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1291-92 (Del. 2007) ("Even if the Superior Court considered the defendants' interpretation [of the release] more reasonable than the plaintiffs', on a Rule 12(b)(6) motion it was error to select the 'more reasonable' interpretation as legally controlling."); *Tucker v. Albun, Inc.*, No. CIV. A. 97C-04-025, 1999 WL 1241073, at *4 (Del. Super. Ct. Sept. 27, 1999) (denying motion for summary

---

[8] The "Contributing Entities" include Blue Mountain Healthcare, LLC, First United Health LLC, Constellation Health LLC and Alpha Cepheus, LLC.

[9] Defendants cite New York law in support of their argument that the Release Agreement precludes this action but fail to realize the "integral" Release Agreement contains a Delaware choice-of-law provision.  (Rice Decl. Ex. K, at 10.)  New York law is inapplicable to the interpretation of the agreement.

judgment because "the release [was] ambiguous and the legal effects of the release [could] only be evaluated after a full airing of the facts"); *In re Fruehauf Trailer Corp.,* 250 B.R. 168, 194 (D. Del. 2000) ("If a release is ambiguous its interpretation becomes a question of fact and the fact finder may consider extrinsic evidence.").

To the extent Defendants are correct on the interpretation of the Release Agreement, in effect, they are contending that they are now released from all claims by the Debtors by the signature of Parmar; the architect of Former Management's fraudulent schemes—who was not only receiving a release under the Release Agreement, but also providing one. Simply put, Defendants cannot shield themselves from liability under the cover of Former Management's fraudulent schemes. *See, e.g., Xu Hong Bin v. Heckmann Corp.*, No. 4637-CC, 2009 WL 3440004, at *6 (Del. Ch. 2009) (former director had committed fraud; accordingly, the former director had a fiduciary duty to inform the company that the release would cover his alleged fraudulent conduct because the information would have been material to company's decision to enter into the agreement).

## III.    SUFFICIENCY OF PLEADING[10]

### A.    The Debtors State a Claim for Legal Malpractice.

Next, the Defendants contend that the Debtors failed to meet their pleading threshold on each of the substantive causes of action.  (Mot. at 19-20).  This *pro forma* objection fails as a matter of law under the well-pleaded allegations of the Complaint.

To establish a claim for legal malpractice, the Debtors must establish sufficient facts showing: (1) the existence of an attorney-client relationship creating a duty of care upon the

---

[10] With one exception, Debtors are not aware of conflicts of New Jersey and New York law related to the Debtors' claims for legal malpractice, aiding and abetting breach of fiduciary duty, breach of fiduciary duty, and unjust enrichment.  The Debtors cite New York and New Jersey law throughout this section.

attorney, (2) the breach of that duty, and (3) proximate causation. *Wiatt v. Winston & Strawn LLP*, 838 F. Supp. 2d 296, 309 (D.N.J. 2012) (citing *Conklin v. Hannoch Weisman*, 145 N.J. 395, 416 (1996)); *see also Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) ("To state a claim for legal malpractice under New York law, a plaintiff must allege: (1) attorney negligence; (2) which is the proximate cause of a loss; and (3) actual damages.").

First, the Debtors sufficiently allege that Defendants performed legal services with negligence. Defendants distort their representation of Former Management and claim that Debtors' legal malpractice count rests on Robinson Brog's failure to "uncover" Former Management's fraudulent schemes. (Mot. at 19-20.) To the contrary, the Debtors allege that Defendants breached their duty by **both** serving as counsel to the Debtors and Parmar without a waiver and in conscious disregard of this fundamental conflict of interest (Compl. ¶¶ 45-46) **and** *facilitating* Former Management's fraud. Specifically, the Debtors allege that Defendants failed to exercise the skill, prudence, and diligence commonly possessed by members of the legal profession by (1) forming sham entities (Compl. ¶¶ 57-77); (2) preparing sham acquisition documents (Compl. ¶¶ 55-77); (3) using the IOLA Escrow Account as a conduit for the conversion of the Debtors' funds to Former Management and payment to themselves (Compl. ¶¶ 87-99); and (4) helping Former Management funnel Go-Private Transaction proceeds towards personal real estate purchases (Compl. ¶¶ 100-134). Not surprisingly, Defendants simply ignore the well-pleaded allegations of the Complaint, which properly allege causes of action for legal malpractice under both New Jersey and New York law. *Wiatt*, 838 F. Supp. 2d 296, 309 (denying motion to dismiss legal malpractice claim where plaintiff adequately alleged conflict of interest, failure to disclose the conflict of interest, failure to monitor or manage plaintiff's assets and financial losses, and that said failures were a substantial factor in plaintiff's inability to recover financial losses).

*Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer*, 867 N.E.2d 385, 387 (N.Y. 2007) (setting

forth standards for a legal malpractice claim in New York); *see also Sitar v. Sitar,* 854 N.Y.S.2d

536 (N.Y. App. Div. 2008) (holding that complaint asserted valid cause of action for legal practice

due to conflict of interest as attorney possessed important information that should have been

conveyed to injured client).

Second, the Debtors sufficiently allege that Defendants' malpractice was the proximate

cause of the Debtors' losses.   Under New Jersey law, Debtors must allege that Defendants'

negligent conduct was a "substantial factor" contributing to their financial loss.   *Wiatt*, 838 F.

Supp. at 310.

> The substantial factor test accounts for the fact that there can be any
> number of intervening causes between the initial wrongful act and
> the final injurious consequence and does not require an unsevered
> connecting link between the negligent conduct and the ultimate
> harm. The test is thus suited for legal malpractice cases in which
> inadequate or inaccurate legal advice is alleged to be a concurrent
> cause of harm.

*Conklin v. Hannoch Weisman*, 678 A.2d 1060, 1072 (N.J. 1996); *Gallara v. Koskovich*, 836 A.2d

840, 853 (N.J. Super. 2003) ("'A proximate cause need not be the sole cause of harm.  It suffices

if it is a substantial contributing factor in the harm suffered.'") (quoting *Perez v. Wyeth*

*Laboratories, Inc.*, 734 A.2d 1245 (N.J. 1999)).

The conclusion is no different were New York law to be applied, as New York law requires

"but-for" causation in attorney malpractice claims.  *See Barnett v. Schwartz*, 848 N.Y.S.2d 663,

667 (N.Y. App. Div. 2007) (holding that "but-for" causation in a legal malpractice action does not

require a greater degree of causation than in an ordinary negligence action).  However, under New

York law "it is not necessary to demonstrate *sole causation* in order to demonstrate proximate but-

for causation."  *Neogenix Oncology, Inc. v. Gordon*, 133 F. Supp. 3d 539, 550 (E.D.N.Y. 2015)

(holding that corporation plausibly pleaded proximate cause in action against CFO, members of

its business advisory board, and its former attorneys where illegal fundraising program ultimately forced corporation into bankruptcy) (quoting *Smartix Int'l Corp. v. Garrubbo, Romankow & Capese, P.C.*, No. 06 CIV. 1501 (JGK), 2009 WL 857467, at *4 (S.D.N.Y. Mar. 31, 2009)).  Here, Debtors allege that but for Defendants' substantial assistance, Former Management's fraudulent scheme would never have come into fruition.  (Compl. ¶ 3.)  Regardless of whether New York or New Jersey law applies, the Debtors have adequately linked the wrongful acts of the Defendants to the Debtors' ultimate injuries.

**B.    The Debtors State a Claim for Aiding and Abetting Breach of Fiduciary Duty.**

*i.    Rule (9)(b)'s particularity requirement does not apply.*

Next, the Defendants appear to claim that Rule 9(b) of the Federal Rules of Civil Procedure somehow precludes the Debtors' claim for aiding and abetting the breach of fiduciary duty.  This Rule "is a special pleading requirement and contrary to the general approach of simplified pleading adopted by the federal rules, its scope of application should be construed narrowly and not extended to other legal theories or defenses." *Rahl v. Bande*, 328 B.R. 387, 412-13 (S.D.N.Y. 2005) (quoting *Strougo on Behalf of Brazil Fund, Inc. v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783, 805 (S.D.N.Y. 1997)), *rev'd in part on other grounds*.  As such, Rule 9(b)'s heightened pleading standard is applicable to breach of fiduciary claims and aiding and abetting breach of fiduciary duty only when the breach is premised on a *defendant's* fraudulent conduct. *See, e.g.*, *Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 00 Civ. 8688, 2002 WL 362794, at *8 (S.D.N.Y. Mar. 6, 2002) (holding that general pleading standards set out by Rule 8(a), rather than heightened pleading standards of Rule 9(b), apply to breach of fiduciary duty claims where defendant's conduct may be found to have breached its fiduciary duty "by conduct not amounting to fraud, such as breaching its duties of care, disclosure and loyalty"); *In re Luxottica Group S.p.A., Sec. Litig.*, 293 F. Supp. 2d 224, 238 (E.D.N.Y. 2003) (holding that

Rule 9(b) does not apply where a plaintiff alleges that defendants breached their fiduciary duties but does not allege fraud); *Schupak v. Florescue*, No. 92 Civ. 1189 (JFK), 1993 WL 256572 at *2-*3 (S.D.N.Y. July 8, 1993) ("Rule 9(b) is not applicable to breach of fiduciary duty claims . . . it applies only to . . . claims sounding in fraud.") (quotations omitted).

Of course here, there are no allegations of fraud against Defendants; the asserted claims against Defendants are for legal malpractice, aiding and abetting breach of fiduciary duty, breach of fiduciary duty, and unjust enrichment. The Debtors' breach of fiduciary duty claim is grounded in Former Management's duties of loyalty and care to the Debtors, Defendants' actual knowledge of such fiduciary duties, and Defendants' substantial assistance to Former Management in breaching their fiduciary duties to Debtors. (Compl. ¶¶ 142-144.) Accordingly, pursuant to Rule 8(a)(2), a short and plain statement of the claim is sufficient, and the Complaint meets this standard. *See* Fed. R. Civ. P. 8(a)(2).

> ## ii.    Even if Rule 9(b) does apply, the Debtors adequately plead "actual knowledge" and "substantial assistance" elements.

To be found liable for aiding and abetting a breach of fiduciary duty, (1) a defendant must know that the other's conduct constituted such a breach, (2) and substantially assist or encourage the other in committing that breach, and (3) there must be damages resulting from the breach. *Capitol First Corp. v. Todd*, No. CIV A 04-6439 MLC, 2006 WL 3827329, at *13 (D.N.J. Dec. 27, 2006) (citing *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.,* 296 F.3d 164, 174 (3d Cir. 2002)); *see also Kaufman v. Cohen*, 760 N.Y.S.2d 157, 169 (N.Y. App. Div. 2003). Under Rule 9(b), "knowledge . . . and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Accordingly, "if a party pleads facts leading to a 'substantial inference' that will be enough" to satisfy the actual knowledge element of aiding and abetting breach of fiduciary duty. *Adelphia Recovery Tr. v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 314

(S.D.N.Y. 2009) (plaintiff adequately pleaded actual knowledge by pleading facts which constituted strong circumstantial evidence that defendant banks were aware of the fraud) (citing *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006)); *see also Oster v. Kirschner*, 905 N.Y.S.2d 69, 72 (N.Y. App. Div. 2010) ("This Court has stated that actual knowledge need only be pleaded generally, cognizant, particularly at the pre-discovery stage, that a plaintiff lacks access to the very discovery materials which would illuminate a defendant's state of mind."); *Bogart v. Nat'l Cmty. Banks, Inc.*, Civ. No. 90-5032, 1992 WL 203788, at *7 (D.N.J. Apr. 25, 1992) (holding that general allegations that defendants had actual knowledge of false and misleading statements, or acted with reckless disregard for the truth were sufficient). Furthermore, aiding and abetting a breach of fiduciary duty does not depend on knowledge of outright fraud. *See Lerner*, 459 F.3d at 294-95. Instead, the knowledge required is of a breach of duty. *Id.*

The allegations as pled amply demonstrate that Defendants had actual knowledge of Former Management's breaches of their fiduciary duties. The Complaint alleges that Robinson Brog knew of Former Management's breaches (Compl. ¶ 144), and supports this allegation with very specific facts that create a "substantial inference" of Defendants' actual knowledge. The Complaint adequately demonstrates Defendants had actual knowledge of Former Management's breaches through their active involvement in preparing and filing certificates of incorporation for three sham entities (Compl. ¶¶ 57-77), assisting in the preparation of sham acquisition documents (Compl. ¶¶ 57-77), using the IOLA Escrow Account as a conduit for the conversion of the Debtors' funds to Former Management (Compl. ¶¶ 87-99), serving as the escrow agent in connection with the receipt and misappropriation of over $46 million relating to the fraudulent stock offerings and Go-Private Transaction (Compl. ¶¶ 87-99), and helping Former Management funnel Go-Private Transaction proceeds towards Parmar's personal real estate purchases (Compl. ¶¶ 100-134).

Seeking to reprise their proximate causation argument, Defendants also claim that Robinson Brog only performed "routine legal services" that do not amount to "substantial assistance" necessary to state a claim for aiding and abetting breach of fiduciary duty. (Mot. at 24.) *See Cromer Finance Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001) ("Substantial assistance requires the plaintiff to allege that the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated."). This allegation flies in the face of the record that confirms the Defendants' critical role in Former Management's fraudulent schemes and breaches of fiduciary duties and their handsome reward (over $4 million in fees) for this work. (*See* Compl. ¶¶ 55-77, 87-99, 100-134.)

### C.    The Debtors State a Claim for Breach of Fiduciary Duty.

To establish a claim for breach of fiduciary duty, a plaintiff must allege: "(1) the existence of a fiduciary relationship between the parties; (2) the breach of the duty imposed by that relationship; and (3) damages or harm to the plaintiff caused by said breach." *Equiom (Isle of Man) Ltd. v. Jacobs*, No. CV 16-4362 (CCC-JBC), 2017 WL 6550481, at *3 (D.N.J. Dec. 22, 2017) (quoting *SalandStacy Corp. v. Freeney*, No. 11-3439, 2012 WL 959473, at *12 (D.N.J. Mar. 21, 2012)). In order to "prevail on a claim of breach of fiduciary duty, plaintiffs must demonstrate a conflict of interest which amounted merely to a 'substantial factor' in their loss . . . ." *Ciocca v. Neff*, No. 02CIV-5067(LTS)(HBP), 2005 WL 1473819, at *6 (S.D.N.Y. June 22, 2005) (quoting *Estate of Re v. Kornstein Veisz & Wexler*, 958 F. Supp. 907, 924 (S.D.N.Y.1997)); *see also Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994) ("Milbank cannot enjoy impunity by showing that [client's] losses *might* have resulted from other possible causes."). For the purposes of the Complaint, it is critical to note that an attorney's conflict of interest is actionable as a breach of fiduciary duty. *See Sage Realty Corp. v. Proskauer Rose L.L.P.*, 251

A.D.2d 35, 36 (N.Y. App. Div. 1998); *Estate of Spencer v. Gavin*, 946 A.2d 1051, 1063 (N.J. Super. Ct. App. Div. 2008).

Here, the Debtors sufficiently allege a causal link between Robinson Brog's disloyal conduct and the Debtors' losses. The Debtors allege that Defendants simultaneously represented Former Management and the Debtors in numerous matters without even the hint of adequate procedures. These representations created numerous conflicts of interests and divided loyalties. (Compl. ¶¶ 45, 151-152.) Moreover, Defendants "never discussed the risks of simultaneous representations with the Debtors, never advised the Debtors about the existence of these conflicts of interest" and never sought or obtained the Debtors' informed consent. (Compl. ¶¶ 46, 152.) Contrary to Defendants' Motion, the Debtors' allegations do not end there. Instead of alerting their client to Former Management's activities, the Defendants enabled them. (Compl. ¶ 3-4, 59, 87, 101, 154.) As the Complaint alleges, had Defendants alerted the Debtors of Former Management's fraudulent schemes, the Debtors could and would have taken action to remove Former Management and stop the fraud. (Compl. ¶ 153.) In fact, Defendants continued to assist Former Management even after the fraud was discovered, including the transfer of over $5 million to the shell entity of Parmar—Ranga Bhoomi, LLC—that they helped to create. (*See* Compl. ¶¶ 54-56; 99.) The Debtors have adequately pled that Defendants' concurrent representation of Former Management and the Debtors amounted to a substantial factor in their losses; thus, Defendants' motion to dismiss the breach of fiduciary duty claim must be denied.

To the extent there is a question whether the Defendants' actions or inactions caused the Debtors harm, then the Motion must be denied. *See Crowley v. Chait*, No. CIV.85-2441(HAA), 2004 WL 5434953, at *7 (D.N.J. Aug. 25, 2004) ("In general, the issue of proximate cause is left

to the jury for its factual determination.") (citing *Jakelsky v. Friehling*, 33 F. Supp. 2d 359, 365 (D.N.J. 1999)).

### D.    The Debtors State a Claim for Unjust Enrichment.

The Debtors must allege three elements to properly state a claim for unjust enrichment: (1) the defendant received a benefit, (2) at the plaintiff's expense, and (3) under circumstances that would make it unjust for the defendant to retain the benefit. *Jurista v. Amerinox Processing, Inc.,* 492 B.R. 707, 754 (D.N.J. 2013). The doctrine is based on "the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Greenberger v. Varus Ventures LLC*, No. CIV.A. 13-7920, 2014 WL 6991993, at *9 (D.N.J. Dec. 10, 2014) (quoting *Associates Commercial Corp. v. Wallia,* 511 A.2d 709 (N.J. Super. Ct. App. Div. 1986)).

Based upon information and belief, all legal fees for Robinson Brog's representation of Former Management were paid from proceeds of the Debtors. (Compl. ¶ 156.) These allegations, combined with Defendants' concurrent representation of the Debtors and Former Management, are sufficient to continue to discovery, and Defendants' Motion to dismiss the unjust enrichment claim must be denied.

## IV.    OBJECTION TO ROBINSON BROG'S CLAIMS

Finally, the Defendants argue that the Debtors' objection to Robinson Brog's proofs of claim should be dismissed, and the claims allowed, simply by virtue of the Court's Turnover Order.[11] In making this argument, Robinson Brog entirely misconstrues the Turnover Order. Specifically, Robinson Brog was granted administrative expense priority for its unpaid attorney's fees and expenses, subject to certain terms and conditions. In particular, Robinson Brog was

---

[11] "Turnover Order" refers to the *Order Concerning Debtors' Motion Pursuant to 11 U.S.C. §§ 542(a) and 542(e) Regarding Turnover of Property of the Estates and Establishing Procedures for Administrative Expense Claims*, dated May 25, 2018 [Docket No. 256].

required to "file a proof of claim in conformity with Bankruptcy Rule 3001 in the amount of its prepetition unpaid attorney's fees and expenses itemized as to each Debtor for which fees and expenses were incurred but remained unpaid at the petition date, and separately filed in the case of each Debtor for which fees are claimed."  The deadline to serve such claims was June 29, 2018. (Turnover Order ¶¶ 1-2.)  While Robinson Brog's proofs of claim are entitled to prima facie validity under Bankruptcy Rule 3001(f), the next paragraph of the Turnover Over clearly afforded parties in interest with the right to file an objection to such proofs of claim.  (*Id.*)  This is precisely what the Debtors have done in the Complaint.

Nothing in the Court's Turnover Order protects Robinson Brog's claims from objection; in fact, it requires Robinson Brog to provide detail supporting those claims.  The claims filed by Robinson Brog are devoid of the necessary detail as required by the Turnover Order.  (Compl. ¶ 163.)  For example, there is no explanation or justification for Robinson Brog's allocation of prepetition fees and expenses among the Debtors.  Moreover, Robinson Brog's claims are not entitled to administrative expense priority because Robinson Brog clearly did not provide a benefit to the estates but rather facilitated the Debtors' demise.  (Compl. ¶¶ 55-77, 87-99, 100-134.)  In fact, Robinson Brog makes no attempt whatsoever to demonstrate a benefit to the estates, which is fundamental to allowance of an administrative expense priority claim.  *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986) ("[A]n expense is administrative only if it arises out of a transaction between the creditor and the bankrupt's trustee or debtor in possession, and 'only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business.'" (citations omitted)).  Accordingly, Court V of the Complaint should not be dismissed.[12]

---

[12] In addition, a claim objection is not the proper subject of a motion to dismiss. Claim objections, which are governed by Bankruptcy Rule 3007, are contested matters under Bankruptcy Rule 9014.  Bankruptcy Rule 7012, which provides

## **CONCLUSION**

For the forgoing reasons, the Debtors respectfully request that the Court deny Defendants'

Motion in its entirety.


Dated:      October 15, 2018                    Respectfully submitted,
            New York, New York

                                                **DLA PIPER LLP (US)**

                                                */s/ Thomas R. Califano*
                                                Thomas R. Califano (6144)
                                                DLA Piper LLP (US)
                                                1251 Avenue of the Americas
                                                New York, New York 10020-1104
                                                Telephone: (212) 335-4500
                                                Facsimile:  (212) 335-4501
                                                E-mail:  thomas.califano@dlapiper.com

                                                *Counsel to the Debtors and*
                                                *Debtors in Possession*

---

for judgment on the pleadings, is not incorporated in the applicable Part VII sections listed in Bankruptcy Rule 9014(c). The Debtors included the claim objection as Count V of the Complaint in the interest of judicial economy, and it is not subject to dismissal on the pleadings. However, to the extent the Court determines that the allegations in the Complaint render the claim objection part of the adversary proceeding under Bankruptcy Rule 7001, and therefore subject to a motion to dismiss, there are numerous factual issues that would preclude such dismissal at this point in time. Any decision whether to allow Robinson Brog's claims necessarily must await a determination of its liability on the other claims that are the subject of the Complaint. *See* 11 U.S.C. § 328(c); *Milwaukee Engraving Co., Inc.*, 219 F.3d 635 (2d Cir. 2000). The same is true with respect to the Debtors' claim for equitable subordination, which is not relevant unless and until Robinson Brog has an allowed claim.